11 CV 1333

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WING F. CHAU and HARDING ADVISORY LLC, | |
| Plaintiffs, | COMPLAINT |
| v. | Civil Action No. |
| MICHAEL LEWIS, STEVEN EISMAN, and W.W. NORTON & COMPANY, INC., | JURY TRIAL DEMANDED |
| Defendants. | |

RECEIVED
FEB 25 2011
U.S.D.C. S.D. N.Y.
COMPLETED

Plaintiffs Wing F. Chau and Harding Advisory LLC bring this complaint against

defendants Michael Lewis, Steven Eisman, and W.W. Norton & Company, Inc.

Plaintiffs allege as follows:

## INTRODUCTION

1.  This is a suit against best-selling author Michael Lewis, his publisher, and one of

the sources for his book, *The Big Short: Inside the Doomsday Machine* – a so-called

"character-driven narrative brimming with indignation and dark humor" about the global

financial crisis that began unfolding in 2007.  In sharing his purported insider's view of

the mortgage market meltdown, Lewis made false and defamatory statements about an

experienced investment professional, Wing Chau, and his firm, Harding Advisory LLC.

Through this suit, Mr. Chau and Harding seek to redress that wrong.

2.  *The Big Short* has been an incredibly popular book.  Its hardcover edition spent

six weeks at number 1 on the *New York Times*' list of hardcover nonfiction bestsellers,

and its paperback edition has already spent two weeks near the top of that list for

paperbacks. The book has been sold internationally and translated into multiple languages. Brad Pitt's production company, Plan B Entertainment, Inc., has bought the movie rights and is working with Paramount Pictures Corporation to produce the film. *The Big Short*'s popularity has made the harm to plaintiffs all the more severe.

## PARTIES

3.     Plaintiff Wing Chau is an experienced financial professional, with particular expertise in the management of fixed income assets known as collateralized debt obligations ("CDOs"). In the course of his career, he has held a number of significant positions at prominent firms, including Prudential Securities Inc., Salomon Brothers Inc., Salomon Smith Barney Inc., SG Cowen Securities Corporation, New York Life Investment Management, and Nomura Securities International, Inc. He received his M.B.A. from the highly regarded graduate school of business at Babson College and a B.A. in Economics from the University of Rhode Island. Mr. Chau is the president and principal of Harding Advisory LLC. He is a citizen of New Jersey.

4.     Plaintiff Harding Advisory LLC ("Harding") is an asset manager specializing in CDOs. At the height of the CDO market, Harding ranked among the top CDO managers, along with other well-known firms such as BlackRock Financial Management Inc., TCW Asset Management Co., Vanderbilt Capital Advisors LLC, Aladdin Capital Management LLC, GSC Partners, and Credit Suisse Alternative Capital. It employed a team of highly skilled and experienced investment professionals. Harding is a limited liability company organized under the laws of Delaware, with its principal place of business in Morristown, New Jersey. Harding's sole LLC members are Mr. Chau and his wife, both of whom are citizens of New Jersey.

5.     Defendant Michael Lewis is a best-selling author of 12 books and editor of a thirteenth. While *The Big Short* and Lewis's first book, *Liar's Poker: Rising Through the Wreckage on Wall Street,* concern the financial world, most of his other books concern a variety of unrelated topics such as fatherhood, baseball, Silicon Valley, football, and the 1996 presidential election.

6.     Lewis holds a B.A. in Art History from Princeton University and an M.Sc. from the London School of Economics. Lewis's experience in the financial services industry is limited to a short stint as a trainee and junior bond trader at Salomon Brothers more than 20 years ago – a job he admittedly "stumbled into" and for which he was ill-prepared. As Lewis concedes, "I'd never taken an accounting course, never run a business, never even had savings of my own to manage." Lewis admits that he was so unqualified that he feared that "someone was going to identify me, along with a lot of other people more or less like me, as a fraud."

7.     Lewis escaped any charges of fraud and went on to write *Liar's Poker*, concerning his brief experience at Salomon Brothers, which became a bestseller and made him rich. Lewis now writes and occasionally does television interviews from his family compound in Berkeley, California. He is a citizen of California.

8.     Defendant Steven Eisman is one of the principal sources Lewis relied on in writing *The Big Short*. Eisman is a manager for the hedge fund FrontPoint Partners LLC. After a short-lived legal career, Eisman – along with the family nanny – was hired by his parents to work as an analyst at Oppenheimer & Co., Inc. Eisman's parents paid him out of their own pockets while he worked at Oppenheimer to help him get started. Eisman then moved to a giant hedge fund, Chilton Investment Company, with the idea of

3

managing money himself and "bet[ting] on his own judgments." Chilton "had second thoughts" and "relegated him to his old role of analyzing companies for the guy who actually made the investment decisions." He eventually landed at FrontPoint. Eisman has a well-known reputation for being offensive. "Even on Wall Street people think he's rude and obnoxious and aggressive," according to his wife, who met him while she worked on Wall Street. Eisman is a citizen of New York.

9.     Defendant W.W. Norton & Company, Inc. ("Norton") published *The Big Short*. Norton is an established book publisher. It is a New York corporation with its principal place of business at 500 Fifth Avenue in New York, New York.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between plaintiffs and defendants and the amount in controversy exceeds $75,000, exclusive of costs and interest.

11.     Jurisdiction over Eisman is proper because he is a citizen of New York.

12.     Jurisdiction over Norton is proper because it is a New York corporation with its principal place of business in New York.

13.     Jurisdiction over Lewis is proper because he transacts business within New York and has contracted to supply goods or services in the state. Among other things, Lewis contracted with Norton, a New York publisher, to publish *The Big Short*, came to New York to do research for it, and intended its publication in New York.

14.     Venue in this district is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in the district.

4

## FACTUAL ALLEGATIONS

### The CDO Market

15.     The market for CDOs developed substantially as an outgrowth of the corporate and mortgage bond markets.  In essence, mortgage bonds are debt obligations backed by pools of mortgages.  The bondholders receive a promise of the payment of interest, principal, or some combination of the two from the pool.  CDOs are issuers of highly sophisticated and complex bonds backed by those pools of mortgage-backed bonds or other assets such as corporate bonds or loans.

16.     CDO managers such as Harding are responsible for assembling and maintaining the portfolio of assets held by a CDO, pursuant to the CDO's investment mandate.  Like many complex financial products, however, CDOs are not created through the work of a single individual or company, and those managed by Harding were no exception.

17.     CDOs are created through the work of underwriters, investors, accountants, attorneys, asset managers, and rating agencies, among others.   Typically, those stakeholders shape the CDO's structure and portfolio parameters, among other terms.

18.     The CDO manager selects the asset-backed bonds from among those available in the marketplace to create the pool of assets that will generate revenue for the CDO.  The manager then monitors those assets consistent with the CDO's established parameters.

