UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------- X

WING F. CHAU and HARDING ADVISORY LLC,          :

                             Plaintiff,          :

           -against-          :

MICHAEL LEWIS, STEVEN EISMAN,          :
and W.W. NORTON & COMPANY, INC.,          :

                      Defendant.          :

-------------------------------------------- X

Index No. 11-CV-1333 (GBD)
ECF Case

## DEFENDANTS MICHAEL LEWIS
## AND W.W. NORTON & COMPANY, INC.'S
## STATEMENT OF UNDISPUTED MATERIAL FACTS

## UNDISPUTED FACTS[1]

Michael Lewis and W.W. Norton & Co., Inc. respectfully submit the following statement of material facts as to which there is no genuine dispute, in further support of their motion for summary judgment:

## THE DINNER

1. On January 28, 2007, Greg Lippmann hosted a dinner at the 2007 American Securitization Forum ("ASF") in Las Vegas (the "Dinner"). Eisman Dec. ¶ 20-21.

2. Wing Chau attended the Dinner. Cplt. ¶53.

3. Steven Eisman attended the Dinner. Cplt. ¶53.

4. Daniel Moses attended the Dinner. Moses Dep. 148:13-149:8.

5. Vincent Daniel attended the Dinner. Daniel Dep. 153:21-24.

6. <center>REDACTED</center>

7. Eisman and Chau sat next to each other and had a conversation (the "Dinner Conversation"). Chau Dep. 75:25-76:8; 78:23-83:4; Eisman Dec. ¶¶ 21-31.

8. Chau discussed with Eisman that in the CDS market for every long investor there must be a short investor. Rauterberg Dec., Ex. 120 (Chau Dep. 81:9-11, 81:17-20, 82:2-5).

9. As a result of the Dinner, Eisman decided to short CDOs for the first time. Eisman Dec. ¶ 6; Rauterberg Dec., Exs. 123 (Daniel Dep. 203:8-25, 207:6-16), 125  (Moses Dep. 186:17-25).

10. Eisman intended to short Chau's CDOs, and contacted a trader at Deutsche Bank to do so upon his return to New York. Eisman Dec. ¶¶ 35-36.

---

[1] "Blasie Aff." refers to the affirmation of Michael Blasie, dated April 3, 2012; "Crespo Dec." refers to the declaration of Daniel Crespo, dated April 11, 2012; "Eisman Dec." refers to the declaration of Steven Eisman, dated April 11, 2012; "Goldman Dec." refers to the declaration of Annika Goldman, dated April 13, 2012; "Lawrence Dec." refers to the declaration of Starling Lawrence, dated April 10, 2012; "Lewis Dec." refers to the declaration of Michael Lewis, dated April 10, 2012; "Rauterberg Dec." refers to the declaration of Gabriel Rauterberg, dated April 13, 2012; "Schwartz Dec." refers to the declaration of Renee Schwartz, dated April 12, 2012, filed herewith. "Goldstein Dec." refers to the declaration of Jacob Goldstein, dated April 13, 2012, filed with Defendant Steven Eisman's Motion for Summary Judgment.

11.   Eisman did not ultimately short Chau's CDOs because his Deutsche Bank trader told him there were other equally bad CDOs he could short for less money. Eisman Dec. ¶ 36.

12.   Eisman's Deutsche Bank trader explained that Chau's CDOs were expensive because of the volume of investors already shorting them. Eisman Dec. ¶ 36.

13.   As a result of the Dinner, Eisman did increase his short position on CDOs. Eisman Dec. ¶ 37.

**MICHAEL LEWIS**

14.   Lewis has written or edited 14 non-fiction books. Lewis Dec. ¶ 4.

15.   Eleven of these books were published by W.W. Norton & Company, Inc. ("Norton"). Lewis Dec. ¶ 4.

16.   All but one of Lewis's books published by Norton were published before *The Big Short*. Lewis Dec. ¶ 5; Lawrence Dec. ¶¶ 10-11.

17.   Lewis has written many non-fiction articles and opinion pieces, including articles on business topics, for publications like *Vanity Fair*, *The New York Times*, *Portfolio*, *Bloomberg News*, *The Wall Street Journal* and *Forbes*. Lewis Dec. ¶ 6.

