PUBLIC VERSION -
CONFIDENTIAL
MATERIAL REDACTED

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

WING F. CHAU and HARDING ADVISORY LLC,  :  Index No. 11-CV-1333 (GBD) (KNF)

                                                   :

                   Plaintiffs,  :  ECF Case

               -against-  :

MICHAEL LEWIS, STEVEN EISMAN, and W.W.  :
NORTON & COMPANY, INC.,

                   :

                Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

### STATEMENT OF MATERIAL
### FACTS NOT GENUINELY IN DISPUTE
### SUBMITTED BY DEFENDANT STEVEN EISMAN

      Pursuant to Local Rule 56.1, Defendant Steven Eisman ("Eisman") respectfully submits

the following statement of material facts as to which there is no genuine dispute, in further

support of his motion for summary judgment:

### DEFENDANT STEVEN EISMAN

     1.      Eisman is one of the individuals profiled in *The Big Short* ("*TBS*"), a non-fiction

book by Michael Lewis ("Lewis").  Declaration of Steven Eisman ("ED") ¶ 2.

     2.      Eisman was one of a number of sources Lewis interviewed in researching *TBS*.

ED ¶ 3.

     3.      Starting in 2004, Eisman began working at FrontPoint Partners LLC, where he

came to manage several funds, including the FrontPoint Financial Services Fund, L.P. and the

FrontPoint Financial Horizons Fund, L.P. (collectively, "FrontPoint"), two equity funds

dedicated to investments in financial services companies.  ED ¶¶ 2, 12.

4.      Vincent Daniel and Daniel Moses, who worked with Eisman at FrontPoint, are also profiled in *TBS*.  ED ¶ 2.

5.      The aspect of Eisman's work at FrontPoint that *TBS* focuses on is a substantial "short" position FrontPoint took against the market for subprime mortgage-backed securities. ED ¶¶ 2, 13.

6.      In early 2006, Eisman was introduced by Greg Lippmann of Deutsche Bank to the idea of using credit default swaps to short bonds backed by subprime residential mortgages.  ED ¶¶ 17-18; Declaration of Jacob P. Goldstein ("GD") Ex. 8 (Eisman Dep.) 121:23-122:8; GD Ex. 7 (Daniel Dep.) 92:18-93:14.

7.      A credit default swap requires a short party and a long party.  ED ¶ 16; GD Ex. 6 (Chau Dep.) 81:21-25.

8.      In October 2006, FrontPoint first purchased credit default swaps on bonds backed by subprime residential mortgages.  ED ¶¶ 13, 19; GD Ex. 8 (Eisman Dep.) 136:25-137:10.

9.      FrontPoint's short position against the market for subprime mortgage-backed securities ultimately exceeded $500 million, and eventually included credit default swaps on both mortgage-backed bonds and mortgage-backed collateralized debt obligations ("CDOs"). ED ¶¶ 13, 19, 37.

## PLAINTIFFS WING CHAU AND HARDING ADVISORY LLC

### Chau's and Harding's CDO-Management Business

10.      Plaintiff Wing Chau ("Chau") is a financial professional who specializes in the management of CDOs.  GD Ex. 1 (Compl.) ¶ 3.

11.      Plaintiff Harding Advisory LLC ("Harding") is an asset management firm specializing in the management of CDOs.  GD Ex. 1 (Compl.) ¶ 4.

2

12.     Chau entered the CDO management business in 2004, when he joined Maxim Group LLC in order to develop a CDO management business for Maxim Advisory LLC. GD Ex. 1 (Compl.) ¶ 24.

13.     Chau managed four CDOs at Maxim Advisory LLC, backed by nearly $4 billion in collateral, before leaving in 2006 to form Harding. GD Ex. 1 (Compl.) ¶¶ 25-26.

14.     During 2006 and 2007, Harding managed a total of 21 CDOs, 17 of which were issued by Harding and 4 of which were taken over from Maxim Advisory LLC. GD Ex. 1 (Compl.) ¶¶ 26, 32.

15.     Of the 17 CDOs issued by Harding, 6 were issued between June 2006 and December 2006: Jupiter 4, Lexington 2, Cloverie, Octans 1, Octans 2, and Octans 3. GD Ex. 19 (DX 281) at 3; GD Ex. 14 (DX 27) at 11.

