PUBLIC VERSION -
CONFIDENTIAL
MATERIAL REDACTED

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

WING F. CHAU and HARDING ADVISORY LLC,  :  No. 11-CV-1333 (GBD) (KNF)

           :

           Plaintiffs,  :  ECF Case

        -against-  :

MICHAEL LEWIS, STEVEN EISMAN, and W.W.  :
NORTON & COMPANY, INC.,

           :

         Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -   x


## MEMORANDUM OF LAW IN SUPPORT OF
## STEVEN EISMAN'S MOTION FOR SUMMARY JUDGMENT

*Of Counsel*:

Celeste Phillips
Paul Safier
LEVINE SULLIVAN KOCH & SCHULZ, LLP

David A. Schulz
Michael D. Sullivan
Jacob P. Goldstein
LEVINE SULLIVAN KOCH & SCHULZ, LLP
321 West 44th Street, Suite 510
New York, NY 10036
Tel:  (212) 850-6100;
Fax:  (212) 850-6299

*Attorneys for Defendant Steven Eisman*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

ARGUMENT ........................................................................................................................ 10

I.    SUMMARY JUDGMENT SHOULD BE ENTERED ON ALL CLAIMS
      CHALLENGING EISMAN'S RECOLLECTION OF THE DINNER
      CONVERSATION ..................................................................................................... 11

      A.   Plaintiffs Are Public Figures For Purposes Of A Book About The
           Causes Of A Financial Crisis In Which They Played A Role ................................ 11

      B.   Plaintiffs Cannot Meet Their Constitutional Burdens to Defeat
           Summary Judgment ....................................................................................... 16

II.   SUMMARY JUDGMENT SHOULD BE ENTERED ON ALL CLAIMS
      CHALLENGING EISMAN'S VIEWS ABOUT THE CDO MARKET
      AND THE ROLE OF CDO MANAGERS ................................................................ 25

      A.   Plaintiffs' Claims Lack Necessary Elements of a Libel Cause of
           Action ............................................................................................................. 25

      B.   Eisman's Opinions Are Constitutionally Protected ............................... 31

      C.   All of the Libel Claims Fail Because Plaintiffs Cannot Meet their
           Constitutional Burdens ............................................................................ 40

III.  SUMMARY JUDGMENT SHOULD BE ENTERED ON PLAINTIFFS'
      OVER-REACHING CLAIMS OF LIBEL BY IMPLICATION ................................ 42

CONCLUSION ..................................................................................................................... 45

APPENDIX

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abramson v. Pataki,*
    278 F.3d 93 (2d Cir. 2002)..............................................................................10, 26

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)......................................................................................16, 24

*Anyanwu v. CBS,*
    887 F. Supp. 690 (S.D.N.Y. 1995) ....................................................................26

*Armstrong v. Simon & Schuster, Inc.,*
    85 N.Y.2d 373 (1995)....................................................................................42, 43

*Bose Corporation v. Consumers Union,*
    466 U.S. 485 (1984).............................................................16, 22, 23, 31

*Brady v. Ottaway Newspapers, Inc.,*
    84 A.D2d 226.....................................................................................................28

*Brian v. Richardson,*
    87 N.Y.2d 46 (1995) ..........................................................................32, 33, 34, 44

*Bruno v. New York Daily News Co.,*
    89 A.D.2d 260 (3d Dep't 1982) ........................................................................44

*Celle v. Filipino Reporter Enterprises Inc.,*
    209 F.3d 163 (2d Cir. 2000)..........................................................................19, 20

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)...........................................................................................10

*Chandok v. Klessig,*
    648 F. Supp. 2d 449 (N.D.N.Y. 2009), *aff'd,* 632 F.3d 803 (2d Cir. 2011) ...........................25

*Chapin v. Knight-Ridder, Inc.,*
    993 F.2d 1087 (4th Cir. 1993) ..............................................................42, 43, 44

*Church of Scientology International v. Behar,*
    238 F.3d 168 (2d Cir. 2001)...............................................................16, 40, 41

*Church of Scientology International v. Daniels,*
    992 F.2d 1329 (4th Cir. 1993) ........................................................................41, 42

{00487133;v7 }

*Church of Scientology International v. Time Warner, Inc.,*
    806 F. Supp. 1157 (S.D.N.Y. 1992)......................................................................26

*Contemporary Mission, Inc. v. New York Times Co.,*
    842 F.2d 612 (2d Cir. 1988)...........................................................................16, 24

*Couloute v. Ryncarz,*
    2012 WL 541089 (S.D.N.Y. Feb. 17, 2012)......................................................38

*Croton Watch Co. v. National Jeweler Magazine, Inc.,*
    2006 WL 2254818 (S.D.N.Y. Aug. 7, 2006).....................................................17

*Dameron v. Washington Magazine, Inc.,*
    779 F.2d 736 (D.C. Cir. 1985) ...........................................................12, 14, 15

*Daniel Goldmeyer, Ltd. v. Dow Jones & Co.,*
    259 A.D.2d 353 (1st Dep't 1999) ............................................................12, 14

*Delaney v. American Telephone & Telegraph Co.,*
    171 A.D.2d 456 (1st Dep't 1991) ....................................................................29

*Diaz v. NBC Universal, Inc.,*
    536 F. Supp. 2d 337 (S.D.N.Y. 2008).................................................................6

*DiBella v. Hopkins,*
    403 F.3d 102 (2d Cir. 2005)...............................................................................17

*DiFolco v. MSNBC Cable L.L.C.,*
    --- F. Supp. 2d ---, 2011 WL 5519824 (S.D.N.Y. Nov. 9, 2011) ...................32, 33

*Doe v. White Plains Hospital Medical Center,*
    2011 WL 2899174 (S.D.N.Y. July 8, 2011), aff'd, *Doe v. French*, --- F. App'x ---,
    2012 WL 129836 (2d Cir. Jan. 18, 2012) ........................................................32

*Duane Reade, Inc. v. Clark,*
    2004 WL 690191 (Sup. Ct. N.Y. Cnty. Mar. 31, 2004) ..............................30, 34

*Dworin v. Deutsch,*
    2008 WL 508019 (S.D.N.Y. Feb. 22, 2008)...................................................34, 39

*Finkelstein v. Wachtel,*
    2003 WL 1918309 (S.D.N.Y. Apr. 21, 2003)....................................................38

*Foley v. CBS,*
    2006 WL 6619947 (Sup. Ct. N.Y. Cnty. Sept. 13, 2006)..................................40

*Freeman v. Johnston,*
    84 N.Y.2d 52 (1994) ..........................................................................................19

*Garrison v. Louisiana,*
   379 U.S. 64 (1964)..................................................................................23

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339-40 (1974) .....................................38, 39

*Gross v. New York Times Co.,*
   82 N.Y.2d 146 (1993) ........................................................................31, 44

*Guccione v. Hustler Magazine, Inc.,*
   800 F.2d 301 (2d Cir. 1986)...................................................................17

*Hall v. Binghamton Press Co.,*
   263 A.D. 403 (3d Dep't 1942), *aff'd,* 296 N.Y. 714 (1946) ....................................30

*Harte-Hanks Communications, Inc. v. Connaughton,*
   491 U.S. 657 (1989)........................................................................16, 17

*Haynes v. Alfred A. Knopf,*
   8 F.3d 1222 (7th Cir. 1993) ...................................................................39

*Herbert v. Lando,*
   781 F.2d 298 (2d Cir. 1986)...................................................................42

*Immuno AG. v. Moor-Jankowski,*
   74 N.Y.2d 549 (1989) .....................................................................36, 37

*Immuno AG. v. Moor-Jankowski,*
   77 N.Y.2d 235 (1991) ................................................................10, 17, 32

*James v. Gannett Co.,*
   40 N.Y.2d 415 (1976) .........................................................................28

*Karaduman v. Newsday, Inc.,*
   51 N.Y.2d 531 (1980) .........................................................................10

*Kirch v. Liberty Media Corp.,*
   449 F.3d 388 (2d Cir. 2006)...................................................................25

*Konikoff v. Prudential Insurance Co. of America,*
   234 F.3d 92 (2d Cir. 2000)....................................................................23

*Krepps v. Reiner,*
   588 F. Supp. 2d 471 (S.D.N.Y. 2008), *aff'd,* 377 F. App'x 65 (2d Cir. 2010).......................29

*Landmark Education Corp. v. Hachette Filipacchi Medias Group,*
   28 Media. L. Rep. 1123 (Sup. Ct. N.Y. Cnty. Apr. 28, 1999)....................................40

*Levin v. McPhee,*
   917 F. Supp. 230 (1996) ......................................................................28

{00487133;v7 }

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
    838 F.2d 1287 (D.C. Cir. 1988) ..................................................................................20

*Loeb v. New Times Communications Corp.*,
    497 F. Supp. 85 (S.D.N.Y. 1980) ...........................................................................43, 44

*Long v. Arcell*,
    618 F.2d 1145 (5th Cir. 1980) ....................................................................................24

*Love v. William Morrow & Co.*,
    597 N.Y.S.2d 424 (2d Dep't 1993) .............................................................................17

*Mahoney v. Adirondack Publishing Co.*,
    71 N.Y.2d 31 (1987) ...................................................................................................24

*Mann v. Abel*,
    10 N.Y.3d 271 (2008) .................................................................................................32

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991) ..............................................................................................16, 17

*McCabe v. Rattiner*,
    814 F.2d 839 (1st Cir. 1987) ......................................................................................34

*McGill v. Parker*,
    179 A.D.2d 98 (1st Dep't 1992) .................................................................................23

*Michtavi v. New York Daily News*,
    587 F.3d 551 (2d Cir. 2009) .......................................................................................28

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) .......................................................................................................31

*Murray v. Bailey*,
    613 F. Supp. 1276 (N.D. Cal. 1985) ..........................................................................27

*New York Times v. Sullivan*,
    376 U.S. 254 (1964) ........................................................................................16, 25, 26

*National Nutritional Foods Assoc. v. Whelan*,
    492 F. Supp. 374 (S.D.N.Y. 1980) .............................................................................26

*Neiman-Marcus v. Lait*,
    13 F.R.D. 311 (S.D.N.Y. 1952) .................................................................................26

*O'Loughlin v. Patrolmen's Benevolent Association*,
    178 A.D.2d 117 (1st Dep't 1991) ...............................................................................38

*Old Dominion Branch No. 486, National Association of Letter Carriers v. Austin*,
    418 U.S. 264 (1974) ..............................................................................................38, 39

*Philadelphia Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986) ...................................................................................................17

*Qureshi v. St. Barnabas Hospital Center*,
    430 F. Supp. 2d 279 (S.D.N.Y. 2006) ......................................................................28

*Rappaport v. VV Publishing Corp.*,
    163 Misc. 2d 1 (Sup. Ct. N.Y. Cnty. 1994), *aff'd*,
    223 A.D.2d 515 (1st Dep't 1996) ...................................................................39, 42, 43

*Renco Group, Inc. v. Workers World Party, Inc.*,
    2006 WL 2739006 (Sup. Ct. N.Y. Cnty. Sept. 26, 2006) ..........................................38

*Riley v. Harr*,
    292 F.3d 282 (1st Cir. 2002) .........................................................................32, 33, 34

*Rinaldi v. Holt, Rinehart & Winston, Inc.*,
    42 N.Y.2d 369 (1977) .................................................................................................10

*Schuster v. U.S. News & World Report, Inc.*,
    459 F. Supp. 973 (D. Minn. 1978), *aff'd*, 602 F.2d 850 (8th Cir. 1979) .................28

*Silverman v. Newsday, Inc.*,
    38 Media L. Rep. (BNA) 1613 (Sup. Ct. Nassau Cnty. 2010) .................................14

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ..............................................................................................16, 23

*Steinhilber v. Alphonse*,
    68 N.Y.2d 283 (1986) ....................................................................................31, 32, 44

*Torain v. Liu*,
    2007 WL 2331073 (S.D.N.Y. Aug. 16, 2007), *aff'd*, 279 F. App'x 46 (2d Cir. 2008) .....32, 38

*Tracy v. Newsday, Inc.*,
    5 N.Y.2d 134 (1959) ...................................................................................................42

*Trustco Bank of New York v. Capital Newspaper Division of Hearst Corp.*,
    213 A.D.2d 940 (3d Dep't 1995) ...............................................................................38

*Veilleux v. NBC*,
    206 F.3d 92 (1st Cir. 2000) ........................................................................................27

*Vinas v. Chubb Corp.*,
    499 F. Supp. 2d 427 (S.D.N.Y. 2007) ........................................................................43

*Wagstaffe v. The Morning Call, Inc.*,
    1999 WL 1258967 (Pa. Ct. Com. Pl. Apr. 12, 1999), *aff'd*, 758 A.2d 732 (Pa. Super.
    2000) ................................................................................................................................14, 15

*Waldbaum v. Fairchild Publications*,
    627 F.2d 1287 (D.C. Cir. 1980) ........................................................................................12

*White v. Fraternal Order of Police*,
    707 F. Supp. 579 (D.D.C. 1989), *aff'd*, 909 F.2d 512 (D.C. Cir. 1990) ................................43

*Yiamouyiannis v. Consumers Union*,
    619 F.2d 932 (2d Cir. 1980).................................................................................................23

*Zupnick v. Associated Press, Inc.*
    31 F. Supp. 2d 70 (D. Conn. 1998).....................................................................................14

### OTHER AUTHORITIES

RESTATEMENT (SECOND) OF TORTS § 564A cmt. a .....................................................................26

RESTATEMENT (SECOND) OF TORTS § 581A, cmt. F ..................................................................17

Robert D. Sack, SACK ON DEFAMATION: LIBEL, SLANDER & RELATED PROBLEMS
    § 5.3.11.C & n.419 ............................................................................................................11

Robert D. Sack, SACK ON DEFAMATION: LIBEL, SLANDER & RELATED PROBLEMS
    § 5.3.10..............................................................................................................................23

{00487133;v7 }

## PRELIMINARY STATEMENT

This libel suit was filed for all the wrong reasons.  Caught up in a storm of controversy over the causes of a world-wide financial crisis—the focus of many news reports, called by a congressional commission, and ███████████████████████████████—plaintiffs sued to divert attention and to punish an outspoken critic of Wall Street's "CDO machine."  Plaintiffs cannot penalize defendant Steve Eisman for voicing his honestly held views about what he saw as the irresponsible practices that led to calamity, and the time has come to end this meritless litigation.