19.     Between 2003 and 2007, Wall Street issued nearly $700 billion in CDOs that included mortgage-backed securities as collateral.  By 2007, the top 30 asset-backed CDO managers were managing approximately $350 billion.  The largest, TCW Asset Management Co., managed more than $35 billion.  And more than half of that group,

including TCW Asset Management Co., BlackRock Financial Management Inc., and Credit Suisse Alternative Capital, managed CDOs that had been issued in 2003 or earlier.

20.     By the time Lewis wrote *The Big Short*, the Wall Street he had gotten a brief glimpse of fresh out of school had morphed -- principally with the aid of technology -- several times over into something he did not fully comprehend.   That ignorance manifested itself in the false and defamatory statements Lewis made about Mr. Chau and Harding.

### Wing Chau and Harding

21.     Wing Chau and his immediate family are Chinese immigrants.  His father, Muk Loong Chau, fled Chairman Mao's China in 1953 to make a better life for his family in America – to pursue the American dream.  Mr. Chau was born in Hong Kong, where the family was waylaid for many years while awaiting a visa.  Eventually, the family immigrated to Rhode Island, where his father took various jobs at Chinese restaurants, usually working six days per week.  In time, Mr. Chau's father earned enough money to open his own small restaurant, where Mr. Chau and his siblings worked while growing up.

22.     Mr. Chau has spent his entire career in the financial services industry and has more than 15 years' experience in the fixed income sector.  During the course of his career, he has developed substantial expertise in structured finance and the trading of asset-backed securities.  He worked as a research analyst specializing in asset-backed securities at Salomon Smith Barney Inc. and Prudential Securities Inc., as a portfolio manager at New York Life Investment Management, and as a senior asset-backed

securities trader at Nomura Securities International, Inc. and SG Cowen Securities Corporation.

23.     Mr. Chau's broad range of experience in research, portfolio management, and trading provided him with the necessary background to create and lead his own asset management business.

24.     In 2004, Mr. Chau joined Maxim Group LLC – a broker-dealer that had more than $67 million in revenue that year – to develop a CDO management business for Maxim Advisory LLC.  At Maxim, Mr. Chau began to recruit the team of professionals who would continue to work with him at Harding.

25.     Maxim Advisory managed four CDOs, backed by almost $4 billion in securities.

26.     In 2006, Mr. Chau amicably parted ways with Maxim Group and formed Harding. He purchased Maxim Group's interest in Maxim Advisory and continued to manage its four CDOs through Harding.  In addition, Harding began to manage new CDOs of its own.

27.     Mr. Chau recruited a highly credentialed and experienced team to work with him at Harding.  Those individuals included:

- a portfolio manager from a large hedge fund, Watch Hill Investment Advisors, LLC, with 19 years of experience in fixed income, including mortgage-backed securities, and an M.S. in Mechanical Engineering from the Massachusetts Institute of Technology;

- a portfolio manager with more than a decade of experience in structured credit products – including participating in the development of quantitative models at J.P. Morgan & Co. – and an M.S. in Physics from Cornell University;

- an associate portfolio manager from a major hedge fund, BlueMountain Capital Management, LLC, who also had worked in the CDO Analytics Group at AMBAC Financial Group Inc. and had seven years of experience in structured finance and fixed income securities – and a B.A. in Economics from Columbia University;

- an attorney who had worked at a Big Four accounting firm and specialized in tax law at the prestigious law firm Covington & Burling, and had received a B.S. from the Wharton School of the University of Pennsylvania, a J.D. from Columbia Law School, and an LL.M. in Taxation from the New York University School of Law;

- an analyst at Fitch Ratings, who had worked as an investment analyst at MetLife, Inc., in the Asset-Backed Securities Group, and who had received a B.S. in Business Administration from Washington University in St. Louis;

- an analyst from Citigroup Inc. who had graduated with a B.S. in Applied Economics from Cornell University.

28.     Over time, Harding hired other well-credentialed professionals and grew to a total of 24 employees.

29.     Harding also worked with, and was advised by, several leading law firms, including Schulte Roth & Zabel and McDermott Will & Emery. Those professionals helped prepare detailed offering circulars for Harding CDOs in coordination with the underwriters' equally prestigious counsel, which included Freshfields Bruckhaus Deringer; Cadwalader, Wickersham & Taft; and Milbank, Tweed, Hadley & McCloy. In

addition, Harding worked with leading accounting firms, including Deloitte & Touche and Ernst & Young.

30.    Harding invested in powerful financial analysis technology.  It relied on Intex Solutions, the industry standard cash-flow modeling system, as well as Bloomberg Analytics and other software.

31.    Like many successful hedge funds and private equity firms in today's financial world, Harding was able to use technology to leverage its small but sophisticated team to engage in major transactions.

32.    In all, during 2006 and 2007, Harding managed 21 CDOs, including the four from Maxim Advisory.  Eight were high-grade, backed almost entirely by securities rated A- or better by Standard & Poor's or A3 or better by Moody's.  Two others were backed by corporate debt – collateral that had nothing to do with the mortgage market.  The rest were made up of a mix of assets, including residential mortgage-backed securities, other types of collateralized debt, and other CDOs.  By 2007, the total value of Harding's CDOs was approximately $21 billion.

33.    Harding was neither the first nor the largest CDO manager.  Its $21 billion in assets under management represented less than one-tenth of the overall market for CDOs invested in asset-backed securities.  In 2007, Harding ranked fourth in size among CDO managers generally, and second among CDO managers with substantial exposure to mortgage markets.  As noted above, moreover, many market participants had been active for years before Harding was formed.

34.    Mr. Chau and Harding had a significant stake in several of the CDOs they managed.  One or the other held an interest in five of Harding's 21 CDOs; each of those

positions was either held through liquidation or continues to be held today. In addition, Maxim Advisory held an interest in one of its four CDOs and retained the majority of that stake after Harding acquired the company.

35.     In assembling portfolios for CDOs, the Harding team employed sophisticated analyses that considered a variety of factors. Harding routinely refused to purchase securities that it deemed undesirable for the CDOs, rejecting significantly more than it accepted.

36.     In creating CDO portfolios, Harding developed "credit files" that contained documents reflecting Harding's analyses. The data in those credit files totals more than 20.6 gigabytes in approximately 24,000 electronic files – which, if printed, would total more than 848,000 pages.

37.     As a CDO manager, Harding was subject to review by the three major rating agencies – Moody's Investors Service, Inc., Standard & Poor's Financial Services LLC, and Fitch Ratings, Ltd. – as well as insurers such as MBIA, Inc., AMBAC Financial Group Inc., and Federal Guaranty Insurance Company. It was also subject to inspections and on-site reviews by institutional investors and bankers including Wachovia Bank, N.A. and Absolute Capital LLC.

38.     Harding worked with numerous CDO underwriters including Citigroup Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., Credit Suisse Securities (USA) LLC, Wachovia Bank, N.A., and ABN AMRO Inc. In some instances, Harding was approached by a sponsor to determine whether it was interested in managing a particular CDO, and Harding refused.