18.   Over the course of Lewis's more than twenty year career as a writer, he has received critical acclaim and several awards. Lawrence Dec. ¶¶ 9, 12-16, 28.

19.   Lewis has been cited as one of the country's finest financial journalists. Lawrence Dec. ¶ 28.

20.   A number of Lewis's books and articles have concerned economics, finance, or business. Lewis Dec. ¶ 5-7.

**THE PUBLICATION OF "THE END"**

21.   In November 2008, *Portfolio* magazine published Lewis's article, *The End of Wall Street's Boom* ("The End"). Lewis Dec. ¶ 20.

22.   "The End" was read widely and received critical acclaim and several awards. Lawrence Dec. ¶¶ 27-28.

23.   "The End" includes a number of events that are depicted in *The Big Short* (or "the Book"), including the Dinner Conversation, although Chau is not identified by name in the article. Lewis Dec. ¶ 20.

24.   Eisman told Lewis about the Dinner Conversation, and *The Big Short* accurately recounts what Eisman told Lewis. Lewis Dec. ¶ 73; Eisman Dec. ¶¶ 20, 90-93.

25.                                             REDACTED

26.     Lewis corroborated Eisman's account of the Dinner Conversation with Moses and
        Daniel, who saw the dinner conversation unfold and discussed it with Eisman afterward,
        and whose recollections are consistent with Eisman's account.  Lewis Dec. ¶ 73;
        Rauterberg Dec., Exs. 123 (Daniel Dep. 153:21-154:3), 125 (Moses Dep. 162:13-163:21,
        172:9-189:10, 245:6-246:17).

27.     A Condé Nast researcher fact-checked "The End." Lewis Dec. ¶ 21.

28.     Eisman confirmed the quotes attributed to both him and Chau in statements 5, 6, 8, 18,
        20, 21, and 25 in connection with "The End" prior to its publication.  Lewis Dec. ¶¶ 21,
        81 n.32, 84 n.34, 89, 102 n.40, 104 n.41, 105 n.43, 110.

29.     Moses and Daniel confirmed the quotes attributed to them in the "The End."  Lewis ¶ 21.

30.     Lewis did not receive any complaints regarding the depiction of the dinner in "The End."
        Lewis Dec. ¶ 22.

## THE WRITING AND EDITING OF *THE BIG SHORT*

31.     Lawrence has spent 42 years at Norton, and in 1993 became Norton's editor-in-chief.
        Lawrence Dec. ¶ 3.

32.     Lawrence has been Lewis's editor for each of the eleven books by Lewis that Norton has
        published, including *The Big Short*.  Lawrence Dec. ¶ 10; Lewis Dec. ¶ 26.

33.     Lawrence knows Lewis well, and believes he is hard working, of the utmost integrity,
        and a thorough researcher who develops a deep knowledge of his subject matter and his
        subjects.  Lawrence Dec. ¶¶ 18-19, 41.

34.     Lewis signed a contract with Norton for *The Big Short* dated October 28, 2008 (the
        "Book Contract").  Lawrence Dec. ¶ 29; Lewis Dec. ¶ 23.

35.     In the Book Contract, Lewis warranted to Norton that he was the "sole proprietor" of the
        work and that the work would not be libelous.  Lawrence Dec. ¶ 29.

36.     The Book Contract provided for Lewis to deliver the Book to Norton by
        August 15, 2009.  Lawrence Dec. ¶ 30; Lewis Dec. ¶ 24.

37.     Sometime prior to March 30, 2009, Lewis told Lawrence he was not likely to meet the
        Book Contract's August 15, 2009 date.  Lawrence Dec. ¶ 30; Lewis Dec. ¶ 24.

38. Norton did not ask Lewis to deliver the manuscript any faster than he was able to, and rescheduled publication of the Book for March 2010. Lawrence Dec. ¶¶ 31, 33; Lewis Dec. ¶ 24.

39. On August 16, 2009, Lewis told Lawrence that he would deliver the manuscript in four installments starting on September 15, 2009 and ending on December 15, 2009. Lawrence Dec. ¶ 32; Lewis Dec. ¶ 24.