16.     Of the 17 CDOs issued by Harding, 11 were issued between January 2007 and October 2007: Lexington 3, Octonion, 888 Tactical, Tigris, Jupiter 5, Lexington 5, Neo, Jupiter 6, Jupiter 7, Adrastea, and Tribune. GD Ex. 19 (DX 281) at 3; GD Ex. 14 (DX 27) at 11.

17.     Harding managed eight mezzanine CDOs: Lexington I, Lexington II, Lexington III, Lexington V, Octans I, Octans II, Octans III and Octonion. GD Ex. 6 (Chau Dep.) 165:3-166:24.

18.     As of the first quarter of 2007, Harding managed 16 CDOs. GD Ex. 14 (DX 27) at 11; GD Ex. 19 (DX 281) at 3.

19.     Harding marketed itself as having $16 billion in assets under management as of the first quarter of 2007. GD Ex. 14 (DX 27) at 10.

20.     As of October 2007, Harding had over $23.1 billion in assets under management. GD Ex. 19 (DX 281) at 4; GD Ex. 6 (Chau Dep.) 156:15-158:11.

21. 

22.     S&P determined that, between January 2007 and September 2007, Harding issued

more asset-backed CDOs by volume than any other manager.  GD Ex. 21 (CH05805476 –

CH05805497) at 14.

23.

24.     At the height of the CDO market, Harding ranked among the top CDO managers.

GD Ex. 2 (Chau's Responses to Defendants' Third Set of Interrogatories) at 12; GD Ex. 3

(Harding's Responses to Defendants' Third Set of Interrogatories) at 12.

**Ownership of CDO Equity**

25.

26.



27.

28.

29.

30.

**Harding's Compensation**



31.

32.

33.

34.

35.

36.

37.



38. 

39.

40.

41. ████████████████████████████████████████████

████████████████████████████████████████████████████████

## THE LAS VEGAS DINNER

42.     On January 28, 2007, Eisman and Chau both attended a dinner ("the dinner") at the Okada Restaurant in the Wynn Las Vegas Hotel.  ED ¶¶ 21, 24; GD Ex. 8 (Eisman Dep.) 230:7-10; 232:9-22; GD Ex. 6 (Chau Dep.) 49:12-51:7; GD Ex. 12 ████████████████████

43.     At the time, both Eisman and Chau were attending the annual conference of the American Securitization Forum ("ASF").  ED ¶ 21; GD Ex. 8 (Eisman Dep.) 230:7-10, 232:9-22; GD Ex. 6 (Chau Dep.) 49:12-51:7; GD Ex. 12 ████████████████

44.     The dinner was hosted by Greg Lippmann of Deutsche Bank.  GD Ex. 12 ██████████████████; GD Ex. 6 (Chau Dep.) 50:6-51:7; GD Ex. 8 (Eisman Dep.) 232:9-11; ED ¶ 24.

45.     Lippmann and Chau knew each other because they had both been working in the asset-backed securities market since the late 1990s and Deutsche Bank was one of the investment banks with which Chau's firm interacted.  GD Ex. 6 (Chau Dep.) 41:8-51:7.

46. ████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████

47.     Prior to the dinner, Lippmann told Eisman that he wanted him to attend so that he could meet a CDO manager.  ED ¶ 24; GD Ex. 8 (Eisman Dep.) 233:9-17.

48.     At the dinner, Eisman was seated between Chau and Lippmann.  GD Ex. 12
████████████████████; ED ¶ 25; GD Ex. 8 (Eisman Dep.) 234:9-16; GD Ex. 13 (Moses Dep.)
158:5-19.

49.     Eisman and Chau had a conversation at the dinner.  GD Ex. 6 (Chau Dep.) 78:17-
82:17; ED ¶¶ 20-34; GD Ex. 8 (Eisman Dep.) 243:16-21; GD Ex. 12 ████████████████████
████.

50.     ████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████.

51.     Eisman recalls the following from the conversation he had with Chau at the
dinner:

     a.     Chau told Eisman that he wished to grow his business from $15 billion in

        CDO collateral to $50 billion.  ED ¶¶ 26-27; GD Ex. 8 (Eisman Dep.)

        283:12-14.

     b.     Eisman remarked that he (Chau) "must be having a hard time," given the

        growing defaults among subprime mortgages, and Chau responded by

        telling Eisman that he had "sold everything out."  ED ¶¶ 28-29; GD Ex. 8

        (Eisman Dep.) 274:9-18.

     c.     Chau told Eisman, "I love guys like you who short my market.  Without

        you, I don't have anything to buy," ED ¶ 30; GD Ex. 8 (Eisman Dep.)