Defendant Eisman is a Wall Street insider, an investment manager, who came to believe early on that the risks of newly-engineered  mortgage securities were being wrongly assessed by the rating agencies and sold as high-quality assets to unsuspecting investors.  Key among his concerns were CDO managers—such as plaintiffs Wing Chau and Harding Advisory LLC ("Harding")—who were incentivized to grow assets under their management without due regard to market risk.  Based on insights he gained over dinner with Chau, Eisman concluded that the economic interests of CDO managers were too aligned with the investment banks from whom they were buying toxic assets, and for whom they basically served as "beards."  He correctly concluded that the market for mortgage-backed securities was destined to collapse, and is now being sued for sharing his views about why things went wrong.

As demonstrated below, summary judgment should be entered on all of plaintiffs' allegations that Eisman misrepresented the facts about a dinner conversation with Chau because plaintiffs are public figures for purposes of this lawsuit and they cannot meet their constitutional burdens to show both that Eisman's statements about the dinner were materially false and that Eisman knew they were false.  All of plaintiffs' claims arising out of Eisman's statements about the CDO market and CDO managers also fail for multiple additional reasons—most of the

statements are not about the plaintiffs, many are not defamatory, and all reflect Eisman's personal opinions, which cannot as a matter of law be the basis of a claim for libel.

## STATEMENT OF FACTS

### A.   How Eisman Came to be Portrayed in the Book

Eisman is a defendant in this lawsuit because he was a source for Michael Lewis as he researched *The Big Short* ("*TBS*"). *TBS* explores the causes of the 2008 financial crisis primarily by profiling a few individuals, Eisman included, who foresaw the collapse of the market for securities backed by subprime mortgages and invested substantial money "shorting" (*i.e.*, betting against) that market. The libel claims against Eisman are based on his contributions to one chapter of that book, "Spider-Man at The Venetian," which, among other things, recounts a 2007 dinner conversation Eisman had with Chau that substantially shaped Eisman's thinking about the market for collateralized debt obligations ("CDOs").

### 1.   Eisman's assessment of the CDO business.

As more fully described in the accompanying declaration of Steven Eisman (cited as "ED"), the story of how Eisman and his hedge funds at FrontPoint Partners LLC ("FrontPoint") found themselves with a substantial short position on subprime mortgage bonds and subprime CDOs begins back in 1991, when Eisman first started studying the subprime mortgage market. ED ¶¶ 10-11, 63-68.[1]  In 2006, Eisman and his team at FrontPoint, including Vincent Daniel and Daniel Moses, became convinced that subprime mortgage securities were headed for disaster when the housing bubble ultimately burst, as they anticipated it would. ED ¶¶ 17-18. Early that year, Eisman was introduced to the concept of using credit default swaps to take a short position

---

[1] Briefly, a subprime mortgage bond is a bond made up of a pool of subprime mortgage loans, while a subprime CDO is a security made up of pools of subprime mortgage bonds and, in some cases, other subprime CDOs. For a more complete explanation, see ED ¶¶ 15, 40-44.

on residential mortgage-backed securities ("RMBS") by Greg Lippmann, a trader at Deutsche Bank.  ED ¶¶ 17-18; Eisman's Statement of Undisputed Material Facts ("SUMF") ¶ 6.  In October 2006, he first purchased credit default swaps on RMBS.  ED ¶¶ 14, 18-19, 80; SUMF ¶ 8.[2]  In early 2007, after his dinner conversation with Chau, Eisman began purchasing credit default swaps on CDOs as well.  ED ¶¶ 6, 19, 35-37; SUMF ¶¶ 56, 57.

In the course of researching the CDO market, Eisman developed a number of theories, which informed his investment decisions and which he later shared with Lewis.  *See* ED ¶¶ 62-83 (describing Eisman's research); *id.* ¶¶ 38-58 (describing Eisman's theories); *id.* ¶¶ 89-96 (describing views shared with Lewis).  In particular, Eisman came to believe that CDOs were being used by Wall Street banks to mask the true risks of the underlying mortgage-backed securities that were held by the CDOs, that CDO managers were acting as "beards" for those banks, enabling them to sell (and, therefore, remove from their books) otherwise largely unmarketable mortgage-backed securities, and that the increasing availability to CDOs of synthetic securities[3] was allowing the CDO market to expand beyond all reason.  *See* ED ¶¶ 4, 38-61 (explaining Eisman's understanding of CDO fundamentals).

### 2.   The dinner in Las Vegas.

The dinner between Chau and Eisman that is at the heart of this lawsuit took place on January 28, 2007 in Las Vegas, Nevada during the annual conference of the American Securitization Forum ("ASF").  ED ¶ 5, 21; SUMF ¶¶ 42-43; Declaration of Jacob P. Goldstein

---

[2] A credit default swap essentially functions as a side bet on the performance of the underlying security, with the buyer betting that the security will deteriorate, while the seller is betting that the security will continue to perform.  For a more complete explanation, see ED ¶ 16.

[3] The synthetic securities acquired by CDOs, in this context, were made up of the "long" side of a credit default swap on a RMBS or another CDO.  The credit default swap replicates the same interest payments and default risks as the actual RMBS or CDO, but does not reflect an interest in any actual mortgages, hence its description as "synthetic."  For a more complete explanation, see ED ¶¶ 16, 55-61.

("GD") Ex. 8 (Eisman Dep.) at 230:7-10, 232:9-22; GD Ex. 6 (Chau Dep.) at 49:12-51:7; GD

Ex. 12 (Lippmann Dep.) at 87:12-88:4.  By the time of the dinner, Chau and his firm Harding

were already significant players in the CDO market.  Chau first entered the CDO management

business in 2004, but by late 2007, when the market for mortgage-backed CDOs crashed, he was

already managing 21 CDOs with over $23.1 billion in assets.  SUMF ¶¶ 12-14, 20.  According to

Standard & Poor's Financial Services LLC ("S&P"), between January 2007 and September 2007

Harding issued more asset-backed CDOs by volume than any other manager.  SUMF ¶¶ 21-22.

       That Eisman and Chau found themselves engaged in conversation at the Las Vegas

dinner was not a coincidence.  The dinner was hosted by Lippmann of Deutsche Bank, from

whom Eisman had purchased his first credit default swaps, and whose firm did business with

Chau.  SUMF ¶¶ 44-45; ED ¶¶ 17, 24; Eisman Dep. at 137:6-138:6.  Lippmann's specific

purpose was to bring together "shorts" like Eisman with CDO managers like Chau, who were

acquiring for their CDOs the very kind of securities the "shorts" were betting would fail.  SUMF

¶ 46; *see also* ED ¶¶ 22-24; Eisman Dep. at 233:9-17.  ███████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  ED ¶ 24.

       At the dinner, Eisman was seated between Lippmann and Chau.  SUMF ¶ 48.  Although,

as *TBS* reports, Eisman could not later recall much about Chau's appearance or his manner, he

distinctly recalls the substance of his conversation with Chau, because that conversation ended

up exerting a significant influence on Eisman's thinking about the CDO industry and his

eagerness to expand his short position.  *See* ED ¶¶ 32-37 (describing the influence of his

conversation with Chau on his thinking).  Eisman was struck by three things Chau said to him:

- Chau told Eisman that he wished to grow his business from $15 billion in CDO collateral to $50 billion. This struck Eisman as a remarkable thing to say, given the deterioration in the quality of subprime mortgages that Eisman knew to be happening at the time. ED ¶¶ 26-28; SUMF ¶ 51(a).

- When Eisman remarked that Chau "must be having a hard time," given the growing defaults among subprime mortgages, Chau responded by telling Eisman that he had "sold everything out." Eisman understood this to mean that Chau had no direct, personal exposure to the risk that the assets Chau was buying would default. ED ¶ 28-29; SUMF ¶ 51(b).

- Chau told Eisman: "I love guys like you who short my market. Without you, I don't have anything to buy." Chau also added that his greatest fear was that the United States economy would improve so much that guys like Eisman would stop shorting mortgage-backed securities. Eisman understood that Chau needed people to take the "short" side of credit default swaps on subprime mortgage bonds so that he could purchase the "long" side into his CDOs. ED ¶¶ 16, 30-31; Eisman Dep. at 186:22-187:7, 189:20-25; SUMF ¶ 51(c).

Based on Chau's remarks, Eisman concluded that Chau's focus was on growing his assets under management and not necessarily on the credit quality of those assets. ED ¶¶ 5, 7. ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Eisman has repeatedly described his conversation with Chau as a pivotal moment in convincing him that he was right in his assessment of the subprime CDO market. ED ¶¶ 5-7, 20, 34-38, 58; *see also* GD Ex. 7 (Daniel Dep.) at 203:18-25 (describing Eisman's conversation with Chau as "an important moment" for him, one which prompted Eisman to direct FrontPoint to begin shorting CDOs); GD Ex. 13 (Moses Dep.) at 186:17-20 (same). The lesson Eisman took away from the conversation was that CDO managers were taking long positions in the instruments Eisman wanted to short simply as a means to grow their business, and not because they knew something Eisman did not about the quality of those assets. ED ¶¶ 30-34; *see also* Moses Dep. at 172:9-173:20, 176:12-18, 177:4-18 (describing the summary of his conversation

with Chau that Eisman shared with Daniel and Moses the next day). This conversation convinced Eisman of the lunacy of the "CDO machine."

Eisman acted on the lesson he learned from Chau. After the dinner, Eisman immediately increased his short position, including about $50 million of his very first short positions on CDOs. SUMF ¶¶ 56-57. Between the dinner in January and mid- 2007 when the CDO machine began to fall apart, FrontPoint expanded its short position by roughly a quarter billion dollars. ED ¶¶ 6, 80.

### 3. Eisman's interview by Michael Lewis.

Eisman first met Lewis in the fall of 2008, when Lewis was working on an article for *Portfolio* magazine about the financial crisis. ED ¶ 89; Eisman Dep. at 147:17-148:3, 150:25-151:10. After that meeting, Eisman communicated with Lewis frequently in connection with the *Portfolio* article and later with the *TBS* book project. ED ¶¶ 90-91. The substance of his statements to Lewis is not in dispute, and is detailed in the Eisman Declaration. ED ¶¶ 93; SUMF ¶¶ 59-85.

### B. Plaintiffs' Libel Claims Against Eisman

The Complaint (¶¶ 52-66) alleges that a chapter in *TBS* accuses plaintiffs of "grave professional misconduct, incompetence and irresponsibility." GD Ex.1 (Compl.) ¶ 53. During discovery, plaintiffs refined this broad claim, identifying 26 specific statements alleged to be false and defamatory. GD Ex. 2 (Chau Resp. to Third Interrogs.) ("Chau 3rd Resp.") at 4-36; GD Ex. 3 (Harding Resp. to Third Interrogs.) ("Harding 3rd Resp.") at 4-37. While the challenged statements are in Lewis's words, Eisman was a source, in whole or in part, for 18 of

the statements at issue.  SUMF ¶¶ 59-85.[4]  These 18 statements concern two topics:  Eisman's

dinner with Chau, and Eisman's opinions about the CDO market and CDO managers.

### 1.    Challenged statements about the Las Vegas dinner.

Plaintiffs challenge eight specific statements about the dinner conversation.[5]  Two of the

statements involve Chau's assertion that he had no significant exposure to the market risk of the

assets in his CDOs:

- **Statement 8:**  Eisman made the statement to Chau, "God, you must be having a hard time." And Chau responded, "No, I've sold everything out."

- **Statement 14:**  Now, almost giddily, Chau explained to Eisman that he simply passed all the risk that the underlying home loans would default on to the big investors who had hired him to vet the bonds.

Plaintiffs separately challenge statements recounting Chau's comments about how he

wanted to grow the volume of assets he managed:

- **Statement 6:**  Chau told Eisman that he was a mezzanine CDO manager who controlled roughly $15 billion in assets.

- **Statement 16:**  Chau told Eisman that he had $15 billion under management and wanted to increase that to $50 billion.

- **Statement 20:**  "Then he says something that blew my mind," said Eisman.  "He says, 'I love guys like you who short my market.  Without you, I don't have anything to buy.'"

- **Statement 23:**  Chau told Eisman he would rather have $50 billion in crappy CDOs than none at all, because he was paid mostly on volume.

- **Statement 24:**  He told Eisman that his main fear was that the U.S. economy would strengthen, and dissuade hedge funds from placing bigger bets against the subprime mortgage market.

Finally, plaintiffs challenge one statement *Eisman made* at the dinner:

---

[4] The annexed appendix sets out the 26 statements made in *TBS* that are challenged by plaintiffs and cross-references each statement to the specific information that Eisman provided Lewis.

[5] The eight statements about the dinner conversation between Chau and Eisman that are alleged to be false are:  Statements 6, 8, 14, 16, 20, 23, 24 and 25 (the "dinner statements").

- **Statement 25:** After the dinner, Eisman told Lippmann "Whatever that guy is buying, I want to short it … I want to short his paper."