39.     The investors in Harding CDOs included prominent financial institutions, such as New York Life Investment Management, UBS AG, Hartford Insurance Management Company, and Deutsche Bank AG.

## The Mortgage-Backed Securities and CDO Market Meltdown

40.     While in hindsight many claim that the collapse of the mortgage-backed securities market was foretold by ample warning signs, there is much evidence to the contrary. In May 2007, for example, Bloomberg reported that 63 percent of banks, analysts, and investors saw a "buying opportunity" in mortgage-backed securities. And throughout the summer of 2007, both Federal Reserve Chairman Ben Bernanke and Treasury Secretary Henry Paulson publicly stated that any turmoil in the subprime mortgage markets would be contained, and not spread to more creditworthy mortgage-backed securities.

41.     Even Michael Lewis commented in 2007 that skepticism about the world economy was misplaced. In deriding the attendees at that year's Annual Meeting of the World Economic Forum in Davos, he wrote: "[I]f they really believe the markets mispriced risk, or were about to adjust, they must also believe they could make vast sums of money if they quit their day jobs and opened a hedge fund to take the other side of stupid trades. But they don't really believe that, or at least some of them would be off doing it, rather than spilling the beans to Bloomberg News."

42.     Sophisticated players in the CDO market shared the general belief that market conditions would not fall precipitously. Indeed, Fidelity Investments, one of the largest mutual fund and financial services groups in the world with a well-deserved reputation as a conservative and stable firm, launched its first CDO made up primarily of mortgage-

backed securities in 2007, and was committing its own capital to develop a CDO management platform.

43.     Notwithstanding the positive views of those sophisticated parties, the CDO market, along with the rest of the world economy, collapsed in the fall of 2007.  CDO issuance died out with the collapse.

### Lewis Decides to Write *The Big Short*

44.     Lewis is a story-teller.  His books are written in a fast-paced narrative style that purports to provide an "insider's account" – a style that has proved popular with the public.  Following *Liar's Poker*, Lewis wrote several books that made it to the *New York Times* bestseller list, including *Moneyball: The Art of Winning an Unfair Game*, which purports to tell the story of the Oakland Athletics' use of sabermetrics and statistics in baseball, *The New New Thing*, which purports to tell the story of entrepreneurship in Silicon Valley during the Internet boom, and *Pacific Rift: Why Americans and Japanese Don't Understand Each Other*, which purports to explain cultural differences between Japan and the United States in the 1990s.

45.     Lewis saw the world economic crisis – which he acknowledges was "a tragedy" – as another opportunity for a bestseller.  He thus embarked upon writing *The Big Short*.

46.     As Lewis was writing, other highly credible books on the financial crisis were already beginning to hit the bookstores.  For example, *Too Big to Fail: The Inside Story of How Wall Street and Washington Fought to Save the Financial System and Themselves*, written by respected *New York Times* financial reporter Andrew Ross Sorkin, was published in October 2009.  And *On the Brink: Inside the Race to Stop the Collapse of the Global Financial System*, by former Treasury Secretary Henry Paulson,

was published, following much advance hype, on February 1, 2010. Both books –
detailed and insightful accounts weighing in at 624 and 496 pages respectively – were
well received.

47.      Lewis took a different approach. Consistent with the style of his earlier books, he
set out to tell an engaging narrative about the financial crisis. He used his purported
"insider's view" style, peppered with quotes from colorful characters, to make the book
interesting.

48.      As a master story-teller, Lewis recognizes that colorful characters – especially
those depicted as heroes and villains – make for compelling reading. *The Big Short* is
structured accordingly. The book's central premise is that there were a handful of people
who were smart – or lucky – enough to bet against the mortgage bond market prior to its
collapse. One of those central, heroic figures is Eisman, whom the book portrays as a
kind of financial savant who foresaw the collapse of the market and made a fortune
betting against it. By contrast, the "villains" in the book are the CDO managers – and
specifically, Wing Chau – who were, according to Lewis, responsible for the crisis.

49.      While the publisher has billed *The Big Short* as "a fitting sequel to his #1 best-
selling *Liar's Poker*," the book is a "sequel" that was a long time coming. Whatever
knowledge of Wall Street Lewis had from working as a trainee and junior bond trader
some 20 years earlier had certainly become obsolete. The world had changed – Ronald
Reagan was no longer president and the Yankees no longer played in the "House that
Ruth Built." The Wall Street bond market likewise was no longer the world described by
Tom Wolfe in *The Bonfire of the Vanities* – an elitist environment of Ivy League men in
white button-down collar shirts and suspenders, talking into telephones while having their

shoes shined. Technological advances had propelled Wall Street to a place where new financial products based on complex algorithms could be invented virtually overnight, and nuclear physicists could move to the front of the job line, ahead of finance majors as well as art historians.

50.    To compensate for his outsider status and lack of knowledge, Lewis was forced to rely on other sources to provide information for his latest bestseller. One of those key sources was Eisman. Eisman was no doubt eager to talk to a famous author writing a book that would glorify him. As explained below, however, Eisman was a highly suspect source, for a number of reasons. Nevertheless, *The Big Short* mentions Eisman 350 times -- on average, more than once per page -- and quotes him liberally.

51.    Lewis and Norton were able to get *The Big Short* to print on March 15, 2010. The book is a slim 266 pages. The hardback first edition was so hurried, it did not even include an index -- something the publisher added subsequently in the paperback edition.

### The Defamatory Statements

52.    Consistent with the engaging narrative of heroes and villains Lewis set out to create, *The Big Short* purports to recount the thinking and conduct of a few investors like Eisman who foresaw the crash. And it purports to recount the actions and statements of the "villain" CDO managers, particularly Wing Chau, who supposedly brought about the calamity.

53.    The defamatory statements about Mr. Chau appear in Chapter 6 of *The Big Short*, "Spider-Man at The Venetian," specifically at pages 138-144. There, Lewis describes a dinner in Las Vegas attended by Eisman, Mr. Chau, and other participants in the CDO industry, and recounts statements that Mr. Chau supposedly made to Eisman during that

dinner. In the same breathless tone that permeates the rest of the book, this chapter makes a series of accusations of grave professional misconduct, incompetence, and irresponsibility. The relevant passage is reproduced in full in Exhibit A to this complaint and incorporated by reference herein.

54.     The passage begins with Eisman being introduced to Mr. Chau, who tells Eisman that he ran Harding Advisory. "When Eisman asked exactly what Harding Advisory advised, Wing Chau explained that he was a CDO manager. 'I had no idea there was such a thing as a CDO manager,' said Eisman. 'I didn't know there was anything to manage.'" The book then goes on to take false, and gratuitous, swipes at Mr. Chau's professional experience and appearance – claiming that he "spent most of his career working sleepy jobs at sleepy life insurance companies," and that he "was short with a Wall Street belly – not the bleacher bum's boiler but the discreet, necessary pouch of a squirrel just before winter."