40. Lewis sent each group of chapters to Lawrence for editing in accordance with the schedule that Lewis had set for himself. Lawrence Dec. ¶ 34; Lewis Dec. ¶ 26.

41. Lawrence carefully edited each chapter of the Book, and gave Lewis questions and comments regarding clarity, consistency, and comprehension. Lawrence Dec. ¶ 35; Lewis Dec. ¶ 26.

42. Lawrence edited the portion of the Book that contains the Challenged Statements twice. Lawrence Dec. ¶ 37.

43. Janet Byrne is an able and experienced copy editor. Lawrence Dec. ¶ 36.

44. Janet Byrne copy-edited the Book. She told Lewis if she thought anything was unclear, inaccurate, or inconsistent, and checked dates and spellings of names. Lawrence Dec. ¶ 36; Lewis Dec. ¶ 27.

45. Byrne and Lawrence reviewed the entire manuscript again from beginning to end when the editing was done. Lawrence Dec. ¶ 39.

46. Norton had complete confidence in Lewis and relied on him for the accuracy of *The Big Short*. Lawrence Dec. ¶¶ 19, 22-23, 29.

47. Lawrence requested a pre-publication legal review of the Book because Lewis was a prominent author and the Book concerned current events. Lawrence Dec. ¶¶ 40-41.

48. Renee Schwartz, Esq., Norton's outside counsel, reviewed the Book for legal issues such as libel prior to its publication. Lawrence Dec. ¶¶ 42-43; Schwartz Dec. ¶¶ 15-17.

49. Schwartz is an experienced, well-credentialed lawyer who has conducted hundreds of legal reviews for Norton and other publishers. Lawrence Dec. ¶42; Schwartz Dec. ¶¶ 3-6.

50. Schwartz told Lawrence that there was no reason that Norton could not proceed to publish the Book. Lawrence Dec. ¶ 43; Schwartz Dec. ¶ 22.

51. Norton had complete confidence in Schwartz, and relied on her. Lawrence Dec. ¶ 42.

52. Nothing arose during the development or editing of *The Big Short* that caused Norton to question Lewis's credibility, methodology, accuracy or sources. Lawrence Dec. ¶¶43, 48-50; Schwartz Dec. ¶ 22.

53. Norton did not know that any facts in the Book were false. Lawrence Dec. ¶ 50.

54. Norton had no doubt about the reliability of Lewis's sources, and had no reason to doubt the reliability of Lewis's sources. Lawrence Dec. ¶ 49.

55. Norton had no doubts about the accuracy of the Book, and had no reason to doubt the accuracy of the book. Lawrence Dec. ¶ 50.

56. *The Big Short*, by Michael Lewis, was published by Norton on March 15, 2010. Lawrence Dec. ¶ 13; Lewis Dec. ¶ 32.

57. Until the complaint in this action, Norton had not received a lawyer's letter or other such complaint about the Book. Lawrence Dec. ¶ 54.

58. Of the 11 Lewis books that Norton has published, none contained an index in the first printing, and only one contained an index in a later edition. Lawrence Dec. ¶ 47; Lewis Dec. ¶ 32 n. 7.

59. Given the length of time over which Norton has been publishing Lewis's books and the number of books sold (6.8 million), the number of complaints Norton has received pertaining to matters of factual accuracy in Lewis's work is *de minimis*. Lawrence Dec. ¶¶ 52-53; Lewis Dec. ¶ 68.

## LEWIS'S RESEARCH AND FACT-CHECKING PROCESS

60. Lewis spent approximately 16 months doing research on the subject matter of the Book before he began writing. Lewis Dec. ¶ 19, 25.

61. Lewis interviewed over 100 people in connection with his research for the Book, including Eisman, Daniel, Moses, REDACTED Marc Rosenthal,   REDACTED   REDACTED   Jamie Mai, Charles Ledley, and Anna Katherine Barnett-Hart. Lewis Dec. ¶ 36 Lewis also interviewed many others, including hedge fund managers who shorted the subprime mortgage bond market; people who were knowledgeable about CDOs as underwriters or traders; people who either managed CDOs or worked for companies that managed CDOs, and industry analysts or commentators, etc. Lewis Dec. ¶¶ 37-39.