        287:13-21, and that his main fear was that the U.S. economy would

        improve, which would discourage shorts from placing bigger bets against

the subprime mortgage market, ED ¶ 31; GD Ex. 8 (Eisman Dep.) 290:22-291:12.

52. ███████████████████████████████████████████

███████████████████████████

    a. ███████████████████████████████████████████

███████████████████

    b. ███████████████████████████████████████████

██████████

53. Chau remembers "[n]othing specific" from the conversation he had with Eisman at the dinner. GD Ex. 6 (Chau Dep.) 79:11-14.

54. After the dinner, Eisman informed Lippmann that "whatever that guy is buying I want to short it," and, "I want to short his paper. Sight unseen." ED ¶ 34; GD Ex. 8 (Eisman Dep.) 294:5-295:8; GD Ex. 7 (Daniel Dep.) 203:6-15; GD Ex. 13 (Moses Dep.) 245:6-246:11; GD Ex. 12 ████████████████████;

55. The day after the dinner, Eisman explained to Daniel and Moses that, based on his conversation with Chau, he now believed that "these CDO managers just don't understand what we think we understand as far as the degradation of the [subprime] marketplace," and that CDO

managers "need us as much as we need them."  GD Ex. 13 (Moses Dep.) 172:9-173:20, 177:4-18; ED ¶ 34.

56.  FrontPoint shorted about $50 million in CDOs within three weeks of the dinner, and continued to expand its short position by hundreds of millions of dollars thereafter.  ED ¶ 6, 37; GD Ex. 8 (Eisman Dep.) 191:11-192:11.

57.  Before the dinner, FrontPoint had not purchased any credit default swaps on CDOs.  ED ¶¶ 19, 35; GD Ex. 8 (Eisman Dep.) 295:9-20; GD Ex. 13 (Moses Dep.) 186:17-25; GD Ex. 7 (Daniel Dep.) 203:18-25.

## THE CHALLENGED STATEMENTS

58.  In this action, plaintiffs allege that 26 statements in *TBS* are false and defamatory. GD Ex. 2 (Chau's Responses to Defendants' Third Set of Interrogatories) at 4-36; GD Ex. 3 (Harding's Responses to Defendants' Third Set of Interrogatories) at 4-37.  A complete list of the 26 statements as they appear in *TBS* is annexed hereto as the Appendix.  The statements identified in bold refer to the statements as numbered in that chart.

59.  With respect to **Statement 1**, Eisman told Lewis that Chau introduced himself at the Las Vegas dinner as a CDO manager, and that, at the time he met Chau, he "had no idea there was such a thing as a CDO manager [because he] didn't know there was anything to manage."  ED ¶ 93; GD Ex. 8 (Eisman Dep.) 259:9-17; GD Ex. 11 (Lewis Dep.) 253:23-25.

60.  Eisman was not a source for Lewis with respect to **Statement 2**.  ED ¶ 93; GD Ex. 8 (Eisman Dep.) 260:23-261:21; GD Ex. 11 (Lewis Dep.) 265:20-21.

61.  Eisman was not a source for Lewis with respect to **Statement 3**.  ED ¶ 93.

62.  Eisman was not a source for Lewis with respect to **Statement 4**.  ED ¶ 93.

63.     With respect to **Statement 5**, Eisman told Lewis that he considered mezzanine CDOs the "engine of doom" behind the financial crisis because (a) in his view they were the most destructive of the various financial products associated with subprime-mortgage-securitization and (b) they deceptively alchemized risky investments into seemingly safe ones. Eisman also told Lewis that before meeting Chau, he did not appreciate the role of CDO managers in producing and marketing mezzanine CDOs. ED ¶ 93; GD Ex. 11 (Lewis Dep.) 273:22-275:11.

64.     With respect to **Statement 6,** Eisman told Lewis that: (a) Chau said at the dinner that he controlled $15 billion in mezzanine CDOs; (b) Eisman understood that mezzanine managers invested in BBB tranches of mortgage bonds; and (c) Eisman considered the mezzanine CDOs to be "the equivalent of three levels of dog shit lower than the original bonds." ED ¶ 93; GD Ex. 8 (Eisman Dep.) 268:4-6.