## 2.    Challenged statements about the CDO market and CDO managers.

Other statements challenged by plaintiffs reflect Eisman's understandings and opinions about the operation of the CDO market. These statements are not specifically about plaintiffs, but rather reflect the views Eisman expressed to Lewis about CDOs and CDO managers.

Some of these statements provide Eisman's understanding of how the market worked. For example, **Statement 5** explains the "ratings alchemy" through which CDOs could be used to convert triple-B assets into triple-A securities::

- "This was the engine of doom." . . . The Wall Street firms had taken these triple-B tranches—the worst of the worst—to build yet another tower of bonds: a CDO. A collateralized debt obligation. The reason they'd done this is that the rating agencies, presented with the pile of bonds backed by dubious loans, would pronounce 80 percent of the bonds in it triple-A. These bonds could then be sold to investors—pension funds, insurance companies—which were allowed to invest only in highly rated securities. It came as news to Eisman that this ship of doom was piloted by Wing Chau and people like him.

Likewise, **Statement 21** presents Eisman's views that credit default swaps were being used to increase total assets available to CDO managers:

- The credit default swaps, filtered through the CDOs, were being used to replicate bonds backed by actual home loans. *There weren't enough Americans with shitty credit taking out loans to satisfy investors' appetite for the end product.* Wall Street needed his bets in order to synthesize more of them. "They weren't satisfied getting lots of unqualified borrowers to borrow money to buy a house they couldn't afford," said Eisman. "They were creating them out of whole cloth. One hundred times over! That's why the losses in the financial system are so much greater than just the subprime loans. That's when I realized they needed us to keep the machine running. I was like, *This is allowed?*"

Plaintiffs also challenge statements that express, in various words, Eisman's opinion that CDO managers had no meaningful role to play in selecting specific assets for a CDO:

- **Statement 1:** "I had no idea there was such a thing as a CDO manager," said Eisman. "I didn't know there was anything to manage."

- **Statement 9:** This Statement derives from Eisman's statement to Lewis that investors bought CDOs primarily because of the rating agencies' seal of approval, and so managers only had to comply with the investment mandates and rating agency methodologies, rather than conduct extensive analyses of the underlying assets.

- **Statement 15:** His job was to be the CDO "expert," but he actually didn't spend a lot of time worrying about what was in CDOs.

- **Statement 18:** "He 'managed' the CDOs," said Eisman, "but managed what? I was just appalled that the structured finance market could be so insane as to allow someone to manage a CDO portfolio without having any exposure to the CDOs. People would pay up to have someone "manage" their CDOs—as if this moron was helping you. I thought, *You prick, don't you give a fuck about the investors in this thing.*"

Challenged **Statement 18** presents Eisman's conclusion that the incentives in the CDO market were terribly off. Because CDO managers were not exposed to the market risk of their CDOs, and their compensation was based largely on the size of their total assets under management, they had an overwhelming incentive to grow without significant concern about the quality of the assets they were acquiring. This meant to Eisman that their economic interest was more closely aligned with the Wall Street banks selling the risky mortgage securities than with the investors who were buying the CDOs.

Plaintiffs finally object to Eisman's conclusion that mezzanine CDO managers were nothing more than "beards" for Wall Street, creating the perception of independence so investment banks could sell from their inventory vast quantities of securities backed by sub-prime mortgages that investors might otherwise have been wary to acquire:

- **Statement 11:** This Statement derives from Eisman's statement to Lewis that Wall Street banks were more likely to give mandates to CDO managers who would take in as collateral the bonds the banks were underwriting.

- **Statement 12:** The whole point of the CDO was to launder a lot of subprime mortgage market risk that the firms had been unable to place straightforwardly. The last thing you wanted was a CDO manager who asked lots of tough questions.

- **Statement 13:** The bond market had created what amounted to a double agent—a character who seemed to represent the interests of investors when he better represented the interests of Wall Street bond trading desks.

- **Statement 19:** Chau's real job was to serve as a new kind of front-man for the Wall Street firms he "hired"; investors felt better buying a Merrill Lynch CDO if it didn't appear to be run by Merrill Lynch.

The record establishes that Eisman said nothing about his dinner conversation with Chau that is substantially false, and he said nothing at all that he believed to be untrue. Moreover, none of Eisman's opinions about the CDO and CDO managers is actionable—they are fully protected by the First Amendment and the New York Constitution. Summary judgment should be entered on all of the libel claims lodged against Eisman, as will now be demonstrated.

## ARGUMENT

Summary judgment is properly granted where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In libel cases, the chilling impact of a pending claim on First Amendment freedoms has led New York courts to conclude that summary judgment should be entered at the earliest appropriate moment. *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 256 (1991). *See Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 545 (1980) (courts must not be reluctant to grant summary judgment in libel cases); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 384 (1977) (First Amendment protects against "crippling libel suits, brought to punish those who exercise free speech").[6]

---

[6] New York law governs plaintiffs' libel claim. Eisman, a New York citizen, communicated with Lewis in New York for nation-wide publication by the New York publisher W.W. Norton several statements about plaintiffs' CDO business and its integral connections to Wall Street, that are alleged to have damaged plaintiffs' "reputation in the business community" and the "financial services industry." Compl. ¶ 8-9, 13, 29, 37-39, 84-86. Thus, New York is the state with the most significant interest in the litigation. *See* Lewis/Norton Brief at Point I.

## I.   SUMMARY JUDGMENT SHOULD BE ENTERED ON ALL CLAIMS CHALLENGING EISMAN'S RECOLLECTION OF THE DINNER CONVERSATION

Summary judgment should be entered on each of the statements challenging Eisman's clear recollection of his dinner conversation with Wing Chau. Plaintiffs are public figures for purposes of this libel lawsuit and they have no evidence that, if credited by a jury, would clearly establish either that (1) Eisman's recollections are materially false or (2) Eisman told them to Lewis with knowledge of falsity or substantial doubts about their truth.

### A.   Plaintiffs Are Public Figures For Purposes Of A Book About The Causes Of A Financial Crisis In Which They Played A Role

As demonstrated by co-defendants Lewis and Norton, plaintiffs are *voluntary* limited purpose public figures for purposes of their libel lawsuit challenging statements in *TBS*.[7] They are also properly considered *involuntary* public figures.

Unlike voluntary public figures, *involuntary* public figures are those whose chosen course of conduct could foreseeably lead to an entanglement in public controversy, even though they did not voluntarily seek a role in the controversy. In essence, the involuntary public figure has acted in such a manner so as to have "assumed the risk" of being *drawn into* the public spotlight. As Second Circuit Judge Robert Sack explains, "[t]he weight of reason and authority supports the conclusion that a person who voluntarily commits an act the foreseeable consequences of which are publicity is to be treated as a public figure." Robert D. Sack, SACK ON DEFAMATION: LIBEL, SLANDER & RELATED PROBLEMS ("Sack") § 5.3.11.C & n.419, at 5-61(4th Ed. 2010) (citing cases).

---

[7] Defendant Eisman hereby incorporates all positions advanced by Lewis and Norton in support of summary judgment, to the extent not inconsistent with the positions stated herein. In addition, to avoid duplication and overburdening the record, Eisman cites, where possible, to evidentiary materials filed by Lewis and Norton. (The Declaration of Annika Goldman is cited as "Goldman Decl.").

{00487133;v7 }

To determine whether a plaintiff is an involuntary public figure, courts consider three factors. First, there must be a public controversy that preceded the challenged publication. Second, the plaintiff must have a sufficiently important role in that controversy. Finally, the challenged publication must be germane to the plaintiff's involvement in the controversy. *Daniel Goldmeyer, Ltd. v. Dow Jones & Co.*, 259 A.D.2d 353, 353-354 (1st Dep't 1999) (adopting the involuntary public figure test established in *Dameron v. Wash. Magazine, Inc.*, 779 F.2d. 736, 741-43 (D.C. Cir. 1985), and *Waldbaum v. Fairchild Publ'ns*, 627 F.2d 1287, 1296-98 (D.C. Cir. 1980)). All three of these factors are readily met here.

Pre-existing controversy. Well before *TBS* was published, an important public controversy existed over the causes of the collapse of the market for mortgage-backed securities and the international financial crisis that followed. It was the greatest financial disaster to befall America—indeed the world—since the 1929 stock market crash and the ensuing Great Depression. Lewis/Norton Brief at Point IV.

Plaintiffs' role in the controversy. Plaintiffs plainly played a central role in the controversy—they were leading asset managers of the specific financial instruments at the heart of the financial crisis. Plaintiffs' central roles in the public controversy followed as a natural consequence of their deliberate course of conduct to enter the highly-regulated field of money management and to seek to become one of the largest managers of CDOs investing in subprime mortgage-backed assets. In 2004, Chau started his CDO management business. SUMF ¶ 12. For 2006, Chau's company, Harding, was ranked the sixth largest CDO manager of ABS-backed CDOs, and between January and September 2007, issued more ABS-backed CDOs by volume than any other asset manager. SUMF ¶ 21-23. Before the crash, plaintiffs managed a total of 21 CDOs, with over $23 billion in assets under management. SUMF ¶ 14-20. By plaintiffs' own

admission, at "the height of the CDO market, Harding ranked among the top CDO managers" in the country. SUMF ¶ 24.

Harding accomplished this success through diligent efforts in furtherance of a career where public scrutiny is to be expected. Plaintiffs' business was conducted on the largest and brightest of public stages—Wall Street—in the financial and media center of the country. It was against this backdrop that plaintiffs set out to secure a position in the CDO asset management field, and where, in the space of but a few years, plaintiffs achieved a measure of success that placed them at the very top of the market, self-described "industry leaders." Goldman Decl. ¶¶ 15-16. It is plainly foreseeable that participants in this arena will receive public scrutiny, both from the press and from regulators. Plaintiffs cannot now be heard to complain when the glare of the predictable spotlight casts those onstage in a harsh, rather than flattering, light.

Plaintiffs garnered precisely the scrutiny that would be anticipated. As the record shows, the question of whether the housing boom was sustainable, and the consequences that might befall those invested in the very financial instruments marketed by plaintiffs, were the subjects of keen public discourse, in newspapers, books and films. Goldman Decl. ¶¶ 20-22. More to the point, plaintiffs' specific endeavors were followed closely in the financial press, as well as the rating agencies, with articles and press releases that regularly chronicled their performance. Goldman Decl. ¶¶ 2-14. Chau was often interviewed by the press, and was sometimes even quoted. Goldman Decl. ¶ 18.

████████████████████   Plaintiffs again gained notoriety because of the spectacular manner in

which the CDOs they managed went into default.  Beginning in late 2007, the Harding CDOs

began a massive collapse that was widely noted in the financial press.  Of the 21 CDOs managed

by Harding, two-thirds were liquidated or suffered a default, and plaintiffs' investors suffered

massive losses.  GD Ex. 23 (DX 13).  ████████████████████████████

████████████████████████████████████████

    Courts have conferred involuntary public figure status on professionals who have pursued

careers that were less likely to attract public debate or scrutiny than a Wall Street asset manager.

In *Daniel Goldmeyer*, 259 A.D.2d at 353-354, an art restorer was found to be an involuntary

public figure with respect to a story about his controversial techniques.  Courts have also found

plaintiffs to be involuntary public figures when their career pursuits landed them in the path of a

legitimate inquiry, such as occurred here.  In *Silverman v. Newsday, Inc.*, 38 Media L. Rep.

(BNA) 1613, 1616 (Sup. Ct. Nassau Cnty. 2010), the court held an assistant superintendent in a

school district that was under investigation for misuse of funds to be an involuntary public

figure, because the recoupment of overpayments made to plaintiff "rendered her involvement in

that controversy to be a 'sufficiently central' one." *Id.*  In *Dameron*, 779 F.2d at 741, an air

traffic controller on duty during a plane crash that resulted in a government investigation was

held to be an involuntary public figure for purposes of reporting on the cause of the accident.  So

also here, as plaintiffs acknowledge, their conduct has become the subject of several official

inquiries by virtue of their role in the mortgage-backed securities market.  *See also e.g., Zupnick*

*v. Associated Press, Inc.* 31 F. Supp. 2d 70, 73 (D. Conn. 1998) (husband's notoriety spilled over

to his wife, who was accused of conspiring with her husband to defraud creditors); *Wagstaffe v.*

*The Morning Call, Inc.*, 1999 WL 1258967, at *6 (Pa. Ct. Com. Pl. Apr. 12, 1999) (landlord who

innocently leased to criminals was a public figure since he "found himself in the path of legitimate inquiry"), *aff'd*, 758 A.2d 732 (Pa. Super. 2000).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████  In much the same way that the air controller on duty during a plane accident was assigned involuntary public figure status by the court in *Dameron* with respect to the crash investigation, so these plaintiffs were "on duty" when the financial markets imploded, and were similarly drawn into legitimate inquiries regarding the underlying causes of that "crash."

_Connection of the statements and the controversy._  There can be no serious dispute that the challenged statements, which focus on the subprime mortgage market and plaintiffs' key participation in it, are germane to the pre-existing controversy.

The evidence thus clearly establishes that plaintiffs steadfastly pursued a course of conduct—to become leading CDO asset managers—that resulted in their having "sufficiently central" roles in the controversy surrounding the 2008 financial crash and, more particularly, the legitimate inquiry as to how CDOs contributed mightily to that collapse.  Inasmuch as the

---

[8] In May 2009, legislation was passed to create the Financial Crisis Inquiry Commission ("FCIC"), which was tasked with examining the causes of the financial crisis.  Goldman Decl. ¶ 22  Chau was later interviewed by the FCIC, which issued its final report in January 2011, with an entire chapter devoted to its analysis of CDOs, one of "the most ill-fated assets in the financial crisis."  Goldman Decl. ¶ 23.

███████████████████████████████████████████████████

{00487133;v7 }

challenged statements are germane to the public controversy, plaintiffs' "involuntary public figure" status in this action is clearly warranted.