55.     The book proceeds to describe the "ship of doom" Mr. Chau allegedly helped create. "It came as news to Eisman that this ship of doom was piloted by Wing Chau and people like him. The guy controlled roughly $15 billion, invested in nothing but CDOs backed by the triple-B tranche of a mortgage bond or, as Eisman put it, 'the equivalent of three levels of dog shit lower than the original bonds.'" Lewis calls Mr. Chau "a man who had made it possible for tens of thousands of actual human beings to be handed money they could never afford to repay." According to Lewis, "[a]ll by himself, Chau generated vast demand for the riskiest slices of subprime mortgage bonds, for which there had previously been essentially no demand."

56.     The book next provides the following account of Mr. Chau's and Harding's work:

- "The CDO manager, in practice, didn't do much of anything, which is why all sorts of unlikely people suddenly hoped to become one."

- "'Two guys and a Bloomberg terminal in New Jersey' was Wall Street shorthand for the typical CDO manager. The less mentally alert the two guys, and the fewer the questions they asked about the triple-B-rated subprime bonds they were absorbing into their CDOs, the more likely they were to be patronized by the big Wall Street firms."

- "The whole point of the CDO was to launder a lot of subprime mortgage market risk that the firms had been unable to place straightforwardly. The last thing you wanted was a CDO manager who asked lots of tough questions."

57.    The passage sets forth a series of comments Mr. Chau allegedly makes to Eisman during the dinner.  First, Eisman – reasonably assuming that Mr. Chau would have some personal stake in the CDOs he manages – expresses (feigned) concern that Mr. Chau has lost money.  According to the book, however, Mr. Chau responds to that comment by stating that he has abandoned all his CDOs and shifted all the risk to his investors: "'No. . . .  I've sold everything out.'"  The book then goes on to claim that Mr. Chau made the following statements to Eisman as well:

- "[A]lmost giddily, Chau explained to Eisman that he simply passed all the risk that the underlying home loans would default on to the big investors who had hired him to vet the bonds."

- "His job was to be the CDO 'expert,' but he actually didn't spend a lot of time worrying about what was in CDOs."

- "His goal, he explained, was to maximize the dollars in his care."

- "'[Mr. Chau] says, "I love guys like you who short my market.  Without you I don't have anything to buy."'"

- "'[Mr. Chau] says to me, "The more excited that you get that you're right, the more trades you'll do, and the more trades you do, the more product for me."'"

- "[Mr. Chau] told Eisman that he would rather have $50 billion in crappy CDOs than none at all, as he was paid mainly on volume."

- "[Mr. Chau] told Eisman that his main fear was that the U.S. economy would strengthen, and dissuade hedge funds from placing bigger bets against the subprime mortgage market."

58.     From this exchange, the passage concludes that "Chau's real job was to serve as a new kind of front man for the Wall Street firms he 'hired.'" He had been "handpicked" by the event's organizer to "persuade Steve Eisman that the people on the other end of his credit default swaps were either crooks or morons," and "he played the role."

59.     Many of the statements in this passage are attributed expressly to Eisman; others consist of statements that Mr. Chau purportedly made to Eisman, and thus were presumably recounted by Eisman to Lewis. Still others are not explicitly attributed to Eisman, although for many, he appears from the context to be the source.

60.     The entire passage depicts Mr. Chau as someone who ignored his professional responsibilities, made misrepresentations to investors, charged money for work that was not performed, had no stake in the CDOs he managed, was incompetent or reckless in carrying out his responsibilities, and violated his fiduciary duties by putting the interests of "Wall Street bond trading desks" above those of his investors. The passage depicts Harding similarly. In reading Lewis's account, one could well conclude that Mr. Chau and Harding, and perhaps a handful of others acting with them, were somehow responsible for the entire collapse of the mortgage market.

61.     The defamatory nature of those accusations is obvious. Indeed, the book not only accuses Mr. Chau of gross misconduct, but claims he was so indifferent to his responsibilities that he bragged about the misconduct to a complete stranger, known to work in the financial services industry, at a dinner function. It is hard to imagine

accusations with a greater capacity to destroy an investment manager's professional reputation.

62.     The accusations, moreover, are false.  For one thing, Mr. Chau never made the statements to Eisman that the book attributes to him.  Nor would he have, as the statements are false.  It is not true, for example, that Mr. Chau "didn't spend a lot of time worrying about what was in CDOs."  Mr. Chau had an experienced, well-credentialed team at Harding, and they worked diligently to select appropriate assets for the CDOs they managed.

63.     Nor is it true, as the statements falsely attributed to Mr. Chau convey, that Mr. Chau had "sold everything out," "passed all the risk . . . on to the big investors who had hired him to vet the bonds," or merely sought to "maximize the dollars in his care."  Mr. Chau and Harding held a stake in several of Harding's CDOs throughout.  They acted with the best interests of their investors in mind, and indeed turned down proposals for new CDOs.

64.     The book's other accusations are likewise false.  For example, it is not true that Mr. Chau "spent most of his career working sleepy jobs at sleepy life insurance companies."  As explained above, Mr. Chau has a long career in responsible positions with major financial services firms.  Nor is it true that Mr. Chau "controlled roughly $15 billion, invested in nothing but CDOs backed by the triple-B tranche of a mortgage bond or, as Eisman put it, 'the equivalent of three levels of dog shit lower than the original bonds.'"  Harding's CDOs were backed by a variety of collateral.  Much of it was high-grade securities rated A- or better by Standard & Poor's, or A3 or better by Moody's.

And some of it was corporate debt or other assets that had nothing to do with mortgage bonds.

65.     Likewise, the book's descriptions of a "typical CDO manager" – in context, clearly a reference designed to include Mr. Chau, a New Jersey citizen, and Harding – are wholly unfounded in fact. It is not true that Mr. Chau and his team "didn't do much of anything." It is not true that they were "[t]wo guys and a Bloomberg terminal in New Jersey." And it is not true that they avoided asking "tough questions" about the assets they purchased for investors in order to appear less "mentally alert" and drum up business from "the big Wall Street firms."

66.     Finally, needless to say, Mr. Chau is not a "front man," a "crook[]," or a "moron[]," contrary to the book's claims.

### Defendants' Knowledge of the Falsity

67.     All three defendants knew full well that the accusations against Mr. Chau were false and defamatory – or, at the very least, recklessly disregarded obvious warning signs that they were false.

68.     Eisman, for his part, had direct knowledge that the statements were false. Mr. Chau never made the outlandish comments Eisman attributed to him. Rather, Eisman simply fabricated the statements. Given that, Eisman clearly knew that his accusations were false. Moreover, because Eisman lacked any basis for the content of the statements he attributed to Mr. Chau, he necessarily acted at least with reckless disregard in accusing Mr. Chau of incompetence and indifference to his investors.

69.     Lewis and Norton likewise knew that the accusations were false, or acted with reckless disregard for whether they were false. It was readily apparent that Eisman was

not a trustworthy source.  And Lewis and Norton would have had even more reason to doubt Eisman's credibility had they attempted to verify even a fraction of the accusations he made using materials at their disposal.  Instead, Lewis and Norton ignored those obvious warning signs and proceeded to publish the false accusations.