62. Lewis obtained and reviewed thousands of pages of research material including primary source materials from   REDACTED   Michael Burry, Charlie Ledley and Jamie Mai; information from *Bloomberg* and other internet sources; books and articles by scholars and journalists; research reports by financial industry analysts; reports published by the

Ratings Agencies (Standard & Poor's, Moody's, and Fitch); filings from various lawsuits; government materials, etc.  Lewis Dec. ¶¶ 40-44.

63. Lewis had one or more sources for each factual assertion contained in the Challenged Statements. Lewis Dec. ¶¶ 73; Rauterberg Dec., Ex. 110 (at Interrogatory no. 1)

64. Lewis became interested in Chau personally for three reasons: (1) after Lewis wrote "The End," he learned that Lippman had deliberately paired Chau and Eisman at the Las Vegas dinner; (2) as Lewis did his research, he came to understand that Chau was a large and important CDO manager; and (3) Lewis learned that Chau had aggressively marketed CDOs until the market for CDOs had dried up.  Lewis Dec. ¶ 46.

65. Lewis personally visited a number of the locations he wrote about in the Book, including the Las Vegas restaurant where the Dinner Conversation took place.  Lewis Dec. ¶ 45.


## LEWIS'S ATTEMPTS TO INTERVIEW CHAU

66. Lewis attempted to obtain an interview of Chau by contacting him by phone and by email.  Lewis Dec. ¶¶ 52-53.

67. Lewis attempted to obtain an interview of Chau by contacting him       REDACTED
Lewis Dec. ¶¶ 54-56;                    REDACTED

68. Chau was told that Lewis's book would likely include an account of the dinner described in "The End." Rauterberg Dec., Exs. 122       REDACTED       , 120 (Chau Dep. 88:16-89:19; 90:25-94:6; 96:11-97:14).

69.                    REDACTED


70. Lewis attempted to obtain an interview of Chau by contacting him through Margolis. Lewis Dec. ¶ 55.

71.                    REDACTED


72. Chau did not respond to Lewis's attempts to interview him.  Lewis Dec. ¶¶ 52-57; Rauterberg Dec., Ex. 120 (Chau Dep. 107:3-116:4).

73. It is Lewis's practice to triangulate the information he receives from his sources.  Lewis Dec. ¶ 58-61;                    REDACTED

74. Lewis vetted Eisman as a source by interviewing core members of Eisman's investment team, his family, and other people who knew about Eisman and the information he

provided to Lewis.  Lewis Dec. ¶ 60;                                REDACTED

75.                                              REDACTED

76.     At the time of publication of *The Big Short*, Lewis did not doubt, and had no reason to doubt, his sources for the Book.  Lewis Dec. ¶ 62.

77.     At the time of publication of *The Big Short*, Lewis did not have any reason to believe that the Challenged Statements were inaccurate, and believed them to be accurate.  Lewis Dec. ¶ 71.

78.     Eisman confirmed as accurate every quote attributed to him or Chau in the Challenged Statements.  Goldstein Dec. Ex. 5.

79.     Lewis did not intend any of the implications alleged by the plaintiffs. Lewis Dec. ¶¶ 112-113.

## BACKGROUND OF CHAU AND HARDING

80.     Prior to joining Maxim Group LLC ("Maxim"), Chau had never been a CDO manager. Rauterberg Dec., Ex. 134 .

81.     In or about May 2004, Chau was engaged by Maxim to start a CDO management business under the Maxim umbrella.  Rauterberg Dec., Ex. 120 (Chau Dep. 8:10-19).

82.     In February 2006, Chau formed his own CDO management business, Harding. Rauterberg Dec., Exs. 67, 120 (Chau Dep. 6:5-8)

83.     Plaintiffs' goal was to make Harding an industry leader in the management of structured finance CDOs.  Rauterberg Dec., Exs. 8 (at p. 20), 37 (at p. 47).

84.     Plaintiffs' goal was to increase Harding's assets under management ("AUM"). Rauterberg Dec., Exs. 8 (at p. 20), 127 (Harding Dep. 260:25-261:8).