65.     Eisman was not a source for Lewis with respect to **Statement 7**. ED ¶ 93; GD Ex. 8 (Eisman Dep.) 269:7-14.

66.     With respect to **Statement 8**, Eisman told Lewis that: (a) his team at FrontPoint had evaluated the subprime mortgage market and concluded by late January 2007 that the collateral of bonds comprised of subprime loans had deteriorated to a significant extent; (b) he believed that equity investors in many mezzanine CDOs would have been devastated by that deterioration; (c) he said to Chau at the Las Vegas dinner: "God, you must be having a hard time."; and (d) Chau responded, "No, I've sold everything out." ED ¶ 93; GD Ex. 8 (Eisman Dep.) 273:16-274:23; GD Ex. 13 (Lewis Dep.) 290:8-291:4.

67.     With respect to **Statement 9**, Eisman told Lewis his beliefs that: (a) investors were willing to invest in CDOs primarily because of the seal of approval bestowed upon them by

the ratings agencies; (b) because of that, CDO managers did not need to do detailed, loan-level analysis on the underlying loans when acquiring collateral for their CDOs; and (c) CDO managers did little active management once a CDO was issued.  ED ¶ 93.

68.     Eisman was not a source for Lewis with respect to **Statement 10**.  ED ¶ 93.

69.     With respect to **Statement 11**, Eisman told Lewis his assessment that investment banks preferred to give mandates to CDO managers who would take in as collateral the banks' own bonds or CDOs.  ED ¶ 93.

70.     With respect to **Statement 12**, Eisman told Lewis his beliefs that: (a) CDOs were used by investment banks as dumping grounds for assets they could not sell directly; and (b) these investment banks preferred CDO managers who cooperated in that endeavor.  ED ¶ 93.

71.     With respect to **Statement 13**, Eisman told Lewis his beliefs that: (a) CDO managers, despite their nominal independence, were beholden to the investment banks that gave them their mandates; and (b) the underwriting banks ultimately controlled what went into the CDOs.  ED ¶ 93.

72.     With respect to **Statement 14**, Eisman told Lewis that Chau claimed during the dinner to have "sold . . . out" his exposure to the market performance of his CDOs.  ED ¶ 93; GD Ex. 8 (Eisman Dep.) 281:10-25.

73.     With respect to **Statement 15**, Eisman told Lewis that: (a) Chau claimed during the dinner to receive 10 basis points on the assets he managed; and (b) the way that Chau described his compensation during the dinner, he had huge incentives to increase the volume of assets he managed.  ED ¶ 93.

13

74.     With respect to **Statement 16**, Eisman told Lewis that Chau claimed to have $15 billion under management and to want to increase that to $50 billion. ED ¶ 93; GD Ex. 8 (Eisman Dep.) 186:22-187:2; GD Ex. 11 (Lewis Dep.) 308:22-309:9.

75.     Eisman was not a source for Lewis with respect to **Statement 17**. ED ¶ 93;  GD Ex. 11 (Lewis Dep.) 310:20-312:2.

76.     With respect to **Statement 18**, Eisman made the statement that Lewis attributes to him. ED ¶ 93; GD Ex. 8 (Eisman Dep.) 284:16-25, 285:18-286:14; GD Ex. 11 (Lewis Dep.) 312:12-21.

77.     With respect to **Statement 19**, Eisman told Lewis his opinion that CDO managers, including Chau, acted as beards for the investment banks that underwrote the CDOs. ED ¶ 93; GD Ex. 8 (Eisman Dep.) 286:15-287:9.

78.     With respect to **Statement 20**, Eisman made the statement that Lewis attributes to him. ED ¶ 93; GD Ex. 8 (Eisman Dep.) 287:13-24; GD Ex. 11 (Lewis Dep.) 328:14-24.

79.     With respect to **Statement 21**, Eisman told Lewis his belief that credit default swaps dramatically magnified the financial system's exposure to subprime mortgage risk by decoupling that risk from the existence of actual mortgages, and that it was not until meeting Chau, that he (Eisman) came to that insight.  In addition, Eisman told Lewis that in order to churn out more and more subprime CDOs, the CDO industry was increasingly filling CDOs with credit default swaps that replicated subprime home loans, rather than actual home loans, and that doing this required both people like Eisman who were taking a "short" position and people like Chau who were taking a "long" position. ED ¶ 93.

80.     Eisman was not a source for Lewis with respect to **Statement 22**. ED ¶ 93; GD Ex. 8 (Eisman Dep.) 289:3-14; GD Ex. 11 (Lewis Dep.) 315:6-316:14.