**B.      Plaintiffs Cannot Meet Their Constitutional Burdens to Defeat Summary Judgment**

      To protect adequately First Amendment interests, public figures who assert defamation claims must bear the burden of establishing by clear evidence both that the statements at issue are materially false and that they were made with constitutional malice—*i.e.*, with knowledge of falsity or subjective awareness of probable falsity. *See, e.g., Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510, 517 (1991); *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *N.Y. Times v. Sullivan*, 376 U.S. 254, 285-86 (1964); *see also Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173-74 (2d Cir. 2001). Due to the significant constitutional interests at stake in a libel case, a court has an obligation to review independently the evidence to ensure that these burdens have been met, even after a jury verdict is rendered. *Sullivan*, 376 U.S. at 285-86 (courts have duty to review independently the sufficiency of plaintiff's evidence of "actual malice"). A judge in a public figure defamation case has "a *constitutional* responsibility that cannot be delegated to the trier of fact." *Bose Corp. v. Consumers Union*, 466 U.S. 485, 501 (1984) (emphasis added).

      This same "heavy burden of proof" exists for a libel plaintiff at the summary judgment stage. *Contemporary Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 621 (2d Cir. 1988).[9] Whether the record evidence, if credited by a jury, would be sufficiently clear to satisfy these

---

[9] The Supreme Court explained in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 257 (1986), that a judge ruling on a motion for summary judgment must "view the evidence presented through the prism of the substantive evidentiary burden" and in a public figure libel action "must be guided by the *New York Times* 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists."

constitutional burdens is a question of law for the court to decide. *Id.; see Harte-Hanks Commnc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989). In this case, it plainly is not.

### 1. Plaintiffs cannot establish the material falsity of any fact Eisman recounted about the dinner.

It has long been recognized that "truth is an absolute and unqualified defense" to a defamation claim and that "the truth of the statements 'need not be established to an extreme literal degree.'" *E.g., Croton Watch Co. v. Nat'l Jeweler Magazine, Inc.*, 2006 WL 2254818, at *5 (S.D.N.Y. Aug. 7, 2006) (quoting *Love v. Wm. Morrow & Co.*, 597 N.Y.S.2d 424, 426 (2d Dep't 1993)). A plaintiff has no claim for libel if the challenged statement is largely correct; "minor inaccuracies cannot give rise to an actionable defamation claim." *Id.* at 5.[10]

In any libel action involving issues of public concern, the constitution places the burden of proving substantial falsity entirely on the plaintiff. *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 770 (1986). To defeat summary judgment, therefore, it is plaintiffs' obligation to present clear and convincing evidence demonstrating that each disputed statement is materially false. *See Masson*, 501 U.S. at 510-11; *Immuno*, 77 N.Y.2d at 245; *DiBella v. Hopkins*, 403 F.3d 102, 115 (2d Cir. 2005) (plaintiff's burden to establish substantial falsity "by clear and convincing evidence").

Plaintiffs cannot make the requisite showing with respect to the dinner statements—the eight challenged statements depicting the conversation between Eisman and Chau in Las Vegas. It is undisputed that (1) a discussion occurred between Chau and Eisman at a dinner hosted by

---

[10] Under this principle, any allegedly defamatory statement will "be deemed to be substantially true, and hence 'not actionable if the published statement could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation.'" *Id.* (quoting *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 301, 302 (2d Cir. 1986)). *See Masson*, 501 U.S. at 517 (statement substantially true "so long as 'the substance, the gist, the sting, of the libelous charge be justified" (citations omitted)); *see also* RESTATEMENT (SECOND) OF TORTS § 581A, cmt. F (doctrine of substantial truth does not require "the literal truth of the precise statement" but only truth "in substance").

Greg Lippmann, ED ¶¶ 24-32; SUMF ¶ 49; (2) Eisman has testified that Lewis accurately reported the dinner statements, ED ¶ 92; (3) ███████████████████████████████

████████████████████████████████████████████████████████████████████

███████; and (4) Eisman's actions after the dinner—including investing nearly $50 million in the first short positions he had *ever* taken against a CDO—are entirely consistent with the conclusions he reached after speaking with Chau, ED ¶¶ 35-37; SUMF ¶¶ 54-57.

In contrast, Chau testified in this case that he *does not recall the specifics* about what he said to Eisman that evening, Chau Dep. at 79:5-80:7; SUMF ¶ 53, and when questioned about the dinner by the FCIC similarly admitted: "I don't recall any specifics." W. Chau FCIC Interview, Nov. 11, 2011, http://fcic.law.stanford.edu/resource/interviews. In short, plaintiffs have no evidence to demonstrate that Eisman's description of what was said at the dinner is incorrect, let alone clear and convincing evidence.

In fact, except for Chau's blanket denials, the record evidence is completely consistent with the truth of the dinner statements exactly as recounted in *TBS*. Chau acknowledges a general recollection of describing to Eisman his desire to grow his CDO business, Chau Dep. at 79:21-80:3, the mortgage-backed securities market, *id.* at 80:8-16, and general parameters of the credit default swap market, *id.* at 81:7-11, all of which is completely consistent with Eisman's description of the dinner. Chau even admits to "probably" discussing the concept that for every short there must be a long, *id.* at 82:2-5—something his Complaint expressly denies.[11] But, no specifics at all have stuck with Chau about the dinner: "[T]he *only thing I recall* was that

---

[11] In his interview with the FCIC, Chau allowed that the fact the credit default swap market is a "zero sum game" was an "element of the conversation" and that each individual or entity "had their own belief" that "they're right or wrong." Chau FCIC Interview.

[Eisman] didn't have an understanding of how RMBS securities work." Chau Dep. at 82:6-14 (emphasis added). On the face of this record, plaintiffs cannot possibly bear their heavy burden to present clear and convincing evidence of falsity.

A libel plaintiff cannot proceed to a jury with a simple claim of "No, I didn't say that," as plaintiffs seek to do here. This very approach was rejected in *Freeman v. Johnston*, 84 N.Y.2d 52 (1994), a defamation suit over a book that chronicled events in the world of corporate takeovers in the 1980s. Plaintiff Freeman challenged the following passage:

> "Brian Freeman, the lawyer who represented the machinists, compounded the threats of strike, warning that being sold into bondage to Lorenzo would provoke night time trashing of airplanes and other sabotage."

*Id.* at 55. Although plaintiff admitted being present at the meeting, "he denied having made the statement," and claimed it defamed him by conveying that he had "'threatened, condoned and encouraged the likely commission of acts of physical sabotage and other illegal actions' by his clients." *Id.* One source, an airline pilot, "recalled that the statement accurately portrayed plaintiff's sentiment at the meeting," *id.*, explaining that "plaintiff discussed the TWA machinists' animosity … that they were emotionally charged" and asserting that "'the [machinists] would probably trash the air[planes] on their overnight layovers,'" *id.* at 57. An attorney for the TWA board "could not 'remember exactly what [plaintiff] said," but stated that Freeman's comments had been "no big deal.'" *Id.* On this record, the Court found no "clear and convincing evidence" that plaintiff did not make the statement, observing that the contradictory statement of the TWA attorney was "equivocal at best." *Id.*

The Second Circuit has similarly held that a public figure plaintiff's "colorless" denials are insufficient, without more, to provide clear and convincing evidence of falsity. In *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 188 (2d Cir. 2000), plaintiff claimed that defendant

{00487133;v7 }

19

had made false statements about the finances of his radio station. As the *Celle* Court explained:

"While a bland cryptic claim of falsity supported by the credibility of a witness might be

sufficient to establish a proposition in other civil cases, the First Amendment demands more."

*Id.* The Court emphasized that "[t]o accept such a colorless denial as sufficient proof would

effectively shift plaintiffs' burden of establishing falsity onto media defendants to establish

truth." *Id.*; *see Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988)

(where "question of truth or falsity is a close one, a court should err on the side of non-

actionability").

Under this same constitutional principle, plaintiffs' libel claims challenging the dinner

statements in *TBS* must all be dismissed. Indeed, the result here follows *a fortiori* because all of

the independent record evidence supports the substantial truth of the conversation precisely as

recalled by Eisman:

- **Statement 6** derives from Eisman's recollection that Chau introduced himself as a manager of mezzanine CDOs with $15 billion in assets under management.

As of the first quarter of 2007, Harding's own marketing materials indicate that plaintiffs had

$16 billion in assets under management, and of the 16 CDOs that had been issued, eight were

mezzanine CDOs. SUMF ¶¶ 17-19.

- **Statement 8** recounts Chau's saying he had "sold everything out," and **Statement 14** repeats Chau's comment that he had "passed all the risk . . . on to the big investors."

Both statements suggesting that Chau had no equity interest in his CDOs as of the date of the

dinner are consistent with the record facts—



- **Statements 16 and 23** relate to Chau's stated desire to expand his CDO business, reporting that he sought to "maximize the dollars in his care" and "would rather have $50 billion in crappy CDOs than none at all, as he was paid mainly on volume."[12]

The gist of these statements is that plaintiffs were looking to expand significantly their assets

under management because they derived the lion's share of their income from management fees,

and the record again shows this to be true.

---

[12] Eisman testified without contradiction that "Wing Chau said he was at $15 billion and he wanted to go to 50," Eisman Dep. at 283:2-14, and explained: "That was my interpretation of what [Chau] was saying. Wing Chau did not say that he wanted to manage 50 billion in crappy CDOs." *Id.* at 292:4-11.

- **Statement 20** reports that Chau loves guys who "short [his] market" because "[w]ithout you, I don't have anything to buy" and **Statement 24** describes Chau telling Eisman his main fear was that the U.S. economy would strengthen and dissuade hedge funds from placing bigger bets against the subprime mortgage market.

The first statement is consistent with Chau's admitted desire for growth. His CDOs were taking long positions in synthetic CDS transactions, and they needed "shorts" to grow these assets. SUMF ¶ 7. Chau admits that "for every short, there has to be a long" is a "statement of fact," and that he probably discussed this concept with Eisman. Chau Dep. 81:21-82:5. ███████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

- **Statement 25** reports Eisman's statement to Lippmann after the dinner that he wanted to short Chau's CDOs.

It is undisputed that Eisman made this statement. Eisman testified that he made it. Eisman's colleagues Moses and Daniels confirmed that Eisman made the statement. ███████

███████████████████████████ SUMF ¶ 54.

Not only do plaintiffs lack *any* clear evidence that Eisman's recollection of the dinner conversation is incorrect, the record establishes that everything Eisman understood Chau to be saying about his business was consistent with the true state of plaintiffs' business at the time of their conversation. Summary judgment should be entered on all the dinner statements because plaintiffs cannot meet their burden to present clear evidence of substantial falsity.

2.  **Plaintiffs cannot establish that Eisman doubted the truth of anything he told Lewis about the dinner.**

Summary judgment on the challenged dinner statements should be entered for the independent and equally dispositive reason that plaintiffs have no clear and convincing evidence of constitutional malice. To prevail, it is not sufficient for plaintiffs to show that a challenged

{00487133;v7 }

statement is materially false. *See Bose*, 466 U.S. at 511 (noting significant difference "between proof of actual malice and mere proof of falsity"). Rather, plaintiffs must additionally demonstrate that Eisman made false statements with "a high degree of awareness of their probable falsity," *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964), that is, that he "*in fact* entertained serious doubts as to [their] truth," *St. Amant*, 390 U.S. at 731 (emphasis added). *See also Yiamouyiannis v. Consumers Union*, 619 F.2d 932, 940 (2d Cir. 1980) (public figure plaintiff must show "subjective awareness of probable falsity" or an "actual intent" to spread untruths).[14]  No such evidence exists.

Eisman has unequivocally testified to his belief in the truth of what he told Lewis about the dinner. *See* ED ¶¶ 8, 92-96; Eisman Dep. at 155:9-22.  He has particular confidence in the accuracy of his recollection because he found the sentiments Chau was expressing so surprising, and because the conversation significantly influenced his thinking about the CDO market. *See* ED ¶¶ 7, 20, 27-37.  Plaintiffs can point to nothing that contradicts this testimony—Eisman had no motive to lie, nothing to gain by misrepresenting the conversation and no axe to grind with Chau—and all of Eisman's contemporaneous conduct is consistent with a conversation exactly as depicted in *TBS*.  Indeed, the evidence of record precludes a finding of actual malice.

*First*, the evidence supporting the truth of Eisman's account of the dinner *also* supports the conclusion that plaintiffs cannot show actual malice.  In light of the testimony supporting Eisman's recollection, and lack of any detailed testimony opposing it, the *most* plaintiffs could possibly show is that Eisman somehow misunderstood or misperceived what Chau told him.

---

[14] The "actual malice" standard applies to plaintiffs' claims against Eisman, as a source, just as it does to Lewis and Norton. *See Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 101-02 & n.8 (2d Cir. 2000) (citing *McGill v. Parker*, 179 A.D.2d 98, 108 (1st Dep't 1992) ("There is no reason … why the Constitution should … provide greater protection to the media in defamation suits than to others exercising their freedom of speech.")); Sack § 5.3.10 (explaining that "the New York Times 'actual malice' standard" clearly apples to "nonmedia defendants").

That falls well short of a showing of actual malice. Thus, even if a jury were to credit Chau's denials regarding what he is depicted as saying in *TBS*, plaintiffs still could not meet their further burden of showing, by clear and convincing evidence, that Eisman fabricated that conversation. *See, e.g., Contemporary Mission*, 842 F.2d at 626 (plaintiffs' claim that they were misquoted, without more, does not establish a jury question on constitutional malice); *Long v. Arcell*, 618 F.2d 1145, 1148 (5th Cir. 1980) (plaintiffs' contrary "accounts of the conversations" that gave rise to the challenged story were insufficient to establish clear evidence of constitutional malice); *Mahoney v. Adirondack Publ'g Co.*, 71 N.Y.2d 31, 40 (1987) (a misperception about a conversation is not the same as a fabrication).