### *Warning Signs in the Book Itself*

70.    *The Big Short* itself provides numerous indications that Eisman was not a trustworthy source.  The very passage describing the dinner at the Venetian raises obvious doubts.  In describing the meeting between Eisman and Chau, it states: "Later Eisman would fail to recall what Wing Chau looked like, what he wore, where he'd come from, or what he ate and drank -- everything but the financial idea he represented."  Given that Eisman admittedly "fail[ed] to recall" anything about the conversation other than the "idea" Mr. Chau "represented," any author or publisher would have had grave doubts about Eisman's story.

71.    Eisman also had a known track record of fabricating conversations.  Elsewhere in the book, Eisman claims he had a conversation with a Standard & Poor's analyst in which Eisman "asked what happened to default rates" in the company's models "if real estate prices fell."  According to Eisman, "The man at S&P couldn't say:  Their model for home prices had no ability to accept a negative number.  'They were just assuming home prices would keep going up,' says Eisman."  Lewis and Norton knew those statements were false:  Standard & Poor's had already expressly informed them that its "model was capable of handling negative numbers."  Thus, Lewis and Norton knew at the time the book was published that Eisman had a history of attributing statements to people who never made them.

72.     By his own admission, moreover, Eisman was willing to lie in important situations to advance his interests.  Early in *The Big Short*, Lewis recounts how Eisman, while a struggling junior analyst at Oppenheimer & Co., Inc., misled an investment banker at the firm to further his career.  The banker was trying to land investment banking work for a company called Aames Financial Corporation and inquired of the research department, where Eisman worked, "for anyone who knew anything about the mortgage business."  Quoting Eisman, Lewis recounts the episode, "'I'm a junior analyst and I'm just trying to figure out which end is up,' says Eisman, 'but I told him that as a lawyer I'd worked on a deal for The Money Store.'  He [Eisman] was promptly appointed the lead analyst for Aames Financial.  'What I didn't tell him was that my job had been to proofread the documents and that I hadn't understood a word of the fucking things.'"

73.     Lewis also recounts how Eisman was indifferent to -- indeed, contemptuous of -- risk management at FrontPoint Partners, the hedge fund where Eisman got rich gambling with other people's money against the mortgage market.  As Lewis recounts, "Steve Eisman had started out running a $60 million equity fund but was now short around 600 million dollars' worth of various subprime-related securities, and he wanted to short more."  FrontPoint's head trader, Danny Moses, told Lewis that he often found himself caught between Eisman and FrontPoint's risk management staff: "'They'd call me and say, "Can you get Steve to take some of this off?"  I'd go to Steve and Steve would say, "Just tell them to fuck off."  And I'd say, "Fuck off."'"

74.     Other references to Eisman's bizarre and inappropriate behavior abound.  Noting that "there was now hardly an important figure on Wall Street whom Eisman had not insulted, or tried to," for example, Lewis describes Eisman's conduct at a public event in

Hong Kong at which the Chairman of HSBC – which has survived the financial crisis – was speaking. "[A]fter the Chairman of HSBC had claimed that his bank's subprime losses were 'contained,' Eisman had raised his hand and said, 'You don't actually believe that, do you? Because your whole book is fucked.'"

75.     *The Big Short* is replete with other statements and behavior by Eisman that would have caused any reasonably diligent person to question his credibility. Eisman boasts of how he had "'*the world by the fucking balls*'" (emphasis in original) and wanted to short his own employer Morgan Stanley, the parent of FrontPoint Partners. He compares himself to Isaac Newton. He considers former Federal Reserve Chairman Alan Greenspan "almost beneath his contempt, which was saying something." He attends a Bear Stearns event where, after the CEO tells the "audience how 'crazy' the subprime market was," he blurts out: "And whose fault is that? . . . This is how you guys *wanted* it. So you could rip off your customers" (emphasis in original).

76.     Lewis tells of Eisman leaving work "at noon every Wednesday so that he might be present at Midtown Comics when the new shipment of stories arrived. He knew more than any grown man should about the lives of various superheroes. He knew the Green Lantern oath by heart, for instance, and understood Batman's inner life better than the Caped Crusader himself . . . . *Spider-Man* was his favorite."

77.     And if Eisman's own words and behavior were not enough to put someone on notice that Eisman should not be relied upon, *The Big Short* quotes others as saying things about Eisman that would give any author or publisher pause. One of Eisman's closest colleagues, Vincent Daniel, said that Eisman's memory was "so selective, he has no scars from prior experience." Danny Moses, FrontPoint's head trader, said that he and

Daniel hid negative information about the housing market from Eisman because they feared he would order them to take irrational risks: "'We were worried he'd come out of his office and shout "Do a trillion!""" In another passage, Eisman's wife explains that Eisman had a long-time relationship with a therapist with whom she had to establish a "social emergency task force." Together, the two "'beat him up and said, "You really just have to knock this shit off.""'

### *Readily Available Information*

78.     The book itself thus contained obvious warning signs that Eisman's story could not be trusted. Had Lewis and Norton conducted even a minimal investigation using the resources available to them, however, they would have discovered that his accusations were clearly false. Even the passage describing Eisman's encounter with Mr. Chau contains a number of glaring errors that would have been apparent from a brief investigation. Those errors provided ample warning that Eisman could not be trusted – or, to the extent the errors reflected Lewis's own work, that Lewis could not be trusted either.

79.     For example, the book introduces Mr. Chau by stating that he "spent most of his career working sleepy jobs at sleepy life insurance companies." That claim grossly misstates Mr. Chau's impressive resume in the financial services industry. Lewis and Norton easily could have verified the accuracy of the claim. Mr. Chau's work history, including his employers and dates of employment, is publicly available, for free, through the Financial Industry Regulatory Authority's website – just like the work history of most other registered securities professionals. Mr. Chau's work experience also could have been verified through other readily available sources, such as the investor materials for

Harding's CDOs, which provide biographical information for its key investment professional.

80.     Defendants likewise easily could have verified the accuracy of the claim that Harding "invested in nothing but CDOs backed by the triple-B tranche of a mortgage bond or, as Eisman put it, 'the equivalent of three levels of dog shit lower than the original bonds.'"   Harding's CDOs issued documents showing that this was not remotely an accurate description of the makeup of the CDOs.   Those materials were readily available to Lewis and Norton from industry sources.   For example, Lewis presumably could have obtained copies from one of his many other sources such as Deutsche Bank AG head CDO trader Greg Lippmann, who is mentioned 160 times in the book.   Or Lewis presumably could have obtained copies from Eisman himself -- if Eisman was, in fact, doing any research into the CDOs he was shorting.