85.     Harding is a limited liability company formed in February 2006, and which commenced business operations in July 2006.  Rauterberg Dec., Exs. 67, 127 (Harding Dep. 12:6-25).

86.     Harding is owned 99% by Chau and 1% by his wife.  Rauterberg Dec., Exs. 127 (Harding Dep. 163:4-11); 135 (at 5877546-47).

                                         REDACTED

REDACTED

93.   Harding acquired Maxim Advisory on February 8, 2008, and changed Maxim's name to High Perch. Rauterberg Dec., Exs. 127 (Harding Dep. 8:14-10:20); 127 (Harding Dep. 10:21-11:14).

94.   High Perch is a limited liability company which is 100% owned by Harding. Rauterberg Dec., Ex. 127 (Harding Dep. 11:7-19).

95.   Harding is a registered investment advisor pursuant to § 203 of the Investment Advisers Act of 1940. As such, Harding is required to file a Form ADV annually with the SEC. Forms ADV are publicly available documents. Rauterberg Dec., Exs. 84, 127 (Harding Dep. 12:5-13:24).

96.   High Perch is a registered investment advisor pursuant to § 203 of the Investment Advisers Act of 1940. As such, High Perch has annually filed a Form ADV with the SEC since it was formed in 2003 (under the name Maxim Advisory). Rauterberg Dec., Exs. 102, 127 (Harding Dep. 12:24-13:24).

97.   Harding and High Perch's Form ADVs filed list Chau as President, Managing Member, and/or Chief Compliance Officer of Harding and High Perch, respectively. Rauterberg Dec., Ex. 84.

98.   Chau formed the Harding Structured Credit Opportunities Fund, later renamed the Longwall Opportunities Fund ("Longwall"), in November 2007. Longwall was a fund for purchasing distressed residential real estate assets and other asset classes. Rauterberg Dec., Exs. 54, 88.

## THE HARDING CDOS

99.   As of October 2007, plaintiffs managed or submanaged 21 CDOs (collectively, the "Harding CDOs") representing over $23 billion in AUM. Blasie Dec. Exh. A; Rauterberg Dec., Exs. 35, 120 (Chau Dep. 156:3 – 161:23).

100.   Chau managed 8 mezzanine CDOs.  Rauterberg Dec., Exs. 8 (at pp. 10-11), 120 (Chau Dep. 165:3 – 166:24).

<div align="center">REDACTED</div>

103.   As of March 2007, there were at least 90 CDO managers.  Rauterberg Dec., Exs. 23, 127 (Harding dep. 299:7-22).

<div align="center">REDACTED</div>

REDACTED

## PLAINTIFFS' PROMINENCE

114.   Over 70 large corporate investors, including prominent financial institutions, invested in the Harding CDOs.  Cplt. ¶ 39; Rauterberg Dec. Ex. 2.

115.   Plaintiffs described themselves as industry leaders in their marketing materials.  Goldman Dec., Exs. 5 (at p. 32), 7, 8, 25, 36 (at p. 11), 38 (at p. 16).

116.   Plaintiffs' marketing materials describe Harding's role in the issuance of CDOs between January 2007 and September 2007 as a notable achievement.  Goldman Dec. ¶16.

117.   At the height of the CDO market, Harding ranked among the top CDO managers.  Cplt. ¶ 4.

118.   In 2004, Maxim Advisory was the fourteenth-largest CDO of ABS manager.  Rauterberg Dec., Ex. 96.

119.   In 2005, Harding was the seventh-largest CDO of ABS manager.  Rauterberg Dec. 96.

120.   In 2007, Harding was the sixth-largest CDO of ABS manager and the ninth-largest cash flow CDO manager.  Rauterberg Dec., Ex. 96.

121.   In 2007, Harding was the second-largest CDO of ABS manager and the third-largest cash flow CDO manager.  Rauterberg Dec., Ex. 56.

122.   Between January 2007 and September 2007, Harding issued more ABS-backed CDOs by volume than any other CDO manager.  Rauterberg Dec., Ex. 56.

REDACTED

REDACTED

128.   Investors in the Harding CDOs filed lawsuits against Harding. Rauterberg Dec., Ex. 138.

129.   Harding was subject to review by the Ratings Agencies and insurers, and subject to on-site reviews by institutional investors and bankers.  Cplt. ¶ 37; Rauterberg Dec., Ex. 128 (Harding 58:10-59:9, 73:8-73:25, 82:6-84:23).