81.     With respect to **Statement 23**, Eisman told Lewis that Chau described himself as eager to increase the assets he managed to $50 billion and said his focus was on growing his total assets under management.  ED ¶ 93; GD Ex. 8 (Eisman Dep.) 289:15-290:21; 292:5-293:6.

82.     With respect to **Statement 24**, Eisman told Lewis that Chau said at the dinner that his main fear was that the U.S. economy would strengthen and investors like Eisman would stop shorting subprime-mortgage securities.  ED ¶ 93; GD Ex. 8 (Eisman Dep.) 290:22-291:14.

83.     With respect to **Statement 25**, Eisman told Lewis that after his dinner conversation with Chau, he told Lippmann, "Whatever that guy is buying, I want to short it," and "I want to short his paper.  Sight unseen."; and also told Lewis that as a result of his dinner Eisman began to short CDOs for the first time by purchasing credit default swaps on CDOs.  ED ¶ 93; GD Ex. 8 (Eisman Dep.) 294:5-295:8, 297:4-12; 295:24-296:5, 297:4-12.

84.     With respect to **Statement 26**, Eisman told Lewis that he increased his short position substantially after returning from Las Vegas, including by purchasing credit default swaps on CDOs for the first time.  ED ¶ 93; GD Ex. 8 (Eisman Dep.) 297:4-12; GD Ex. 11 (Lewis Dep.) 320:23-321:24.

85.  Except for statements in *TBS* that are attributed to Eisman and appear in quotation marks, the language used in the challenged statements is not Eisman's language.  ED ¶ 94.

Dated:   New York, New York
         April 13, 2012

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, LLP

*Of Counsel*:

Celeste Phillips
Paul Safier
LEVINE SULLIVAN KOCH & SCHULZ, LLP

David A. Schulz
Michael D. Sullivan
Jacob P. Goldstein
321 West 44th Street, Suite 510
New York, NY 10036
Tel:  (212) 850-6100;
Fax:  (212) 850-6299

*Attorneys for Defendant Steven Eisman*

# **APPENDIX**

*Chau v. Lewis*, No. 11-cv-1333 (GBD) (KNF)

## STATEMENTS ALLEGED TO BE FALSE AND DEFAMATORY

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 1 | When Eisman asked exactly what Harding Advisory advised, Wing Chau explained that he was a CDO manager. "I had no idea there was such a thing as a CDO manager," said Eisman. "I didn't know there was anything to manage." (p. 138.) | Same. | Not "of and concerning" plaintiffs.<br><br>Not actionable; protected as opinion.<br><br>No clear evidence of constitutional malice. |
| 2 | He'd graduated from the University of Rhode Island, earned a business degree at Babson College, and spent most of his career working sleepy jobs at sleepy life insurance companies—but all that was in the past. (p. 139.) | | Not a statement by Eisman. |
| 3. | Danny didn't know Wing Chau, but when he heard that he was the end buyer of subprime CDOs, he knew exactly who he was: the sucker. (p. 139.) | | Not a statement by Eisman. |
| 4 | When they saw that Lippmann had seated Eisman right next to the sucker, both Danny and Vinny had the same thought: *Oh no. This isn't going to end well.* Eisman couldn't contain himself. He'd figure out the guy was a fool, and let him know it, and then where would they be? They needed fools; only fools would take the other side of their trades. (p. 139.) | | Not a statement by Eisman. |

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 5 | Later, whenever Eisman set out to explain to others the origins of the financial crisis, he'd start with his dinner with Wing Chau. Only now did he fully appreciate the central importance of the so-called mezzanine CDO—the CDO composed mainly of triple-B-rated subprime mortgage bonds—and its synthetic counterpart: the CDO composed entirely of credit default swaps on a triple-B-rated subprime mortgage bonds. "You have to understand this," he'd say. "This was the engine of doom." He'd draw a picture of several towers of debt. The first tower was the original subprime loans that had been piled together. At the top of this tower was the triple-A tranche, just below it the double-A tranche, and so on down to the riskiest, triple-B tranche—the bonds Eisman had bet against. The Wall Street firms had taken these triple-B tranches—the worst of the worst—to build yet another tower of bonds: a CDO. A collateralized debt obligation. The reason they'd done this is that the rating agencies, presented with the pile of bonds backed by dubious loans, would pronounce 80 percent of the bonds in it triple-A. These bonds could then be sold to investors—pension funds, insurance companies—which were allowed to invest only in highly rated securities. It came as news to Eisman that this ship of doom was piloted by Wing Chau and people like him. (p. 140.) | Eisman told Lewis: (a) mezzanine CDOs were the most destructive of the various financial products associated with subprime-mortgage-securitization because they deceptively alchemized risky investments into seemingly safe ones; and (b) before meeting Chau, he (Eisman) did not appreciate the role of CDO managers in producing and marketing mezzanine CDOs. | Not "of and concerning" plaintiffs. <br><br> Not defamatory. <br><br> Not actionable; protected as opinion. <br><br> No clear evidence of constitutional malice. |