*Second*, the actions Eisman undertook following that conversation conclusively demonstrate that he subjectively understood Chau to have expressed sentiments along the lines described in *TBS*. Eisman, Daniel and Moses have all identified the dinner with Chau as a pivotal moment in the evolution of FrontPoint's short position—specifically, the moment at which Eisman decided to expand that position and begin for the first time to short CDOs in addition to individual subprime mortgage bonds. *See* ED ¶¶ 6, 35-37; Daniel Dep. at 203:18-25; Moses Dep. at 172:9-173:20, 176:12-18, 177:4-18, 186:17-20. FrontPoint shorted about $50 million in CDOs within three weeks of the dinner, and continued to expand its short position by hundreds of millions of dollars. ED ¶¶ 6, 37. It is difficult to imagine what could constitute more definitive proof that Eisman believed in the account of the conversation he later shared with Lewis than this—he invested enormous sums of money based on that understanding.

In short, summary judgment should be entered on all the dinner statements for lack of clear evidence of constitutional malice. *See Anderson*, 477 U.S. at 254 (summary judgment is

required where evidence is "of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence").

## II.   SUMMARY JUDGMENT SHOULD BE ENTERED ON ALL CLAIMS CHALLENGING EISMAN'S VIEWS ABOUT THE CDO MARKET AND THE ROLE OF CDO MANAGERS

Summary judgment is proper for all claims based on Eisman's statements concerning the CDO market and the role of CDO managers for multiple, independent and equally dispositive reasons:  (1) many of plaintiffs' claims lack necessary elements of a cause of action for libel—several describe Eisman's assessment of CDO managers generally and are not "of and concerning" plaintiffs, and many are not defamatory on their face; (2) all of the statements by Eisman about how the market worked, in context, are reasonably understood as his opinions, which cannot be the basis of a libel claim; and (3) plaintiffs in any event cannot satisfy their constitutional burdens to demonstrate that the statements made by Eisman are both false and knowingly so.

### A.   Plaintiffs' Claims Lack Necessary Elements of a Libel Cause of Action

To the extent any of the challenged statements by Eisman can be read to assert specific verifiable facts,[15] plaintiffs' claims in many instances lack essential elements of a libel claim.

#### 1.   Several statements are not "of and concerning" the plaintiffs.

An allegedly defamatory statement must be "of and concerning" the plaintiff asserting the libel claim. *E.g., Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006).  This limitation on the universe of plaintiffs who can challenge a statement is not only a common law

---

[15] It is undisputed that statements 2, 3, 4, 7, 10, 17, 22 and 26 are not based in whole or in part on anything Eisman told Lewis. SUMF ¶¶ 60-62, 65, 68, 75, 80, 84.  Eisman is thus entitled to summary judgment with respect to each of them. *E.g., Chandok v. Klessig*, 648 F. Supp. 2d 449, 456 (N.D.N.Y. 2009) ("To establish a claim of defamation under New York law, a Plaintiff must establish … that the statement was published by the defendant."), *aff'd*, 632 F.3d 803 (2d Cir. 2011).

perquisite, it is a constitutional imperative. *See Sullivan*, 376 U.S. at 288-92 (verdict based on statement that did not refer to plaintiff was "constitutionally defective"); *Diaz v. NBC Universal, Inc.*, 536 F. Supp. 2d 337, 342 (S.D.N.Y. 2008) (a libel claim not "of and concerning" the plaintiff is "barred under constitutional and common law principles").

As relevant here, this requirement has long been held to bar actions based on "group libel." Under the group libel doctrine, "a plaintiff's claim is insufficient if the allegedly defamatory statement referenced the plaintiff solely as a member of a group." *Abramson*, 278 F.3d at 102 (quoting *Church of Scientology Int'l v. Time Warner, Inc.*, 806 F. Supp. 1157, 1160 (S.D.N.Y. 1992)). Where a statement disparages a large group or class, no individual member may assert a claim, "even though the language used is inclusive." *Neiman-Marcus v. Lait*, 13 F.R.D. 311, 315 (S.D.N.Y. 1952). Under this principle, statements that cast general aspersions on the practices of an entire profession or industry cannot give rise to liability. *See, e.g., Anyanwu v. CBS*, 887 F. Supp. 690, 692-93 (S.D.N.Y. 1995) (statements regarding the "fraudulent and deceitful" practices of Nigerian business persons operating in the United States are not actionable by any Nigerian business person); *Nat'l Nutritional Foods Assoc. v. Whelan*, 492 F. Supp. 374, 381 (S.D.N.Y. 1980) (statements describing the "health food industry" as replete with "quacks" and "faddists" are not actionable by any entity in the industry); RESTATEMENT (SECOND) OF TORTS § 564A cmt. a (2011) ("statement that 'All lawyers are shysters,'. . . cannot ordinarily be taken to have personal reference to any of the class").

Under this doctrine, several of the statements at issue are not actionable, because they reflect general commentary about the CDO industry and CDO managers, and are not otherwise "of and concerning" the plaintiffs:[16]

---

[16] This is especially true as regards Eisman's particular contributions to these statements. *See* SUMF ¶¶ 59, 63, 67, 69-71, 79.

{00487133;v7 }

- **Statement 1** provides Eisman's description of his then understanding of the limited role of CDO managers; the statement is not about plaintiffs in particular.

- **Statements 5 and 21** portray the destructive potential of certain financial products, describing how CDOs were used to transform poorly-rated securities into highly-rated ones, and how the credit-default-swap device magnified the financial system's exposure to subprime-mortgage risk. Nothing is said in either statement about plaintiffs' CDOs in particular, or the specific credit default swaps in their portfolios.

- **Statement 9** contrasts Wall Street's description of the role of a CDO manager with Eisman's assessment of what actually occurred in most cases, without specifically describing plaintiffs' activities. While the statement includes, in Lewis's phrasing, a fleeting reference to Chau, the full passage makes clear that the description is a generic one about the kind of investors who invest in CDOs and their reasons for doing so.

- **Statements 11, 12 and 13** collectively provide a characterization of the general relationship between Wall Street banks and CDO managers, and make no specific claim about plaintiffs' conduct.

Such sweeping descriptions about an entire industry, its practices and its products, do not give rise to defamation claims by members of the industry. This is so, even where, as in this case, the general claims appear directly alongside separate references to a specific industry participant, such as Chau. In *Veilleux v. NBC*, 206 F.3d 92, 115-16 (1st Cir. 2000), for example, the Court of Appeals held that a statement in a television broadcast that a "stay awake" mentality plaguing the long-distance trucking industry had "led to many accidents and death" was not defamatory as to the particular truck driver being profiled—even though the broadcast depicted plaintiff as exemplifying that mentality—because the general statement was not personal to him. *See also Murray v. Bailey*, 613 F. Supp. 1276, 1283 (N.D. Cal. 1985) (prosecutor profiled in book could not challenge statement that "once a prosecution gets rolling, police and prosecutors are often reluctant to let truth become an obstacle" because "general statements about a large class of people are not actionable by individual members of that class").

{00487133;v7 }

The group libel rule balances "the incidental and occasional injury to the individual resulting from the defamation of large groups … against the public's right to know," and it is designed to encourage precisely the type of "frank discussions of matters of public concern under the First Amendment" contained in TBS. *Brady v. Ottaway Newspapers, Inc.*, 84 A.D2d 226, 229 (2d Dept. 1981) ; *see also, e.g., Schuster v. U.S. News & World Report, Inc.*, 459 F. Supp. 973, 978 (D. Minn. 1978) (to permit statements commenting generally on the laetrile controversy to create liability to individuals prominent in the controversy "would chill heated public debate into lukewarm pap"), *aff'd*, 602 F.2d 850 (8th Cir. 1979).

Accordingly, summary judgment should be granted on statements 1, 5, 9, 11, 12, 13 and 21 because under the group libel doctrine, they are not "of and concerning" the plaintiffs.

### 2.    Several of the challenged statements are not defamatory.

Summary judgment should be entered with respect to a number of statements because they are not defamatory as a matter of law.  The court must decide "whether the statements complained of are reasonably susceptible of a defamatory construction," reading the statements "in the context of the publication as a whole," without straining "to give the publication either an innocent or a defamatory construction." *Levin v. McPhee*, 917 F. Supp. 230, 236 (1996) (citing *James v. Gannett Co.*, 40 N.Y.2d 415, 419-20 (1976)), *aff'd*, 119 F.3d 189 (2d Cir. 1997).  A statement is defamatory if it tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace. *E.g., Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F. Supp. 2d 279, 287 (S.D.N.Y. 2006); *Michtavi v. N.Y. Daily News*, 587 F.3d 551, 552 (2d Cir. 2009) ("a statement is defamatory only if it would expose an individual to shame 'in the minds of right-thinking persons'" (citation omitted)).

Plaintiffs contend that several statements harmed their reputations "by indicating that the collateral making up Harding's CDOs was less creditworthy or of poorer quality than it actually

{00487133;v7 }

was," and that Harding's CDOs were exclusively backed by BBB mortgage securities when much was allegedly backed by "high-grade securities ... [a]nd some of it was corporate debt or other assets that had nothing to do with mortgage bonds."[17]   No reasonable reading of the information Eisman provided to Lewis conveys these asserted meanings.

- **Statement 5** explains (accurately) how mezzanine CDOs are built using the triple-B tranches of mortgage bonds, along with Eisman's opinions about this.

- **Statement 6** reflects Eisman's description to Lewis that Chau introduced himself as a mezzanine manager with $15 billion in assets, and contains Eisman's unfavorable opinion of mezzanine CDOs.

- **Statement 8** is based on Eisman's statement to Lewis that he and his team at FrontPoint had researched the subprime market and concluded by late January 2007 that the collateral of bonds comprised of subprime loans had deteriorated, with devastating consequences for equity investors in mezzanine CDOs.

These statements cannot reasonably be read to convey that the *only* assets in Harding's CDOs were low-rated, mortgage bonds as plaintiffs contend, and Eisman never said any such thing.[18]   *See Krepps v. Reiner*, 588 F. Supp. 2d 471, 484 (S.D.N.Y. 2008) (referencing two lawsuits that plaintiff lost without mentioning lawsuit that plaintiff won requires "a strained or artificial construction" to be defamatory), *aff'd*, 377 F. App'x 65 (2d Cir. 2010); *Delaney v. Am. Tel. & Tel. Co.*, 171 A.D.2d 456, 456 (1st Dep't 1991) (accusing plaintiffs of not recommending certain products does not imply dishonest business practices and is not defamatory).

In any event, Chau concedes that referring to plaintiffs as exclusively mezzanine CDO managers, when they also managed high-grade CDOs, is not defamatory. As Chau testified, "both mezzanine and high-grade CDOs [were] considered legitimate investment vehicles" and "[c]alling a CDO a mezzanine CDO doesn't imply that the CDO isn't creditworthy"—indeed, he

---

[17] Chau 3rd Resp. at 9-11, 13-14; Harding 3rd Resp. at 9-11, 14.

[18] Eisman Dep. 266:15-17 ("I think the CDOs had a lot of BBB tranches of mortgage bonds. I wouldn't necessarily say it was hundred percent.").

was not "aware of" any "negative connotation in the industry associated with managing a

mezzanine CDO." Chau Dep. 168:25-170:15; *see also* GD Ex. 10 ███████████

████████████████████████████████████████████████████████

██████████

     Plaintiffs are equally off-base in claiming that a number of statements convey that Chau

disregarded the interests of his investors and his fiduciary duties:[19]

- **Statement 16** makes reference to maximizing "dollars in his care," and derives from Eisman's statement that Chau told him he had $15 billion under management and wanted to increase that to $50 billion.[20]

Asserting that Chau wanted to grow his business, even if false, does not expose him to contempt.

"'Greediness does not imply dishonesty.'" *Duane Reade, Inc. v. Clark*, 2004 WL 690191, at *10

(Sup. Ct. N.Y. Cnty. Mar. 31, 2004) (quoting *Hall v. Binghamton Press Co.*, 263 A.D. 403, 413-

14 (3d Dep't 1942) (Bliss, J., concurring), *aff'd*, 296 N.Y. 714 (1946)).   Indeed, plaintiffs

concede that "the motivation of all investment managers is increasing AUM."   Harding Dep.

261:3-4.

- **Statement 20** quotes Chau as saying, "I love guys like you who short my market. Without you, I don't have anything to buy."

- **Statement 24** expresses Chau's fear that market conditions will "strengthen, and dissuade hedge funds from placing bigger bets against the subprime mortgage market."

Neither statement conveys any breach of fiduciary duty or impropriety.   They simply reflect the

reality that Chau's CDOs were going "long" mortgage securities, and he needed investors like

---

[19] *See* Chau 3rd Resp. at 24, 29, 34; Harding 3rd Resp. at 25, 30, 35.  In several instances, plaintiffs claim a statement further harmed their reputations by suggesting that Chau "was so indifferent to his duties and obligations to investors that he would brag about this misconduct to a stranger at a financial industry conference."  E.g., Chau 3rd Resp. at 24, 29, 34.  This bootstrapping argument assumes that the underlying statements themselves are reasonably read as conveying defamatory facts, but they are not.

[20] Eisman Dep. 186:22–187:2, 283:8-17.

{00487133;v7 }

FrontPoint to continue to want to "short" those securities in order to grow his total assets.  Chau himself conceded as much, testifying that the statement "for every short, there has to be a long" is "a statement of fact."  Chau Dep. at 81:21-25.