81.     The accuracy of the claims about the extent of Harding's operations, the CDO industry, and Harding's place in that industry was also easily verifiable.   The book asserts that, "from January 2007 until the market crashed in September, Harding Advisory would be the world's biggest subprime CDO manager," and that, "[a]ll by himself, Chau generated vast demand for the riskiest slices of subprime mortgage bonds, for which there had previously been essentially no demand."   Numerous public sources of information about the industry -- such as Standard and Poor's published research reports -- would have confirmed that those statements are not true.   Harding was not the first, the largest, or the only participant in the subprime CDO market, and those attempts to place the blame for the market collapse solely on Mr. Chau's shoulders do not have the slightest grounding in fact.

82.   Finally, Eisman's characterizations of CDO managers as "'[t]wo guys and a Bloomberg terminal in New Jersey'" who aren't "mentally alert" and "d[o]n't do much of anything" are so divorced from reality that no author or publisher who had made even the slightest effort to fact-check a publication could believe they were true.   Lewis and Norton had access to industry sources, as well as publicly available information, that would have made abundantly clear that CDO managers like Harding are complex financial enterprises staffed by qualified professionals.   Indeed, other CDO managers included prominent firms such as TCW Asset Management Co., BlackRock Financial Management Inc., and Credit Suisse Alternative Capital.   Even a cursory inquiry about the industry Lewis maligns would have revealed those facts.   If nothing else, Lewis could have obtained the information from the American Securitization Forum, the well-respected industry organization that hosted the conference at the Venetian that Eisman, Mr. Chau, and some 6600 other professionals attended.   That Lewis and Norton would uncritically reprint Eisman's bizarre and unfounded descriptions of the industry only underscores the extent of their disregard for the truth.

83.   Instead of making any serious effort to corroborate Eisman's inflammatory accusations, Lewis apparently limited his due diligence efforts to little more than calling Mr. Chau and asking for an interview while writing the book.   Aware of the nature of the books Lewis writes, Mr. Chau declined.   Lewis chose not to determine the true facts.   Of course, had he done so, they would have gotten in the way of his story.

## The Harm to Mr. Chau and Harding

84.     Since the publication of *The Big Short*, Mr. Chau and Harding Advisory have been subjected to much ridicule and scorn. Their reputation in the business community as well as the community at large has been seriously damaged.

85.     In the financial services industry, integrity, credibility, and reputation are essential for a portfolio manager to seek employment or develop business. The defamatory statements have caused investors to avoid Mr. Chau and his company.

86.     As a result of the defamatory statements, Mr. Chau's ability to work in his chosen profession has been severely diminished. Others in the financial services industry with whom he does business have told him repeatedly that *The Big Short* is a substantial liability to him and a reason investors would be unlikely to invest in ventures with which he is associated. He has had to explain the book and deny its allegations about him to people in the financial services industry with whom he has done business or tried to do business. He has lost business opportunities as a result of the defendants' false and defamatory statements in *The Big Short*.

87.     Those injuries are the natural consequence of, and directly and proximately caused by, the false and defamatory statements of and concerning Mr. Chau in *The Big Short*.

## COUNT 1

## DEFAMATION

## (AGAINST ALL DEFENDANTS)

88.     Plaintiffs repeat and incorporate by reference paragraphs 1 through 87.

89.     Defendants published the statements of and concerning Mr. Chau and Harding set forth above in paragraphs 53-60 by writing them, publishing them, or communicating them to the author, authorizing or intending that they would be published in *The Big Short*, in which they were in fact published.

90.     The statements referenced in paragraph 89 are false.

91.     The statements referenced in paragraph 89 refer to Mr. Chau and Harding by name, or would be reasonably understood to refer to them.

92.     The statements referenced in paragraph 89 have a tendency to expose Mr. Chau and Harding to public hatred, contempt, ridicule, or disgrace.

93.     Defendants published the statements referenced in paragraph 89 with malice – knowing they were false, or with reckless disregard for the truth or falsity of the statements; or in a grossly irresponsible manner without consideration for the standards of information gathering and dissemination followed by responsible parties.

94.     The statements referenced in paragraph 89 are defamatory on their face and constitute libel *per se*, as they tend to injure Mr. Chau and Harding in the conduct of their trade, business, or profession.

95.     The statements referenced in paragraph 89 proximately caused actual harm to Mr. Chau and Harding, who have suffered damage to their reputation and – in the case of Mr. Chau – personal humiliation and mental anguish.

96.     The statements referenced in paragraph 89 were a substantial factor in causing Mr. Chau and Harding to suffer financial loss.

        WHEREFORE, plaintiffs Wing Chau and Harding Advisory LLC request that this Court enter judgment against all defendants, jointly and severally, as follows:

(a)     damages in an amount to be proved at trial, but in excess of $75,000;

(b)     punitive damages;

(c)     such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs demand trial by jury in this action of all issues so triable.

Dated:  February 25, 2011                    Respectfully submitted,

Steven F. Molo (SM-1818)
Robert K. Kry (RK-0929)
Edward F. Daniels (ED-2061)
MOLO LAMKEN LLP
540 Madison Avenue
New York, NY 10022
(212) 607-8160 (telephone)
(212) 607-8161 (facsimile)

# Exhibit A

# The Big Short

### INSIDE THE DOOMSDAY MACHINE

## Michael Lewis

W. W. NORTON & COMPANY

NEW YORK   LONDON

Copyright © 2010 by Michael Lewis

All rights reserved
Printed in the United States of America
First Edition

For information about permission to reproduce selections from this book,
write to Permissions, W. W. Norton & Company, Inc.,
500 Fifth Avenue, New York, NY 10110

For information about special discounts for bulk purchases, please contact
W. W. Norton Special Sales at specialsales@wwnorton.com or 800-233-4830

Manufacturing by Courier Westford
Book design by Lovedog Studio
Production manager: Anna Oler

ISBN 978-0-393-07223-5

W. W. Norton & Company, Inc.
500 Fifth Avenue, New York, N.Y. 10110
www.wwnorton.com

W. W. Norton & Company Ltd.
Castle House, 75/76 Wells Street, London W1T 3QT

5 6 7 8 9 0

CHAPTER SIX

# Spider-Man at The Venetian

Golfing with Eisman wasn't like golfing with other Wall Street people. The round usually began with a collective discomfort on the first tee, after Eisman turned up wearing something that violated the Wall Street golfer's notion of propriety. On January 28, 2007, he arrived at the swanky Bali Hai Golf Club in Las Vegas dressed in gym shorts, t-shirts, and sneakers. Strangers noticed; Vinny and Danny squirmed. "C'mon, Steve," Danny pleaded with a man who, technically, was his boss, "there's an etiquette here. You at least have to wear a collared shirt." Eisman took the cart to the clubhouse and bought a hoodie. The hoodie covered up his t-shirt and made him look a lot like a guy who had just bought a hoodie to cover up his t-shirt. In hoodie, gym shorts, and sneakers, Eisman approached his first shot. Like every other swing of the Eisman club, this was less a conclusive event than a suggestion. Displeased with where the ball had landed, he pulled another from his bag and dropped it in a new and better place. Vinny would hit his drive in the fairway; Danny would hit his in the rough; Steve would hit his in the bunker, march into the sand, and

grab the ball and toss it out, near Vinny's. It was hard to accuse him of cheating, as he didn't make the faintest attempt to disguise what he was doing. He didn't even appear to notice anything unusual in the pattern of his game. The ninth time Eisman retrieved a ball from some sand trap, or pretended his shot had nor splashed into the water, he acted with the same unapologetic aplomb he had demonstrated the first time. "Because his memory is so selective, he has no scars from prior experience," said Vinny. He played the game like a child, or like someone who was bent on lampooning a sacred ritual, which amounted to the same thing. "The weird thing is," said Danny, "he's actually not bad."