## PLAINTIFFS' RELATIONSHIP WITH MERRILL LYNCH

130.   Harding worked with numerous CDO underwriters including Merrill Lynch.  Cplt. ¶ 38.

REDACTED

## PLAINTIFFS' MARKETING ACTIVITIES

136.   Harding had a website whose purpose was to "advertise the Harding brand and name and what [it] had done in the CDO industry."  Rauterberg Dec., Ex. 127 (Harding Dep. 25:18-26:11).

137.   The Harding website described Harding as "one of the leading investment advisors in the structured finance market." Rauterberg Dec., Exs. 24, 127 (Harding Dep. 26:33-27:17).

138.   To secure mandates to manage CDOs, Harding had to market itself to investment banks. Rauterberg Dec., Ex. 127 (Harding Dep. 13:25-15:4).

139.   The name and identity of the CDO manager was important for selling CDOs to investors. Rauterberg Dec., Ex. 127 (Harding Dep. 44:4-7).

140.   Harding created "pitch books" to market itself, and potential ventures it was developing. Rauterberg Dec., Exs. 22, 127 (Harding Dep. 13:25-19:12).

141.   For each Harding CDO there was typically a "pitch book" that was used to market the CDO to potential investors. Each pitch book contained information about the collateral manager, such as its prior CDOs, and the size of its AUM, and its rankings. Each pitch book contained information about Harding's key employees, starting with a biography of Chau. Rauterberg Dec., Exs. 7, 127 (Harding Dep. 42:4-44:22).

142.   For each Harding CDO there was typically an offering memorandum that was used to describe the CDO to potential investors. Each offering memorandum featured the CDO manager's name and logo on its cover, and contained information about the CDO manager and Chau. Rauterberg Dec., Exs. 26, 127 (Harding 45:19-51:24).

143.   For each Harding CDO there was typically a term sheet that was used to market the CDO to potential investors. Each term sheet featured the CDO manager and its logo. Rauterberg Dec., Exs. 27, 127(Harding Dep. 51:25-55:9).

144.   The issuance of Harding CDOs was announced in blast emails to Wall Street trading desks. Rauterberg Dec., Exs. 29, 127 (Harding Dep. 308:15-24).

145.   Plaintiffs understood and agreed that the underwriters of the Harding CDOs would use the Harding name and Chau's reputation and experience to market the Harding CDOs. Rauterberg Dec., Ex. 127 (Harding Dep. 42:4-44:7).

146.   Harding wrote and/or reviewed the portions of the marketing materials for the Harding CDOs that pertained to Harding. Rauterberg Dec., Ex. 127 (Harding Dep. 42:4-55:9).

147.   Harding participated in road shows for the Harding CDOs. A road show is a series of presentations in the United States and abroad to potential investors organized by the CDO's underwriter. A road show typically lasts for several weeks. Harding representatives, including Chau, participated in every road show they were asked to participate in, for a total of 12 to 15 road shows. Rauterberg Dec., Ex. 127 (Harding Dep. 21:13-23:2).

148.   Chau and other Harding representatives met with over 200 potential investors in order to market the Harding CDOs. Rauterberg Dec., Ex. 127 (Harding Dep. 21:25 -24:5).

149.   Harding representatives provided information to actual and potential investors upon request. That information was provided via spreadsheets, emails, telephone calls, and through in person visits. Rauterberg Dec., Ex. 127 (Harding Dep. 56:24-58:5).

150.   Chau was the primary person responsible for Harding's marketing activities, and spent much of his time promoting himself, Harding, and the Harding CDOs. Rauterberg Dec., Ex. 127 (Harding Dep. 13:25 – 16:16; 20:7 – 21:24).

151. Chau and/or other Harding representatives attended industry conferences, including major industry events, in order to market Harding and the Harding CDOs. Goldman Dec., ¶¶ 18-19; Rauterberg Dec., Ex. 127 (Harding Dep. 20:7 – 21:24).