2

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 6 | The guy controlled roughly $15 billion, invested in nothing but CDOs backed by the triple-B tranche of a mortgage bond or, as Eisman put it, "the equivalent of three levels of dog shit lower than the original bonds. (p.140.) | Eisman told Lewis: (a) Chau said at the dinner that he controlled $15 billion in mezzanine CDOs; (b) Eisman understood that mezzanine managers invested in BBB tranches of mortgage bonds; and (c) Eisman considered the mezzanine CDOs to be "the equivalent of three levels of dog shit lower than the original bonds." | Not defamatory.<br><br>Not actionable; protected as opinion.<br><br>No clear evidence of falsity.<br><br>No clear evidence of constitutional malice. |
| 7 | All by himself, Chau generated vast demand for the riskiest slices of subprime mortgage bonds, for which there had previously been essentially no demand. This demand led inexorably to the supply of new home loans, as material for the bonds. The soy sauce in which Eisman double-dipped his edamame was shared by a man who had made it possible for tens of thousands of actual human beings to be handed money they could never afford to repay. (pp. 140-41.) | | Not a statement by Eisman. |
| 8 | As it happened, FrontPoint Partners had spent a lot of time digging around in those loans, and knew that the default rates were already sufficient to wipe out Wing Chau's entire portfolio. "God," Eisman said to him. "You must be having a hard time." "No," Wing Chau said. "I've sold everything out." (p. 141.) | Eisman told Lewis: (a) his team at FrontPoint had evaluated the subprime mortgage market and concluded by late January 2007 that the collateral of bonds comprised of subprime loans had deteriorated to a significant extent; (b) he believed that equity investors in many mezzanine CDOs would have been devastated by that deterioration; (c) he said to Chau at the Las Vegas dinner: "God, you must be having a hard time."; and (d) Chau responded, "No, I've sold everything out." | Not defamatory.<br><br>Not actionable; protected as opinion.<br><br>No clear evidence of falsity.<br><br>No clear evidence of constitutional malice. |

3

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 9 | The CDO manager's job was to select the Wall Street firm to supply him with subprime bonds that served as the collateral for CDO investors, and then to vet the bonds themselves. The CDO manager was further charged with monitoring the hundred or so individual subprime bonds inside each CDO, and replacing the bad ones, before they went bad, with better ones. That, however, was mere theory; in practice, the sorts of investors who handed their money to Wing Chau, and thus bought the triple-A rated tranche of CDOs—German banks, Taiwanese insurance companies, Japanese farmers' unions, European pension funds, and, in general, entities more or less required to invest in triple-A-rated bonds–did so precisely because they were meant to be foolproof, impervious to losses, and unnecessary to monitor or even think about very much. The CDO manager, in practice, didn't do much of anything, which is why all sorts of unlikely people suddenly hoped to become one. (p. 141.) | Eisman told Lewis: he believed that (a) investors were willing to invest in CDOs primarily because of the seal of approval bestowed upon them by the ratings agencies; (b) because of that, CDO managers did not need to do detailed, loan-level analysis on the underlying loans when acquiring collateral for their CDOs; and (c) CDO managers did little active management once a CDO was issued. | Not "of and concerning" plaintiffs. Not actionable; protected as opinion. No clear evidence of constitutional malice. |
| 10 | "Two guys and a Bloomberg terminal in New Jersey" was Wall Street shorthand for the typical CDO manager. (p. 141.) | | Not a statement by Eisman. |
| 11 | The less mentally alert the two guys, and the fewer the questions they asked about the triple-B-rated subprime bonds they were absorbing into their CDOs, the more likely they were to be patronized by the big Wall Street firms. (p. 141.) | Eisman told Lewis: his assessment was that investment banks preferred to give mandates to CDO managers who would take in as collateral the banks' own bonds or CDOs. | Not "of and concerning" plaintiffs. Not actionable; protected as opinion. |