Accordingly, summary judgment should be granted on statements 5, 6, 8, 16, 20 and 24 because they are not reasonably capable of conveying the defamatory meanings alleged.

## B.   Eisman's Opinions Are Constitutionally Protected

All of the 18 challenged statements that do not specifically recount Eisman's dinner conversation plainly reflect his opinions that the CDO market was corrupt and that CDO managers played a duplicitous role in advancing the interests of Wall Street.  Even if these statements about the market in general could be understood to apply to plaintiffs in particular, Eisman's expression of his opinions is constitutionally protected.

### 1.   New York law broadly defines and protects opinion.

"The First Amendment presupposes that the freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." *Bose*, 466 U.S. at 503-04.  The First Amendment thus provides absolute protection for the expression of opinion. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990).  Article I, Section 8 of the New York Constitution is even more robust in the scope of opinion it protects. *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 152 (1993) (New York's test for "a nonactionable statement of opinion" is "decidedly more protective" than the First Amendment).  "[F]alse or not, libelous or not," in New York, opinions "are constitutionally protected and may not be the subject of private damage actions," "no matter how vituperative or unreasonable" those opinions might be. *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 286, 289 (1986).

{00487133;v7 }

To determine whether a statement is protected opinion, courts must consider:[21]

> "(1) whether the specific language in issue has a precise meaning
> which is readily understood; (2) whether the statements are capable
> of being proven true or false; and (3) whether either the full
> context of the communication in which the statement appears or
> the broader social context and surrounding circumstances are such
> as to signal . . . readers or listeners that what is being read or heard
> is likely to be opinion, not fact."

*Mann v. Abel*, 10 N.Y.3d 271, 276 (2008) (quoting *Brian v. Richardson*, 87 N.Y.2d 46, 51

(1995)). This standard requires more than consideration of whether the specific words used can

reasonably be understood to convey a false fact. *Immuno*, 77 N.Y.2d at 255-56; *Doe v. White*

*Plains Hosp. Med. Ctr.*, 2011 WL 2899174, at *3 (S.D.N.Y. July 8, 2011) ("objective statements

that could be proven true or false" may nonetheless be understood as an expression of opinion),

*aff'd, Doe v. French*, --- F. App'x ---, 2012 WL 129836 (2d Cir. Jan. 18, 2012).[22] Rather, courts

must consider whether the words, in full context, would reasonably be understood as asserting a

fact about the plaintiff rather than expressing a point of view. *Mann*, 10 N.Y.3d at 276.

In assessing the full context, courts must consider both the context of the specific

communication "as a whole," including "its tone and apparent purpose," as well as the broader

social context. *Brian*, 87 N.Y.2d at 51; *Steinhilber*, 68 N.Y.2d at 295 ("'even apparent

statements of fact may assume the character of statements of opinion'" in context of "'public

debate'" (citation omitted)). Courts must also consider "the 'identity, role and reputation of the

author' to determine whether a reasonable reader would presume that the statement was

---

[21] Whether a challenged statement constitutes fact or opinion is a question of law for the court. *Torain v. Liu*, 2007 WL 2331073, at *2 (S.D.N.Y. Aug. 16, 2007), *aff'd*, 279 F. App'x 46 (2d Cir. 2008).

[22] Even under the less stringent First Amendment standard, "a provably false statement is not actionable if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts." *Riley v. Harr*, 292 F.3d 282, 289 (1st Cir. 2002) (internal quotation marks omitted).

conveying facts." *DiFolco v. MSNBC Cable L.L.C.*, --- F. Supp. 2d ---, 2011 WL 5519824, at *12 (S.D.N.Y. Nov. 9, 2011) (quoting *Brian*, 87 N.Y.2d at 52).

>   **2.** **In context, the statements by Eisman are understood as his personal views.**

Under this controlling standard, Eisman's statements about the CDO market and CDO managers are clearly protected expressions of opinion. His statements in the context of a book exploring the causes of the financial crisis, published in the midst of a heated public debate on the appropriate government response to the crisis, are properly understood as the subjective views of an interested, blunt-speaking market participant. The book's overall tone, its characterization of Eisman and its portrayal of him as a critic of the CDO market, all signal to readers that the challenged statements constitute Eisman's personal assessments and opinions rather than assertions of established fact.

The broader social context of the statements. *TBS* was published amidst a widespread, ongoing public debate about the global financial crisis and its causes—a debate that witnessed many detailed investigative news reports about CDO managers (including plaintiffs),[23] expert commentary,[24] government investigations[25] and on-going regulatory enforcement proceedings.[26] *TBS* offers several views, including Eisman's, on the nature of this crisis and the structural problems that caused and exacerbated it. Such opinions by industry participants are constitutionally protected because otherwise "the threat of defamation lawsuits would discourage" commentary and insights from the "experts in a field, figures closely involved in a

---

[23] *See* Goldman Decl. ¶¶ 2, 20.

[24] ED ¶¶ 82-85; Goldman Decl. ¶¶ 25-27.

[25] ED ¶¶ 86-88; Goldman Decl. ¶¶ 22-24.

public controversy, or others whose perspectives might be of interest to the public." *Riley*, 292 F.3d at 290-91 (internal quotation marks omitted).

The context of the statements within the book. *TBS* itself is understood by readers as advancing a point of view about the problems on Wall Street. By plaintiffs' own reading, the book is the work of "a master story-teller," pitting "heroic figures" such as Eisman against CDO managers depicted as "villains." Compl. ¶ 44, 48, 52. Readers understand the commentary to be colorful and opinionated. *See Dworin v. Deutsch*, 2008 WL 508019, at *4 (S.D.N.Y. Feb. 22, 2008) (plaintiff's portrayal as "'an antagonist to [the book's] protagonist'" supports finding protected opinion); *Clark*, 2004 WL 690191, at *8 (statements "replete with hyperbole and rhetoric," by one whose "inherent bias" is revealed, in context of community's "heated debate over a public matter" are non-actionable opinions). Eisman's comments are offered as his perspective on a market in which he participated, and the book's narrative style hews closely to Eisman's perspective rather than adopting an objective point of view, further alerting the reader to the subjective nature of the assertions. *Brian*, 87 N.Y.2d at 53 (author's participation in dispute signaled "that he was not a disinterested observer"); *McCabe v. Rattiner*, 814 F.2d 839, 843 (1st Cir. 1987) (first-person narrative style "puts the reader on notice that the author is giving his views").

Moreover, by the time readers get to the challenged statements in Chapter 6, they have already learned that words and thoughts coming from Eisman must be understood in light of his combative and hyperbolic style, and his posture as a staunch critic of the CDO market.[27] *TBS*'s

---

[27] In Chapter 1, Eisman's wife describes him as someone people consider "rude and obnoxious and aggressive," while, on the same page, a *friend* describes him as "sort of a prick in a way." *TBS* at 5. In the book's narration, Eisman is described variously as someone with "a talent for offending people," *id.* at 5, someone with "a special talent for making noise and breaking with consensus opinion," *id.* at 2, and "brazen and grandiose," *id.* at 10. *See also* Compl. ¶ 8, 70-77 ("Eisman has a well-known reputation for being offensive," and detailing examples of Eisman's impolitic behavior in *TBS*).

central characterization of Eisman is of someone with "a picture of the financial world in his
head that was radically different from, and less flattering than, the financial world's self-
portrait," *TBS* at 16, and who delights in expressing his opinions and theories about the world of
finance in hyperbolic terms.  Among many other examples, Eisman is portrayed in *TBS*:

- Explaining to "the head of a large U.S. brokerage firm," in the presence of
  "several dozen investors" that "he, the brokerage firm head, didn't understand his
  own business . . . ." *Id.* at 4.

- Telling the CEO of a Japanese real estate firm that his financial statements were
  "toilet paper." *Id.* at 5.

- Explaining that from his early experience researching the subprime mortgage
  market he learned, "Wall Street didn't give a shit what it sold." *Id.* at 24.

- Confronting the CEO of Bear Stearns: "This is how you guys *wanted* it.  So you
  could rip off your customers." *Id.* at 230 (italics in original).

The specific role that Eisman's encounter with Chau plays within *TBS*'s larger narrative
further signals that the challenged statements are to be understood as Eisman's subjective
theories.  A central drama of the book is Eisman's gradual overcoming of the deep doubts he
held about the "Lippmann trade."  The book presents Eisman's dinner conversation with Chau as
the decisive moment in that process.  Thus, the relevant section begins with a description of
Lippmann's concern that the investors he had convinced to take a short position, including
Eisman, "were losing heart," and ends with Eisman committed to substantially expanding his
short position. *TBS* at 137-38, 144.[28]  The challenged section explores how Eisman's thinking
was influenced by his encounter with Chau.  As Lewis explained:

> I felt I'm recording here Eisman's opinion of this guy. . . . [T]he
> reason this is interesting is that Eisman emerges from this
> encounter convinced that he's smart to short the market, and so it

---
[28] ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████

was very important to get across to the reader what Eisman thought
about this guy.  GD Ex. 11 (Lewis Dep.) at 141:15-142:2.

In this context, reasonable readers would understand the challenged statements as

presenting Eisman's theories and opinions about the market and CDO managers rather than

asserting specific facts about plaintiffs.  Such statements are not actionable.

### 3. The challenged statements about the CDO market and CDO managers are protected opinion.

Several statements simply describe Eisman's negative opinions about the nature of the

CDO market, in evocative terms:

- **Statement 5** describes the CDO market as "the engine of doom," with CDOs
illustrated by "several towers of debt" built from "the worst of the worst"
tranches, and expresses Eisman's disdain for CDO managers who made the
machine work for Wall Street.  (In Lewis words, a "ship of doom . . . piloted by
Wing Chau and people like him.")

- **Statement 6** characterizes the type of bonds sold by mezzanine CDO managers as
"the equivalent of three levels of dog shit lower than the original bonds."

- **Statement 8** reflects Eisman's assessment that mezzanine CDO managers in
January 2007 would already "be having a hard time" because he believed their
underlying assets had already deteriorated substantially.

- **Statement 21** offers Eisman's theory that the CDO "machine" had been fueled at
first by "Americans with shitty credit taking out loans," and now needed synthetic
securities "to keep the machine running."  It criticizes the credit default swap as
an invention of greedy bankers that magnified the crisis.

While plaintiffs contend these statements convey that the collateral in Harding's CDOs was "the

worst of the worst" and "less creditworthy or of poorer quality than it actually was,"[29] such

characterizations of the market and how it operates are plainly subjective interpretations that lack

a precise meaning and are incapable of being proven true or false.  Statements that "are not

readily verifiable" are "intrinsically unsuited as a foundation for libel."  *Immuno AG. v. Moor-*

---

[29] Chau 3rd Resp. at 9-11, 14, 31; Harding 3rd Resp. at 9-11, 14, 31.

*Jankowski*, 74 N.Y.2d 549, 560 (1989).  Likewise, Eisman's description of the CDO assets that

Chau wanted to grow as "crappy" in **Statement 23** is not actionable.

Other challenged statements reflect Eisman's assessment of the extent to which CDO

managers failed to perform any meaningful role in managing their assets and improving the

returns achieved by their investors.  *TBS* makes plain that Eisman considered CDO managers

front-men for Wall Street, who were more concerned with helping to market the lousy securities

of the banks that hired them than limiting risk for the investors in their CDOs:

- **Statement 1** presents Eisman's sense before his dinner with Chau that there really wasn't "anything to manage" in a CDO.

- **Statements 9 and 15** articulate Eisman's opinion that most investors bought CDOs based on their ratings rather than the specific underlying assets, and so CDO managers, whose compensation was largely volume-based, didn't need to conduct detailed analyses when acquiring assets or after issuance.

- **Statements 13 and 19** present Eisman's opinion that CDO managers are "beards" for Wall Street—"double agents" who only "seemed to represent the interests of investors" but really served "as a new kind of front-man for the Wall Street firms."

- **Statement 18** caustically expresses Eisman's contempt for the fact that CDO managers were paid to "'manage' their CDOs—as if this moron was helping you," and that managers had no "exposure to [their] CDOs," which in his view meant they had even less incentive to "give a fuck about the investors."

Plaintiffs allege that these statements accuse them, *inter alia*, of doing "nothing to

manage" their CDOs, failing to vet and monitor the assets they acquired, violating their fiduciary

duties and being indifferent to the interest of their investors.[30]  But none of these statements

about the role Eisman perceived CDO managers to play in the "CDO machine" can reasonably

be read, in context, to make such accusations of wrong doing.  Rather, the statements are

---

[30] Chau 3rd Resp. at 5, 15-16, 20, 23, 27-28; Harding 3rd Resp. at 5, 15-16, 20, 23, 27-29.

{00487133;v7 }

37

presented as the subjective assessments of someone advocating for fundamental change in the system.

Presented in hyperbolic language, the statements do not convey specific allegations of wrongdoing that are susceptible to proof or precise meaning. Provocative rhetoric—even statements that, read literally, allege a crime—cannot properly form the basis of a defamation claim when it is understood to be expressing a point of view. *See Old Dominion Branch No. 486, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 268 (1974) ("scab," "traitor to his God, his country, his family and his class"); *Couloute v. Ryncarz*, 2012 WL 541089, at *6 (S.D.N.Y. Feb. 17, 2012) (plaintiff "lied and cheated all through his 40 years of life" and because he is an attorney, "he's great at lying and covering it up without batting an eye"); *Torain*, 2007 WL 2331073, at *3 ("racist pedophile"); *Finkelstein v. Wachtel*, 2003 WL 1918309, at *6 (S.D.N.Y. Apr. 21, 2003) (calling plaintiff a "crook" and predicting that Attorney General will be involved and it will be "very dirty business"); *O'Loughlin v. Patrolmen's Benevolent Ass'n*, 178 A.D.2d 117, 118 (1st Dep't 1991) (characterizing a police officer as "a 'disgrace to the entire police service'" and having "'no feelings' for fallen police officers").