After a round of golf, they headed out to a dinner at the Wynn hotel hosted by Deutsche Bank. This was the first time Eisman had ever been to a conference for bond market people and, not knowing what else to do, he had put himself in Greg Lippmann's hands. Lippmann had rented a private room in some restaurant and invited Eisman and his partners to what they assumed was something other than a free meal. "Even when he had an honest agenda, there was always something underneath the honest agenda," said Vinny. Any dinner that was Lippmann's idea must have some hidden purpose—but what?

As it turned out, Lippmann had a new problem. US house prices were falling, subprime loan defaults were rising, yet subprime mortgage bonds somehow held firm, as did the price of insuring them. He was now effectively short $10 billion in subprime mortgage bonds, and it was costing him $100 million a year in premiums, with no end in sight. "He was obviously getting his nuts blown off," said Danny. Thus far Lippmann's giant bet had been subsidized by investors, like Steve Eisman, who paid him a toll when they bought and sold credit default swaps, but investors like Steve Eisman were losing heart. Some of Lippmann's former converts suspected that the subprime mortgage bond market was rigged by Wall Street to insure that credit default

138   The Big Short

swaps would never pay off; others began to wonder if the investors on the other side of their bet might know something that they didn't, and some simply wearied of paying insurance premiums to bet against bonds that never seemed to move. Lippmann had staged this great game of tug-of-war, assembled a team to pull on his end of the rope, and now his teammates were in full flight. He worried that Eisman might quit, too.

The teppanyaki room inside the Okada restaurant consisted of four islands, each with a large, cast-iron hibachi and dedicated chef. Around each island Lippmann seated a single hedge fund manager whom he had persuaded to short subprime bonds, along with investors who were long those same bonds. The hedge fund people, he hoped, would see just how stupid the investors on the other side of those bets were, and cease to worry that the investors knew something they did not. This was shrewd of him: Danny and Vinny never stopped worrying if they were the fools at Lippmann's table. "We understood the subprime lending market and knew the loans were going bad," said Vinny. "What we didn't have any comfort in was the bond market machine. The whole reason we went to Vegas was we still felt we needed to learn how we were going to get screwed, if we were going to get screwed."

Eisman took his assigned seat between Greg Lippmann and a fellow who introduced himself as Wing Chau and said that he ran an investment firm called Harding Advisory. When Eisman asked exactly what Harding Advisory advised, Wing Chau explained that he was a CDO manager. "I had no idea there was such a thing as a CDO manager," said Eisman. "I didn't know there was anything to manage." Later Eisman would fail to recall what Wing Chau looked like, what he wore, where he'd come from, or what he ate and drank—everything but the financial idea he represented. But from his seat across the hibachi, Danny Moses watched and wondered about the man Lippmann had so carefully seated next to Eisman. He was short,

with a Wall Street belly—not the bleacher bum's boiler but the discreet, necessary pouch of a squirrel just before winter. He'd graduated from the University of Rhode Island, earned a business degree at Babson College, and spent most of his career working sleepy jobs at sleepy life insurance companies—but all that was in the past. He was newly, obviously rich. "He had this smirk, like, *I know better*," said Danny. Danny didn't know Wing Chau, but when he heard that he was the end buyer of subprime CDOs, he knew exactly who he was: the sucker. "The truth is that I didn't really want to talk to him," said Danny, "because I didn't want to scare him."

When they saw that Lippmann had seated Eisman right next to the sucker, both Danny and Vinny had the same thought: *Oh no. This isn't going to end well*. Eisman couldn't contain himself. He'd figure out the guy was a fool, and let him know it, and then where would they be? They needed fools; only fools would take the other side of their trades. "We didn't want people to know what we were doing," said Vinny. "We were spies, on a fact-finding mission." They watched Eisman double-dip his edamame in the communal soy sauce—dip, suck, redip, resuck—and waited for the room to explode. There was nothing to do but sit back and enjoy the show. Eisman had a curious way of listening; he didn't so much listen to what you were saying as subcontract to some remote region of his brain the task of deciding whether whatever you were saying was worth listening to, while his mind went off to play on its own. As a result, he never actually heard what you said to him the first time you said it. If his mental subcontractor detected a level of interest in what you had just said, it radioed a signal to the mother ship, which then wheeled around with the most intense focus. "Say that again," he'd say. And you would! Because now Eisman was so obviously listening to you, and, as he listened so selectively, you felt flattered. "I keep looking over at them," said Danny, "And I see Steve saying over and over, *Say that again. Say that again.*"

Later, whenever Eisman set out to explain to others the origins of the financial crisis, he'd start with his dinner with Wing Chau. Only now did he fully understand the central importance of the so-called mezzanine CDO—the CDO composed mainly of triple-B-rated subprime mortgage bonds—and its synthetic counterpart: the CDO composed entirely of credit default swaps on triple-B-rated subprime mortgage bonds. "You have to understand this," he'd say. "This was the engine of doom." He'd draw a picture of several towers of debt. The first tower was the original subprime loans that had been piled together. At the top of this tower was the triple-A tranche, just below it the double-A tranche, and so on down to the riskiest, triple-B tranche—the bonds Eisman had bet against. The Wall Street firms had taken these triple-B tranches—the worst of the worst—to build yet another tower of bonds: a CDO. A collateralized debt obligation. The reason they'd done this is that the rating agencies, presented with the pile of bonds backed by dubious loans, would pronounce 80 per-cent of the bonds in it triple-A. These bonds could then be sold to investors—pension funds, insurance companies—which were allowed to invest only in highly rated securities. It came as news to Eisman that this ship of doom was piloted by Wing Chau and people like him.

The guy controlled roughly $15 billion, invested in nothing but CDOs backed by the triple-B tranche of a mortgage bond or, as Eisman put it, "the equivalent of three levels of dog shit lower than the original bonds." A year ago, the main buyer of the triple-A-rated tranche of subprime CDOs—which is to say the vast majority of CDOs—had been AIG. Now that AIG had exited the market, the main buyers were CDO managers like Wing Chau. All by himself, Chau generated vast demand for the riskiest slices of subprime mortgage bonds, for which there had previously been essentially no demand. This demand led inexorably to the supply of new home loans, as material for the bonds. The soy sauce in which Eisman double-dipped his edamame was shared by a man who had made it possible for tens of thousands of actual human beings to be handed money they could never afford to repay.