152. Harding sent representatives to events sponsored by investment banks. Rauterberg Dec., Ex. 127 (Harding Dep. 20:7 – 21:24).

153. Chau was invited to speak at industry events and accepted some of these invitations, including invitations to speak at a Hedge Fund Conference sponsored by Merrill Lynch in Florida in 2006 and a conference sponsored by UBS in New York in 2006. Rauterberg Dec., Exs. 77, 109, 127 (Harding Dep. 24:6 – 25:17).

154. In 2008, Harding marketed Longwall, a fund for purchasing distressed residential real estate assets and other asset classes. Rauterberg Dec., Ex. 87 (at p. 6).

155. Plaintiffs' development of Longwall garnered negative press attention. Goldman Dec. ¶ 2 (aa), (ee), (ii).

## PLAINTIFFS' RELATIONSHIP WITH AND COVERAGE BY THE GENERAL AND FINANCIAL PRESS

156. Between 2004 and March 2010, at least 45 articles were published in the general and financial press about Chau, Harding, and the Harding CDOs. Goldman Dec. ¶ 2.

157. Informa Global Markets, a financial news service with over 2000 financial institutions as subscribers, disseminated information about Harding. Goldman Dec. ¶ 4; Rauterberg Dec., Ex. 97.

158. In at least one instance, Harding requested a retraction from Informa Global Markets when it issued a report that Harding believed was inaccurate. Goldman Dec. ¶ 4; Rauterberg Dec., Exs. 30, 127 (Harding Dep. 384:25 – 386:25).

159. Prior to the publication of *The Big Short*, Chau was interviewed either in person, by telephone or by email in connection with at least five articles concerning his work as a CDO manager, including articles for *Asset Securitization Report*, *Credit Investment News*, *The Wall Street Journal*, and two articles for *Bloomberg News*. Rauterberg Dec., Exs. 94, 95, 127 (Harding Dep. 37:6-39:11); Goldman Dec. ¶ 2.

160. Kenneth Margolis, when he was managing director of Harding, was interviewed by a *Wall Street Journal* reporter in connection with the article "Wall Street Wizardry Amplified Credit Crisis."                    REDACTED

161. Margolis and Chau discussed how Margolis should respond to the reporter. Rauterberg Dec., Exs. 104, 105,          REDACTED          ; 121 (Chau 2-27-12 Dep. 375:15 – 379:21).

162. In January 2008, Chau's outside counsel wrote to *Bloomberg News* challenging Bloomberg reporter Jody Shenn's reporting and stating that "both we and our client are available to you for further interviews or explanations." Rauterberg Dec., Ex. 47.

163. Chau was on *Bloomberg News* reporter Jody Shenn's email list of people he solicited for on- and off- the record comments about industry matters. Rauterberg Dec., Ex. 120 (Chau Dep. 123:18-124:4).

164. Chau spoke with *ProPublica* reporter Jesse Eisinger in November 2009 regarding a story that Eisinger was working on with Jake Bernstein on the 2006-2007 CDO market. Rauterberg Dec., Exs. 33, 34, 120 (Chau Dep. 120:25-122:9).

165. After *The Big Short* was published, reporters from *Bloomberg News* (Jody Shenn) and *ProPublica* (Jesse Eisinger and Jake Bernstein) contacted Chau by email, and offered him the opportunity to comment on the Book. Rauterberg Dec., Exs. 61, 80, 90, 127 (Harding 39:15-40:13).

166. Chau responded to Shenn after his attorney reviewed his responses. Rauterberg Dec., Exs. 59, 60, 81.

167. Shenn quoted Chau's response in the article. Goldman Dec. ¶ 2.

168. Chau responded to Eisinger and Bernstein through his outside counsel. Rauterberg Dec., Ex. 57.

169. Investment banks have research analysts who provide market research to the industry in the form of written reports ("Analyst Reports"). Goldman Dec. ¶ 3.

170. Being covered in Analyst Reports helped Harding promote itself, and Harding representatives were free to speak to analysts who contacted them. Goldman Dec. ¶ 3.

171. Harding and the Harding CDOs were covered in Analyst Reports published by financial institutions such as Bear Stearns, Merrill Lynch, Credit Suisse, J.P. Morgan, and Nomura. Goldman Dec. ¶ 3.