4

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 12 | The whole point of the CDO was to launder a lot of subprime mortgage market risk that the firms had been unable to place straightforwardly.  The last thing you wanted was a CDO manager who asked lots of tough questions.  (p. 141.) | Eisman told Lewis: he believed that (a) CDOs were used by investment banks as dumping grounds for assets they could not sell directly; and (b) these investment banks preferred CDO managers who cooperated in that endeavor. | Not "of and concerning" plaintiffs.<br><br>Not actionable; protected as opinion.<br><br>No clear evidence of constitutional malice. |
| 13 | The bond market had created what amounted to a double agent—a character who seemed to represent the interests of investors when he better represented the interests of Wall Street bond trading desks.  (pp. 141-42.) | Eisman told Lewis:  he believed that: (a) CDO managers, despite their nominal independence, were beholden to the investment banks that gave them their mandates; and (b) the underwriting banks ultimately controlled what went into the CDOs. | Not "of and concerning" plaintiffs.<br><br>Not actionable; protected as opinion.<br><br>No clear evidence of constitutional malice. |
| 14 | To assure the big investors who had handed their billions to him that he had their deep interests at heart, the CDO manager kept ownership of what was called the "equity," or "first loss" piece, of the CDO—the piece that vanished first when the subprime loans that ultimately supplied the CDO with cash defaulted. . . .<br><br>Now, almost giddily, Chau explained to Eisman that he simply passed all the risk that the underlying home loans would default on to the big investors who had hired him to vet the bonds. (p. 142.) | Eisman told Lewis: Chau claimed to have "sold . . . out" his exposure to the market performance of his CDOs. | No clear evidence of falsity.<br><br>No clear evidence of constitutional malice. |

5

{00496451;v1 }

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 15 | But the CDO manager was also paid a fee of 0.01 percent off the top, before any of his investors saw a dime, and another, similar fee, off the bottom, as his investor received their money back. That doesn't sound like much, but, when you're running tens of billions of dollars with little effort and no overhead, it adds up. Just a few years earlier, Wing Chau was making $140,000 a year managing a portfolio for the New York Life Insurance Company. In one year as a CDO manager, he'd taken home $26 million, the haul from half a dozen lifetimes of working at New York Life. . . .<br><br>His job was to be the CDO "expert," but he actually didn't spend a lot of time worrying about what was in CDOs. (p. 142.) | Eisman told Lewis: (a) Chau claimed during the dinner to receive 10 basis points on the assets he managed; and (b) the way that Chau described his compensation during the dinner, he had huge incentives to increase the volume of assets he managed. | Statements concerning Chau's income are not from Eisman.<br><br>Not actionable; protected as opinion.<br><br>No clear evidence of constitutional malice. |
| 16 | His goal, he explained, was to maximize the dollars in his care. He was now doing this so well that, from January 2007 until the market crashed in September, Harding Advisory would be the world's biggest subprime CDO manager. (p. 142.) | Eisman told Lewis: Chau claimed to have $15 billion under management and to want to increase that to $50 billion. | Not defamatory.<br><br>No clear evidence of falsity.<br><br>No clear evidence of constitutional malice. |

6

{00496451;v1 }

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 17 | Among its other achievements, Harding had established itself as the go-to buyer of Merrill Lynch's awesome CDO machine, notorious not only for its rate of production (Merrill created twice as many of the things as the next biggest Wall Street firm) but also for its industrial waste (its CDOs were later proven to be easily the worst). (p. 142.) | | Not a statement by Eisman. |
| 18 | "He 'managed' the CDOs," said Eisman, "but managed what? I was just appalled that the structured finance market could be so insane as to allow someone to manage a CDO portfolio without having any exposure to the CDOs. People would pay up to have someone 'manage' their CDOs—as if this moron was helping you. I thought, *You prick, you don't give a fuck about the investors in this thing.*" (pp. 142–43.) | Same. | Not actionable; protected as opinion.<br><br>No clear evidence of constitutional malice. |
| 19 | Chau's real job was to serve as a new kind of front-man for the Wall Street firms he "hired"; investors felt better buying a Merrill Lynch CDO if it didn't appear to be run by Merrill Lynch. (p. 143.) | Eisman told Lewis: in his opinion, CDO managers, including Chau, acted as beards for the investment banks that underwrote the CDOs. | Not actionable; protected as opinion.<br><br>No clear evidence of constitutional malice. |
| 20 | "Then he says something that blew my mind," said Eisman. "He says, 'I love you guys who short my market. Without you I don't have anything to buy.'" (p. 143.) | Same. | Not defamatory.<br><br>No clear evidence of falsity.<br><br>No clear evidence of constitutional malice. |