As in *Trustco Bank of New York v. Capital Newspaper Division of Hearst Corp.*, 213 A.D.2d 940, 942-43 (3d Dep't 1995), the focus of Eisman's concern with CDO managers was "not with the legality of plaintiff's actions, but with the impact those actions would have on the community." *See Renco Group, Inc. v. Workers World Party, Inc.*, 2006 WL 2739006, at *1, 4 (Sup. Ct. N.Y. Cnty. Sept. 26, 2006) (accusing plaintiff of "robbing the pension fund" non-actionable opinion in context of "impassioned" discussion of "an area of public concern"). Far from accusing anyone of violating their duties, Eisman's shock and dismay expressed in *TBS* is that the market *actually permitted* the very practices he condemned. Eisman's right to express

{00487133;v7 }

38

these concerns is constitutionally protected. "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974).

These and other aspects of the challenged statements are also non-actionable because they speculate about the motives of market participants, which are not susceptible to specific proof.

- **Statements 11 and 12** reflect comments by Eisman to the effect that a Wall Street bank would prefer to give mandates to CDO managers who would then buy assets from the bank, because the bank wanted a distribution outlet for its assets that were otherwise hard to sell.

- **Statement 19** conveys the belief that "investors felt better buying a Merrill Lynch CDO if it didn't appear to be run by Merrill Lynch."

- **Statement 23** reports Eisman's conclusion that Chau "would rather have $50 billion in crappy CDOs than none at all."

- **Statement 25** conveys Eisman's intention, following his dinner with Chau, to short Chau's CDOs.

It is well settled that "statements concerning state of mind, such as hypotheses as to motivation, are not readily verifiable as true or false," and courts "have consistently found them to be protected." *Rappaport v. VV Publ'g Corp.*, 163 Misc. 2d 1, 9 (Sup. Ct. N.Y. Cnty. 1994), *aff'd*, 223 A.D.2d 515 (1st Dep't 1996); *see also Dworin*, 2008 WL 508019, at *5 (defendant's "perception of plaintiff's reaction . . .is non-actionable pure opinion"); *Haynes v. Alfred A. Knopf*, 8 F.3d 1222, 1227 (7th Cir. 1993) ("anyone is entitled to speculate on a person's motives" and such "insight" is "not information that the plaintiff might be able to prove false in a trial").

Plaintiffs are on no firmer ground challenging Eisman's view that the CDO market was corrupt:

- **Statement 12** conveys, in Lewis's phrasing, that the "whole point of the CDO was to launder a lot of subprime mortgage market risk that the firms had been unable to place straightforwardly."

This statement expresses Eisman's understanding, premised on the discussion in

**Statement 5** and elsewhere in *TBS*, that Wall Street firms took lower-rated bonds "backed by

dubious loans"—the triple-B, mezzanine tranches of RMBS—to build a CDO that magically

received AAA ratings on 80% of its structure. Eisman's opinion about this practice is not

reasonably read as a literal accusation of money-laundering, by plaintiffs or anyone else. *See*

*Foley v. CBS*, 2006 WL 6619947, at *4 (Sup. Ct. N.Y. Cnty. Sept. 13, 2006) ("con artist,"

"engaged in a 'scam,'" who "ripped off" customers and "ran a 'crooked' business" are protected

opinions); *Landmark Educ. Corp. v. Hachette Filipacchi Medias Grp.*, 28 Media. L. Rep. 1123,

1126 (Sup. Ct. N.Y. Cnty. Apr. 28, 1999) (accusing plaintiff of engaging in a "pyramid scheme"

is protected opinion where not "reasonably susceptible to a connotation of criminality").

**C.    All of the Libel Claims Fail Because Plaintiffs**
       **<u>Cannot Meet Their Constitutional Burdens</u>**

To the extent that any of Eisman's statements to Lewis are not reasonably understood to

reflect his opinions, the libel claims should still be dismissed because there is no evidence that

Eisman said anything to Lewis he knew to be false, or even had doubts about its truth.

The observations Eisman shared with Lewis about the CDO market and the role of CDO

managers were made against a background of years of research and thought about the subprime

mortgage industry in general, and a detailed consideration of the new CDO market as part of a

major investment decision. ED ¶¶ 10-14, 17-19, 23, 62-80. His observations reflected, *inter*

*alia*, an extensive review of the credit quality of subprime loans by Eisman and his FrontPoint

colleagues, detailed discussions with industry participants (including mortgage originators and

CDO managers), and review of relevant industry publications, studies and reports. *See* ED

¶¶ 69-74, 79, 81. While Eisman may have brought to his thinking about CDOs a particular

cynicism about the subprime mortgage industry and the world of structured finance, that only

underscores his honestly held belief in what he said. *See Behar*, 238 F.3d at 174 (citing with

approval trial court's observation that the "speakers' belief in his statements, even his

exaggerations, enhances, rather than diminishes, the likelihood that they are protected").

Moreover, as noted above, Eisman's observations about the nature and operation of the

CDO market were not unique to him and were widely held by other observers.  For example, the

basic facts surrounding the creation of a CDO, and the role of the rating agencies (discussed in

Statement 5) is well documented and not seriously in dispute, nor is the estimate that 80% of the

bonds issued by a CDO backed by triple-B securities would be rated triple-A.  ED ¶¶ 75-78, 83-

88.  According to Lewis, multiple other sources on which he relied made the exact same

observations about "ratings alchemy."[31]

Eisman's view of the limited asset selection and management role assigned to CDO

managers by the investment banks is also amply supported.  *See* ED ¶¶ 47-49, 83, 87; *see also*

Lewis Dep. at 295:22-297:7 █████████████████████████████

█████████████████████████████████ Equally validated are Eisman's conclusions

about the enormous incentive for CDO managers to grow their assets given their compensation

structure and lack of exposure to risk, ED ¶¶ 48, 49, 60, 85, 87, and the divided loyalties created

by these misplaced economic incentives, *see* Lewis Dep. at 298:18-299:20 ████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

That Eisman's assessment of the CDO market and CDO managers finds such ample

support further undermines any argument that Eisman lacked an authentic basis for his beliefs.

*See, e.g.*, *Church of Scientology Int'l v. Daniels*, 992 F.2d 1329, 1334 (4th Cir. 1993) (the

---

[31] *See* Lewis Dep. at 271:17-273:8 ████████████████████████████████████
█████████████████████

"volume of published commentary" supporting challenged statement makes it "impossible to conclude that [defendant] entertained serious doubts as to the truth of his statement or spoke with a high degree of probable falsity").

## III.   SUMMARY JUDGMENT SHOULD BE ENTERED ON PLAINTIFFS' OVER-REACHING CLAIMS OF LIBEL BY IMPLICATION

Unable to present clear evidence of any specific defamatory, false fact stated about them by Eisman, plaintiffs allege that *TBS* nonetheless conveys a number of false implications. Chau 3rd Resp. at 37-44; Harding 3rd Resp. at 38-45. Among their allegations, plaintiffs claim that the book implies they "did no work" and "got paid for doing no work," were "incompetent " and "dishonest," lacked any "qualified, capable or experienced staff" and were "solely or at least primarily responsible for the collapse of the CDO and housing markets." *Id.* These claims should be dismissed because they do not reflect the reasonable meaning of anything that Eisman said to Lewis. Eisman did not convey anything to Lewis specifically about plaintiffs except the facts of his dinner conversation with Chau, ED ¶ 93, and Eisman's views about the CDO market and CDO managers in general are not reasonably construed to mean that plaintiffs did nothing, cheated their clients or were solely responsible for the financial crisis.

While New York accepts that a claim for libel by implication can potentially arise from a combination of statements that are not individually defamatory, *e.g., Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373 (1995); *Herbert v. Lando*, 781 F.2d 298, 307 (2d Cir. 1986), to sustain such a claim plaintiffs must demonstrate both that (1) Eisman's statements can reasonably be read to convey the implications they allege, and (2) Eisman intended to convey that implication.[32] *See Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993)

---

[32] Each determination raises a question of law for the court in the first instance. *Tracy v. Newsday, Inc.*, 5 N.Y.2d 134, 136 (1959) (court decides whether publication is capable of implication ascribed to it); *Rappaport*, 163 Misc. 2d at 5.

("language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference"); *Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427, 437 (S.D.N.Y. 2007) (same).

Given the substantial First Amendment interest in protecting true speech, claims of libel by unstated implication must be carefully constrained. *Rappaport*, 163 Misc. 2d at 5 (referring to the "significant obstacles" in establishing a claim for libel by implication); *see also Chapin*, 993 F.2d at 1092-93 ("because the constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing"). The sufficiency of plaintiffs' implication claims must be tested by the court against "a fair reading in the context of the publication as a whole," *Armstrong*, 85 N.Y.2d at 380, and plaintiffs may not use their implication claim to "'enlarge upon the meaning of the words so as to convey a meaning that is not expressed.'" *Loeb v. New Times Commc'ns Corp.*, 497 F. Supp. 85, 90 (S.D.N.Y. 1980) (citation omitted). The threshold question for the court is whether the challenged statements *reasonably* convey the defamatory implications alleged, not whether such an interpretation of the book as a whole is possible, or even plausible. *White v. Fraternal Order of Police*, 707 F. Supp. 579, 589 n.12 (D.D.C. 1989), *aff'd*, 909 F.2d 512 (D.C. Cir. 1990).

In similar situations, courts have repeatedly rebuffed efforts to transform true reports that raise questions on matters of public concern into defamatory assertions of misconduct. In *Loeb*, for example, plaintiff claimed that statements referring to a "mysterious fire" that destroyed the printing plant of a competitor implied he was responsible for the fire and was an arsonist. Even though this court found that "[t]he authors' clear intent was to portray an overwhelmingly negative picture of Loeb by presenting purported examples of his ridiculous idiosyncrasies and prejudices, shady political maneuverings, and dishonest reporting practices," 497 F. Supp. at 88-

89, plaintiff had no claim for libel by implication because "defendants have reported the facts accurately and carefully," and the article did not expressly convey "the defamatory conclusion which Loeb claims they intended the reader to draw," leaving the reader "free to draw his own conclusion," *id.* at 91. *See also, e.g. Chapin*, 993 F.2d at 1098 (questions "are not necessarily accusations or affronts").

As in *Loeb*, Eisman conveyed the facts about the dinner to Lewis "accurately and carefully," and nothing that Eisman said can reasonably be construed to accuse plaintiffs of taking money for doing nothing, dishonesty, or primary responsibility for the financial crisis.[33]

---

[33] Of course, if the statements actually could somehow be construed to convey such accusations and that Eisman intended to convey them, the implication claims should still be dismissed because in that event they would constitute opinions presented on fully disclosed facts. The expression of an opinion asserting a belief that is accompanied by the true facts on which it is based cannot form the basis of a defamation claim, no matter how inflammatory the claims might be. *Brian*, 87 N.Y.2d at 53-54; *Steinhilber*, 68 N.Y.2d at 289. Even an accusation of criminal conduct is protected as opinion, when the facts are set forth and a reasonable reader would understand the accusation in context as "personal surmise built upon those facts." *Gross*, 82 N.Y.2d at 155 (charges of blackmail, fraud, bribery, corruption, can in context be nonactionable); *Bruno v. N.Y. Daily News Co.*, 89 A.D.2d 260, 264 (3d Dep't 1982) ("accusations of cheating, gypping, and being conscienceless . . . are not actionable").

**CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment in favor of

Defendant Steven Eisman.

Dated:   New York, New York
          April 13, 2012

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, LLP

*Of Counsel*:

Celeste Phillips
Paul Safier
LEVINE SULLIVAN KOCH & SCHULZ, LLP

David A. Schulz
Michael D. Sullivan
Jacob P. Goldstein
321 West 44th Street, Suite 510
New York, NY 10036
Tel:   (212) 850-6100;
Fax:  (212) 850-6299

*Attorneys for Defendant Steven Eisman*

# APPENDIX

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of April, 2012, a copy of the foregoing was served by email and Federal Express priority overnight courier upon the following:

Steven F. Molo, Esq.
MoloLamken LLP
540 Madison Avenue
New York, NY 10022
smolo@mololamken.com

*Attorneys for Plaintiffs Harding Advisory LLC and Wing F. Chau*


Celia Goldwag Barenholtz
Gabriel Rauterberg
Cooley LLP
1114 Avenue of the Americas
New York, NY 10036
cbarenholtz@cooley.com

*Attorneys for Defendants Michael Lewis and W.W. Norton & Company, Inc.*


Jacob P. Goldstein

*Chau v. Lewis*, No. 11-cv-1333 (GBD) (KNF)

STATEMENTS ALLEGED TO BE FALSE AND DEFAMATORY

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 1 | When Eisman asked exactly what Harding Advisory advised, Wing Chau explained that he was a CDO manager. "I had no idea there was such a thing as a CDO manager," said Eisman. "I didn't know there was anything to manage." (p. 138.) | Same. | Not "of and concerning" plaintiffs.<br><br>Not actionable; protected as opinion.<br><br>No clear evidence of constitutional malice. |
| 2 | He'd graduated from the University of Rhode Island, earned a business degree at Babson College, and spent most of his career working sleepy jobs at sleepy life insurance companies—but all that was in the past. (p. 139.) | | Not a statement by Eisman. |
| 3. | Danny didn't know Wing Chau, but when he heard that he was the end buyer of subprime CDOs, he knew exactly who he was: the sucker. (p. 139.) | | Not a statement by Eisman. |
| 4 | When they saw that Lippmann had seated Eisman right next to the sucker, both Danny and Vinny had the same thought: *Oh no. This isn't going to end well.* Eisman couldn't contain himself. He'd figure out the guy was a fool, and let him know it, and then where would they be? They needed fools; only fools would take the other side of their trades. (p. 139.) | | Not a statement by Eisman. |