As it happened, FrontPoint Partners had spent a lot of time digging around in those loans, and knew that the default rates were already sufficient to wipe out Wing Chau's entire portfolio. "God," Eisman said to him. "You must be having a hard time."

"No," Wing Chau said. "I've sold everything out."

*Say that again.*

It made no sense: The CDO manager's job was to select the Wall Street firm to supply him with subprime bonds that served as the col-lateral for CDO investors, and then to vet the bonds themselves. The CDO manager was further charged with monitoring the hundred or so individual subprime bonds inside each CDO, and replacing the bad ones, before they went bad, with better ones. That, however, was mere theory; in practice, the sorts of investors who handed their money to Wing Chau, and thus bought the triple-A-rated tranche of CDOs—German banks, Taiwanese insurance companies, Japanese farmers' unions, European pension funds, and, in general, entities more or less required to invest in triple-A-rated bonds—did so precisely because they were meant to be foolproof, impervious to losses, and unnec-essary to monitor or even think about very much. The CDO man-ager, in practice, didn't do much of anything, which is why all sorts of unlikely people suddenly hoped to become one. "Two guys and a Bloomberg terminal in New Jersey" was Wall Street shorthand for the typical CDO manager. The less mentally alert the two guys, and the fewer the questions they asked about the triple-B-rated subprime bonds they were absorbing into their CDOs, the more likely they were to be patronized by the big Wall Street firms. The whole point of the CDO was to launder a lot of subprime mortgage market risk that the firms had been unable to place straightforwardly. The last thing you wanted was a CDO manager who asked lots of tough questions.

The bond market had created what amounted to a double agent—a

character who seemed to represent the interests of investors when he better represented the interests of Wall Street bond trading desks. To assure the big investors who had handed their billions to him that he had their deep interests at heart, the CDO manager kept ownership of what was called the "equity," or "first loss" piece, of the CDO—the piece that vanished first when the subprime loans that ultimately supplied the CDO with cash defaulted. But the CDO manager was also paid a fee of 0.01 percent off the top, before any of his investors saw a dime, and another, similar fee, off the bottom, as his investor received their money back. That doesn't sound like much, but, when you're running tens of billions of dollars with little effort and no overhead, it adds up. Just a few years earlier, Wing Chau was making $140,000 a year managing a portfolio for the New York Life Insurance Company. In one year as a CDO manager, he'd taken home $26 million, the haul from half a dozen lifetimes of working at New York Life.

Now, almost giddily, Chau explained to Eisman that he simply passed all the risk that the underlying home loans would default on to the big investors who had hired him to vet the bonds. His job was to be the CDO "expert," but he actually didn't spend a lot of time worrying about what was in CDOs. His goal, he explained, was to maximize the dollars in his care. He was now doing this so well that, from January 2007 until the market crashed in September, Harding Advisory would be the world's biggest subprime CDO manager. Among its other achievements, Harding had established itself as the go-to buyer for Merrill Lynch's awesome CDO machine, notorious not only for its rate of production (Merrill created twice as many of the things as the next biggest Wall Street firm) but also for its industrial waste (its CDOs were later proven to be easily the worst). "He 'managed' the CDOs," said Eisman, "but managed what? I was just appalled that the structured finance market could be so insane as to allow someone to manage a CDO portfolio without having any exposure to the CDOs. People would pay up to have someone 'manage' their CDOs—as if

this moron was helping you. I thought, *You prick, you don't give a fuck about the investors in this thing.*" Chau's real job was to serve as a new kind of front man for the Wall Street firms he "hired," investors felt better buying a Merrill Lynch CDO if it didn't appear to be run by Merrill Lynch.

There was a reason Greg Lippmann had picked Wing Chau to sit beside Steve Eisman. If Wing Chau detected Eisman's disapproval, he didn't show it; instead, he spoke to Eisman in a tone of condescension. *I know better.* "Then he says something that blew my mind," said Eisman. "He says, 'I love guys like you who short my market. Without you I don't have anything to buy.'"

*Say that again.*

"He says to me, 'The more excited that you get that you're right, the more trades you'll do, and the more trades you do, the more product for me.'"

That's when Steve Eisman finally understood the madness of the machine. He and Vinny and Danny had been making these side bets with Goldman Sachs and Deutsche Bank on the fate of the triple-B tranche of subprime mortgage–backed bonds without fully understanding why those firms were so eager to accept them. Now he was face-to-face with the actual human being on the other side of his credit default swaps. Now he got it: The credit default swaps, filtered through the CDOs, were being used to replicate bonds backed by actual home loans. *There weren't enough Americans with shitty credit taking out loans to satisfy investors' appetite for the end product.* Wall Street needed his bets in order to synthesize more of them. "They weren't satisfied getting lots of unqualified borrowers to borrow money to buy a house they couldn't afford," said Eisman. "They were creating them out of whole cloth. One hundred times over! That's why the losses in the financial system are so much greater than just the subprime loans. That's when I realized they needed us to keep the machine running. I was like, *This is allowed?*"

Case 1:11-cv-01333-GBD-KNF   Document 1   Filed 02/25/11   Page 35 of 35

Wing Chau didn't know he'd been handpicked by Greg Lippmann to persuade Steve Eisman that the people on the other end of his credit default swaps were either crooks or morons, but he played the role anyway. Between shots of sake he told Eisman that he would rather have $50 billion in crappy CDOs than none at all, as he was paid mainly on volume. He told Eisman that his main fear was that the U.S. economy would strengthen, and dissuade hedge funds from placing bigger bets against the subprime mortgage market. Eisman listened and tried to understand how an investor on opposite ends of his bets could be hoping for more or less the same thing he was—and how any insurance company or pension fund could hand its capital to Wing Chau. There was only one answer: The triple-A ratings gave everyone an excuse to ignore the risks they were running.

Danny and Vinny watched them closely through the hibachi steam. As far as they could tell, Eisman and Wing Chau were getting along famously. But when the meal was over, they watched Eisman grab Greg Lippmann, point to Wing Chau, and say, "Whatever that guy is buying, I want to short it." Lippmann took it as a joke, but Eisman was completely serious: He wanted to place a bet specifically against Wing Chau. "Greg," Eisman said, "I want to short his paper. Sight unseen." Thus far Eisman had bought only credit default swaps on subprime mortgage bonds; from now on he'd buy specifically credit default swaps on Wing Chau's CDOs. "He finally met the enemy, face-to-face," said Vinny.

In what amounted to a brief attempt to live someone else's life, Charlie Ledley selected from the wall a Beretta pistol, a sawed-off shotgun, and an Uzi. Not long before he'd walked out the door for Las Vegas, he'd dashed an e-mail off to his partner Ben Hockett, who planned to meet him there, and Jamie Mai, who didn't. "Do you guys think we're screwed since we haven't preregistered for anything?" he