172. Chau and Harding monitored the news to find out what was published about Chau, Harding, and the Harding CDOs. Rauterberg Dec., Ex. 127 (Harding 386:2 -6).

173. The deterioration of the Harding CDOs was reported in the financial press and Analyst Reports. Goldman Dec. ¶¶ 2 (j) – (jj), 3.

## THE COVERAGE OF PLAINTIFFS BY THE RATINGS AGENCIES

174.   S&P, Moody's Investors Service ("Moody's"), and Fitch Ratings ("Fitch") (collectively, the "Ratings Agencies") published credit ratings and opinions concerning the Harding CDOs.  Goldman Dec. ¶¶ 4-5; Rauterberg Dec., Ex. 127 (Harding Dep. 66:22-24).

175.   The Ratings Agencies issued over 200 press releases about the Harding CDOs.  Goldman Dec. ¶ 5.

176.   Sometimes when a Ratings Agency was considering changing its opinion with respect to a Harding CDO, it requested information from Harding, and gave Harding the opportunity to comment on press releases.  Goldman Dec. ¶ 8.

177.   The Ratings Agencies published reports concerning Harding and the Harding CDOs. Goldman Dec. ¶ 6.

178.   The Ratings Agencies also published on other subjects relating to CDOs, *e.g.*, reports on particular CDO managers, rankings of CDO managers, and the outlook for the CDO market.  Goldman Dec. ¶¶ 4, 6.

179.   From time to time, representatives of the Ratings Agencies visited the plaintiffs' offices. Chau typically took the lead in these meetings which typically went for a half-day. Goldman Dec. ¶ 7; Rauterberg Dec., Ex. 127 (Harding Dep. 73:17- 76:9).

180.   From time to time, Chau and other representatives of Harding met with Ratings Agency representatives in more social settings, *e.g.*, for lunch or dinner at a restaurant. Rauterberg Dec., Exs. 12, 13, 127 (Harding Dep. 76:10- 77:4).

181.   The Ratings Agencies sought information from plaintiffs through conference calls, emails, and presentations.  Goldman Dec. ¶¶ 7-8.

182.   To the extent possible, Harding provided the Ratings Agencies with whatever information they requested.  Goldman Dec. ¶¶ 7-8, 10; Rauterberg Dec., Ex. 127 (Harding Dep. 73:4-7).

183.   It was not in plaintiffs' interests for tranches of the CDOs it managed to be downgraded. Goldman Dec. ¶ 8; Rauterberg Dec., Ex. 127 (Harding 71:6-20).

184.   Some of the Harding CDOs were listed on the Irish Stock Exchange ("ISE").  Goldman Dec. ¶ 11.

185.   Harding understood that under certain circumstances (*e.g.*, when a CDO had an event of default or was liquidated), the CDO manager had to give written notice to the trustee of the CDO, and the trustee was required to send this notice to the ISE.  Goldman Dec. ¶ 11.

186.    Harding understood that when the ISE was notified of these circumstances, its Company Announcements Office would issue a press release.  Goldman Dec. ¶ 11.

187.    The ISE has its own regulatory regime. Goldman Dec., Ex. 67.


**THE PUBLIC CONTROVERSY**

188.    There was public debate and discussion concerning CDOs before Harding went into business; that debate and discussion continues to this day.  Goldman Dec. ¶¶ 19-27; Cplt. ¶¶ 40-43.

189.    Plaintiffs were aware of the public debate and discussion concerning CDOs.  Goldman Dec. ¶ 20; Rauterberg Dec., Exs. 69, 72.

190.    Plaintiffs publically expressed their views concerning CDOs through their marketing activities and media contacts. Goldman Dec. ¶17.


Dated: New York, New York
       April 13, 2012

Respectfully submitted,

COOLEY LLP

By:    ___s/ Celia Goldwag Barenholtz_____

Celia Goldwag Barenholtz

1114 Avenue of the Americas
New York, New York  10036
(212) 479-6000 (phone)
(212) 479-6275 (fax)
cbarenholtz@cooley.com

*Attorneys for Defendants Michael Lewis and W.W. Norton & Company, Inc.*