7

{00496451;v1 }

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 21 | That's when Steve Eisman finally understood the madness of the machine. He and Vinny and Danny had been making these side bets with Goldman Sachs and Deutsche Bank on the fate of the triple-B tranche of subprime mortgage-backed bonds without fully understanding why those firms were so eager to accept them. Now he was face-to-face with the actual human being on the other side of his credit default swaps. Now he got it: The credit default swaps, filtered through the CDOs, were being used to replicate bonds backed by actual home loans. *There weren't enough Americans with shitty credit taking out loans to satisfy investors' appetite for the end product.* Wall Street needed his bets in order to synthesize more of them. "They weren't satisfied getting lots of unqualified borrowers to borrow money to buy a house they couldn't afford," said Eisman. "They were creating them out of whole cloth. One hundred times over! That's why the losses in the financial system are so much greater than just the subprime loans. That's when I realized they needed us to keep the machine running. I was like, *This is allowed?*" (p. 143.) | Eisman told Lewis: he believes that credit default swaps dramatically magnified the financial system's exposure to subprime mortgage risk by decoupling that risk from the existence of actual mortgages, and that his meeting with Chau drove him to this insight. | Not "of and concerning" plaintiffs.<br><br>Not actionable; protected as opinion.<br><br>No clear evidence of constitutional malice. |
| 22 | Wing Chau didn't know he'd been handpicked by Greg Lippmann to persuade Steve Eisman that the people on the other end of his credit default swaps were either crooks or morons, but he played the role anyway. (p. 144.) | | Not a statement by Eisman. |

8

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 23 | Between shots of sake he told Eisman that he would rather have $50 billion in crappy CDOs than none at all, as he was paid mostly on volume. (p. 144.) | Eisman told Lewis: Chau described himself at the dinner as eager to increase the assets he managed to $50 billion and said his focus was on growing his total assets under management. | Not actionable; protected as opinion.<br><br>No clear evidence of falsity.<br><br>No clear evidence of constitutional malice. |
| 24 | He told Eisman that his main fear was that the U.S. economy would strengthen, and dissuade hedge funds from placing bigger bets against the subprime mortgage market. (p. 144.) | Same. | Not defamatory.<br><br>No clear evidence of falsity.<br><br>No clear evidence of constitutional malice. |
| 25 | [T]hey watched Eisman grab Greg Lippmann, point to Wing Chau, and say, "Whatever that guy is buying, I want to short it." Lippmann took it as a joke, but Eisman was completely serious: He wanted to place a bet specifically against Wing Chau. "Greg," Eisman said, "I want to short his paper. Sight unseen." Thus far Eisman had bought only credit default swaps on subprime mortgage bonds; from now on he'd buy specifically credit default swaps on Wing Chau's CDOs. (p. 144.) | Eisman told Lewis: after his dinner conversation with Chau, he told Lippmann, "Whatever that guy is buying, I want to short it," and "I want to short his paper. Sight unseen.", and also told Lewis that, as a result of his dinner, he began to short CDOs for the first time by purchasing credit default swaps on CDOs. | Not actionable; protected as opinion.<br><br>No clear evidence of falsity.<br><br>No clear evidence of constitutional malice. |
| 26 | Upon their return they raised it [their short position in subprime mortgage bonds] to $550 million, with new bets against the CDOs created by Wing Chau. With only $500 million under management, the position now overwhelmed their portfolio. (p. 159.) | | Not a statement by Eisman. |

{00496451.v1 }

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of April, 2012, a copy of the foregoing was served

by email and Federal Express priority overnight courier upon the following:

        Steven F. Molo, Esq.
        MoloLamken LLP
        540 Madison Avenue
        New York, NY 10022
        smolo@mololamken.com

        *Attorneys for Plaintiffs Harding Advisory LLC and Wing F. Chau*

        Celia Goldwag Barenholtz
        Gabriel Rauterberg
        Cooley LLP
        1114 Avenue of the Americas
        New York, NY 10036
        cbarenholtz@cooley.com

        *Attorneys for Defendants Michael Lewis and W.W. Norton & Company, Inc.*

                            Jacob P. Goldstein