1

{00496451;v1 }

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 5 | Later, whenever Eisman set out to explain to others the origins of the financial crisis, he'd start with his dinner with Wing Chau. Only now did he fully appreciate the central importance of the so-called mezzanine CDO—the CDO composed mainly of triple-B-rated subprime mortgage bonds—and its synthetic counterpart: the CDO composed entirely of credit default swaps on a triple-B-rated subprime mortgage bonds. "You have to understand this," he'd say. "This was the engine of doom." He'd draw a picture of several towers of debt. The first tower was the original subprime loans that had been piled together. At the top of this tower was the triple-A tranche, just below it the double-A tranche, and so on down to the riskiest, triple-B tranche—the bonds Eisman had bet against. The Wall Street firms had taken these triple-B tranches—the worst of the worst—to build yet another tower of bonds: a CDO. A collateralized debt obligation. The reason they'd done this is that the rating agencies, presented with the pile of bonds backed by dubious loans, would pronounce 80 percent of the bonds in it triple-A. These bonds could then be sold to investors—pension funds, insurance companies—which were allowed to invest only in highly rated securities. It came as news to Eisman that this ship of doom was piloted by Wing Chau and people like him. (p. 140.) | Eisman told Lewis: (a) mezzanine CDOs were the most destructive of the various financial products associated with subprime-mortgage-securitization because they deceptively alchemized risky investments into seemingly safe ones; and (b) before meeting Chau, he (Eisman) did not appreciate the role of CDO managers in producing and marketing mezzanine CDOs. | Not "of and concerning" plaintiffs. Not defamatory. Not actionable; protected as opinion. No clear evidence of constitutional malice. |

2

{00496451;v1 }

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 6 | The guy controlled roughly $15 billion, invested in nothing but CDOs backed by the triple-B tranche of a mortgage bond or, as Eisman put it, "the equivalent of three levels of dog shit lower than the original bonds. (p.140.) | Eisman told Lewis: (a) Chau said at the dinner that he controlled $15 billion in mezzanine CDOs; (b) Eisman understood that mezzanine managers invested in BBB tranches of mortgage bonds; and (c) Eisman considered the mezzanine CDOs to be "the equivalent of three levels of dog shit lower than the original bonds." | Not defamatory.<br><br>Not actionable; protected as opinion.<br><br>No clear evidence of falsity.<br><br>No clear evidence of constitutional malice. |
| 7 | All by himself, Chau generated vast demand for the riskiest slices of subprime mortgage bonds, for which there had previously been essentially no demand. This demand led inexorably to the supply of new home loans, as material for the bonds. The soy sauce in which Eisman double-dipped his edamame was shared by a man who had made it possible for tens of thousands of actual human beings to be handed money they could never afford to repay. (pp. 140-41.) | | Not a statement by Eisman. |
| 8 | As it happened, FrontPoint Partners had spent a lot of time digging around in those loans, and knew that the default rates were already sufficient to wipe out Wing Chau's entire portfolio. "God," Eisman said to him. "You must be having a hard time." "No," Wing Chau said. "I've sold everything out." (p. 141.) | Eisman told Lewis: (a) his team at FrontPoint had evaluated the subprime mortgage market and concluded by late January 2007 that the collateral of bonds comprised of subprime loans had deteriorated to a significant extent; (b) he believed that equity investors in many mezzanine CDOs would have been devastated by that deterioration; (c) he said to Chau at the Las Vegas dinner: "God, you must be having a hard time."; and (d) Chau responded, "No, I've sold everything out." | Not defamatory.<br><br>Not actionable; protected as opinion.<br><br>No clear evidence of falsity.<br><br>No clear evidence of constitutional malice. |

3

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 9 | The CDO manager's job was to select the Wall Street firm to supply him with subprime bonds that served as the collateral for CDO investors, and then to vet the bonds themselves. The CDO manager was further charged with monitoring the hundred or so individual subprime bonds inside each CDO, and replacing the bad ones, before they went bad, with better ones. That, however, was mere theory; in practice, the sorts of investors who handed their money to Wing Chau, and thus bought the triple-A rated tranche of CDOs—German banks, Taiwanese insurance companies, Japanese farmers' unions, European pension funds, and, in general, entities more or less required to invest in triple-A-rated bonds–did so precisely because they were meant to be foolproof, impervious to losses, and unnecessary to monitor or even think about very much. The CDO manager, in practice, didn't do much of anything, which is why all sorts of unlikely people suddenly hoped to become one. (p. 141.) | Eisman told Lewis: he believed that (a) investors were willing to invest in CDOs primarily because of the seal of approval bestowed upon them by the ratings agencies; (b) because of that, CDO managers did not need to do detailed, loan-level analysis on the underlying loans when acquiring collateral for their CDOs; and (c) CDO managers did little active management once a CDO was issued. | Not "of and concerning" plaintiffs.<br><br>Not actionable; protected as opinion.<br><br>No clear evidence of constitutional malice. |
| 10 | "Two guys and a Bloomberg terminal in New Jersey" was Wall Street shorthand for the typical CDO manager. (p. 141.) | | Not a statement by Eisman. |
| 11 | The less mentally alert the two guys, and the fewer the questions they asked about the triple-B-rated subprime bonds they were absorbing into their CDOs, the more likely they were to be patronized by the big Wall Street firms. (p. 141.) | Eisman told Lewis: his assessment was that investment banks preferred to give mandates to CDO managers who would take in as collateral the banks' own bonds or CDOs. | Not "of and concerning" plaintiffs.<br><br>Not actionable; protected as opinion. |

4

{00496451;v1 }

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 12 | The whole point of the CDO was to launder a lot of subprime mortgage market risk that the firms had been unable to place straightforwardly. The last thing you wanted was a CDO manager who asked lots of tough questions. (p. 141.) | Eisman told Lewis: he believed that (a) CDOs were used by investment banks as dumping grounds for assets they could not sell directly; and (b) these investment banks preferred CDO managers who cooperated in that endeavor. | Not "of and concerning" plaintiffs.  Not actionable; protected as opinion.  No clear evidence of constitutional malice. |
| 13 | The bond market had created what amounted to a double agent—a character who seemed to represent the interests of investors when he better represented the interests of Wall Street bond trading desks. (pp. 141-42.) | Eisman told Lewis:  he believed that: (a) CDO managers, despite their nominal independence, were beholden to the investment banks that gave them their mandates; and (b) the underwriting banks ultimately controlled what went into the CDOs. | Not "of and concerning" plaintiffs.  Not actionable; protected as opinion.  No clear evidence of constitutional malice. |
| 14 | To assure the big investors who had handed their billions to him that he had their deep interests at heart, the CDO manager kept ownership of what was called the "equity," or "first loss" piece, of the CDO—the piece that vanished first when the subprime loans that ultimately supplied the CDO with cash defaulted. . . .  Now, almost giddily, Chau explained to Eisman that he simply passed all the risk that the underlying home loans would default on to the big investors who had hired him to vet the bonds. (p. 142.) | Eisman told Lewis: Chau claimed to have "sold . . . out" his exposure to the market performance of his CDOs. | No clear evidence of falsity.  No clear evidence of constitutional malice. |

5

{00096451;v1 }

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 15 | But the CDO manager was also paid a fee of 0.01 percent off the top, before any of his investors saw a dime, and another, similar fee, off the bottom, as his investor received their money back. That doesn't sound like much, but, when you're running tens of billions of dollars with little effort and no overhead, it adds up. Just a few years earlier, Wing Chau was making $140,000 a year managing a portfolio for the New York Life Insurance Company. In one year as a CDO manager, he'd taken home $26 million, the haul from half a dozen lifetimes of working at New York Life. . . .<br><br>His job was to be the CDO "expert," but he actually didn't spend a lot of time worrying about what was in CDOs. (p. 142.) | Eisman told Lewis: (a) Chau claimed during the dinner to receive 10 basis points on the assets he managed; and (b) the way that Chau described his compensation during the dinner, he had huge incentives to increase the volume of assets he managed. | Statements concerning Chau's income are not from Eisman.<br><br>Not actionable; protected as opinion.<br><br>No clear evidence of constitutional malice. |
| 16 | His goal, he explained, was to maximize the dollars in his care. He was now doing this so well that, from January 2007 until the market crashed in September, Harding Advisory would be the world's biggest subprime CDO manager. (p. 142.) | Eisman told Lewis: Chau claimed to have $15 billion under management and to want to increase that to $50 billion. | Not defamatory.<br><br>No clear evidence of falsity.<br><br>No clear evidence of constitutional malice. |

{00496451;v1 }

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 17 | Among its other achievements, Harding had established itself as the go-to buyer of Merrill Lynch's awesome CDO machine, notorious not only for its rate of production (Merrill created twice as many of the things as the next biggest Wall Street firm) but also for its industrial waste (its CDOs were later proven to be easily the worst). (p. 142.) | | Not a statement by Eisman. |
| 18 | "He 'managed' the CDOs," said Eisman, "but managed what? I was just appalled that the structured finance market could be so insane as to allow someone to manage a CDO portfolio without having any exposure to the CDOs. People would pay up to have someone 'manage' their CDOs—as if this moron was helping you. I thought, *You prick, you don't give a fuck about the investors in this thing*." (pp. 142-43.) | Same. | Not actionable; protected as opinion.<br><br>No clear evidence of constitutional malice. |
| 19 | Chau's real job was to serve as a new kind of front-man for the Wall Street firms he "hired"; investors felt better buying a Merrill Lynch CDO if it didn't appear to be run by Merrill Lynch. (p. 143.) | Eisman told Lewis: in his opinion, CDO managers, including Chau, acted as beards for the investment banks that underwrote the CDOs. | Not actionable; protected as opinion.<br><br>No clear evidence of constitutional malice. |
| 20 | "Then he says something that blew my mind," said Eisman. "He says, 'I love guys like you who short my market. Without you I don't have anything to buy.'" (p. 143.) | Same. | Not defamatory.<br><br>No clear evidence of falsity.<br><br>No clear evidence of constitutional malice. |

7

{00496451;v1 }

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 21 | That's when Steve Eisman finally understood the madness of the machine. He and Vinny and Danny had been making these side bets with Goldman Sachs and Deutsche Bank on the fate of the triple-B tranche of subprime mortgage-backed bonds without fully understanding why those firms were so eager to accept them. Now he was face-to-face with the actual human being on the other side of his credit default swaps. Now he got it: The credit default swaps, filtered through the CDOs, were being used to replicate bonds backed by actual home loans. *There weren't enough Americans with shitty credit taking out loans to satisfy investors' appetite for the end product.* Wall Street needed his bets in order to synthesize more of them. "They weren't satisfied getting lots of unqualified borrowers to borrow money to buy a house they couldn't afford," said Eisman. "They were creating them out of whole cloth. One hundred times over! That's why the losses in the financial system are so much greater than just the subprime loans. That's when I realized they needed us to keep the machine running. I was like, *This is allowed?*" (p. 143.) | Eisman told Lewis: he believes that credit default swaps dramatically magnified the financial system's exposure to subprime mortgage risk by decoupling that risk from the existence of actual mortgages, and that his meeting with Chau drove him to this insight. | Not "of and concerning" plaintiffs.<br><br>Not actionable; protected as opinion.<br><br>No clear evidence of constitutional malice. |
| 22 | Wing Chau didn't know he'd been handpicked by Greg Lippmann to persuade Steve Eisman that the people on the other end of his credit default swaps were either crooks or morons, but he played the role anyway. (p. 144.) | | Not a statement by Eisman. |

8

| NO. | STATEMENT IN *THE BIG SHORT* | INFORMATION PROVIDED BY STEVEN EISMAN TO MICHAEL LEWIS | GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF STEVEN EISMAN |
|---|---|---|---|
| 23 | Between shots of sake he told Eisman that he would rather have $50 billion in crappy CDOs than none at all, as he was paid mostly on volume. (p. 144.) | Eisman told Lewis: Chau described himself at the dinner as eager to increase the assets he managed to $50 billion and said his focus was on growing his total assets under management. | Not actionable; protected as opinion.<br><br>No clear evidence of falsity.<br><br>No clear evidence of constitutional malice. |
| 24 | He told Eisman that his main fear was that the U.S. economy would strengthen, and dissuade hedge funds from placing bigger bets against the subprime mortgage market. (p. 144.) | Same. | Not defamatory.<br><br>No clear evidence of falsity.<br><br>No clear evidence of constitutional malice. |
| 25 | [T]hey watched Eisman grab Greg Lippmann, point to Wing Chau, and say, "Whatever that guy is buying, I want to short it." Lippmann took it as a joke, but Eisman was completely serious:  He wanted to place a bet specifically against Wing Chau.  "Greg," Eisman said, "I want to short his paper.  Sight unseen." Thus far Eisman had bought only credit default swaps on subprime mortgage bonds; from now on he'd buy specifically credit default swaps on Wing Chau's CDOs. (p. 144.) | Eisman told Lewis: after his dinner conversation with Chau, he told Lippmann, "Whatever that guy is buying, I want to short it," and "I want to short his paper.  Sight unseen."; and also told Lewis that, as a result of his dinner, he began to short CDOs for the first time by purchasing credit default swaps on CDOs. | Not actionable; protected as opinion.<br><br>No clear evidence of falsity.<br><br>No clear evidence of constitutional malice. |
| 26 | Upon their return they raised it [their short position in subprime mortgage bonds] to $550 million, with new bets against the CDOs created by Wing Chau.  With only $500 million under management, the position now overwhelmed their portfolio. (p. 159.) | | Not a statement by Eisman. |

{00496451;v1 }