# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

N.Y.S.D. Case #
11-cv-1333(GBD)

**MANDATE**

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 14th day of November, two thousand and fourteen.

Before:      Amalya L. Kearse,
             Ralph K. Winter,
             Richard C. Wesley
                  *Circuit Judge*s.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: December 24, 2014

Wing F. Chau, Harding Advisory LLC,

Plaintiffs - Appellants,

**JUDGMENT**
Docket No. 13-1217

v.

Michael Lewis, Steven Eisman, W.W. Norton & Company, Inc.,

Defendants - Appellees.

_____

The appeal in the above captioned case from a judgment of the United States District Court for the Southern District of New York was argued on the district court's record and the parties' briefs.  Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is AFFIRMED.

For The Court:

Catherine O'Hagan Wolfe,
Clerk of Court

*Catherine O'Hagan Wolfe* (signature)

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

*Catherine O'Hagan Wolfe* (signature)

**MANDATE ISSUED ON 12/24/2014**

13-1217
*Chau v. Lewis, et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————

August Term, 2013

(Argued: February 19, 2014    Decided: November 14, 2014)

Docket No. 13-1217

WING F. CHAU, HARDING ADVISORY LLC,

*Plaintiffs-Appellants*,

–v.–

MICHAEL LEWIS, STEVEN EISMAN, W.W. NORTON & COMPANY, INC.,

*Defendants-Appellees.*

————————

Before:

KEARSE, WINTER, AND WESLEY, *Circuit Judges*.

Appeal from a March 29, 2013 judgment of the United States District Court
for the Southern District of New York (Daniels, J).  Plaintiffs-Appellants Wing F.
Chau and Harding Advisory brought claims alleging libel against Defendants-
Appellees author Michael Lewis, his source, Steven Eisman, and Lewis's
publisher, W.W. Norton, for twenty-six allegedly defamatory statements in

Lewis's book *The Big Short*.  The district court granted Defendants' motions for summary judgment and dismissed each of Chau's claims.  We AFFIRM the district court's grant of summary judgment.

Judge WINTER dissents in a separate opinion.

> STEVEN F. MOLO (Robert K. Kry, Andrew M. Bernie, MoloLamken LLP, Washington, DC, *on the brief*), MoloLamken LLP, New York, NY, *for Plaintiffs-Appellants*.

> CELIA GOLDWAG BARENHOLTZ (Gabriel Rauterberg, Annika Goldman, *on the brief*), Cooley LLP, New York, NY, *for Defendants-Appellees Michael Lewis and W.W. Norton & Co., Inc.*

> DAVID A. SCHULZ (Michael D. Sullivan, Celeste Phillips, Paul Safier, *on the brief*), Levine Sullivan Koch & Schulz, LLP, New York, NY, *for Defendant-Appellee Steven Eisman*.

WESLEY, *Circuit Judge*:

Plaintiffs-Appellants Wing F. Chau and Harding Advisory LLC appeal from a March 29, 2013 judgment of the United States District Court for the Southern District of New York (Daniels, J) dismissing their claims of libel against Defendants-Appellees author Michael Lewis, his source, Steven Eisman, and Lewis's publisher, W.W. Norton, for twenty-six allegedly defamatory statements in Lewis's book *The Big Short*.  The district court granted Defendants' motion for summary judgment and dismissed each of Plaintiffs' claims.  We AFFIRM the district court's grant of summary judgment.

2

# BACKGROUND[1]

The United States' housing market collapse in 2008-2009 and the ensuing

global financial crisis are widely considered the worst financial disasters since

the Great Depression; their causes have been hotly debated.  One of the many

books that explore the genesis of the financial decline is *The Big Short: Inside the*

*Doomsday Machine*, written by Defendant Michael Lewis and published in 2010

by Defendant W. W. Norton.  A work of non-fiction, *The Big Short* looks at a

"small group of iconoclasts who 'shorted,' or bet against, the subprime mortgage

bond market at a time when most investors thought real estate prices would

continue to rise (*i.e.*, were 'long')."  One of the so-called "iconoclasts" described

in *The Big Short* is Defendant Steve Eisman, who managed a hedge fund and

served as one of Lewis's sources for the book.  Like many of Lewis's previous

books, a great number of which have dealt with business and financial topics,

*The Big Short* met with considerable success and spent 28 weeks on *The New York*

*Times* best-seller list.

Thankfully, we do not have to weigh in on the root of America's fiscal

crisis.  The task before us is much more focused: to determine whether one

---

[1] Unless otherwise noted, the following facts are largely taken from the parties' Rule
56.1 statements and are undisputed.

3

chapter of *The Big Short*—Chapter 6, titled *Spider-Man at the Venetian*—contains statements that are defamatory to Plaintiffs Wing Chau and his business Harding Advisory.

Chapter 6 comprises twenty-four pages of the 270-page, ten-chapter book, and one-third of that chapter focuses on a dinner conversation that took place in January 2007 at the Wynn Las Vegas Hotel during the 2007 American Securitization Forum. The dinner was notable in its design to introduce people who shorted the market to the people who went long. Eisman was in attendance and was seated next to Chau.

Chau, an "investment professional," is the founder and owner of Harding Advisory LLC. He received a BA in economics from the University of Rhode Island and an MBA from Babson College. After graduating from Babson, he spent the next twelve years of his career in structured finance. For five years, he worked as an analyst specializing in asset-backed securities at Salomon Smith Barney and Prudential Securities, then spent two years as a portfolio manager at New York Life Investment Management. With the experience he gained in asset-backed securities through his work at those firms, Chau set off on his own in 2006 and founded Harding Advisory. At the time of the January 2007 dinner,

Harding was a top-ranked manager of Collateralized Debt Obligations[2] (commonly known as "CDOs") and was on its way to issuing more asset-backed CDOs by volume than any other CDO manager.

*Spider-Man at the Venetian* recounts Eisman's interaction and discussions with Chau at that dinner and paints CDO managers in general, and Plaintiffs in particular, in a negative light. In response to this chapter's representations, Chau sued Lewis for writing, Norton for publishing, and Eisman for communicating to Lewis twenty-six allegedly defamatory statements (reproduced below). The district court granted summary judgment to Defendants, finding that none of the statements were actionable defamation because they either were substantially true, were not "of or concerning" Plaintiffs, were not reasonably susceptible to any defamatory meaning, or were mere opinions rather than assertions of fact. Plaintiffs now appeal, arguing that the court erred in most of its findings. For the following reasons, we affirm.

---

[2] Though largely irrelevant for purposes of this discussion, a CDO is a type of structured asset-backed security that evolved to encompass the mortgage and mortgage-backed securities market. Their ready availability and decline in quality is largely credited with fueling the subprime mortgage crisis.

## STATEMENTS AT ISSUE

These statements are as they appear in the book, except that the bolded language in each Statement is the language that was bolded by the district court in its decision.

1. When Eisman asked exactly what Harding Advisory advised, Wing Chau explained that he was a CDO manager. "**I had no idea there was such a thing as a CDO manager,**" said Eisman. "**I didn't know there was anything to manage.**"
   ("Statement 1"), *The Big Short* at 138.

2. He'd graduated from the University of Rhode Island, earned a business degree at Babson College, and **spent most of his career working sleepy jobs at sleepy life insurance companies**—but all that was in the past.
   ("Statement 2"), *Id.* at 139.

3. Danny didn't know Wing Chau, but when he heard that he was the end buyer of subprime CDOs, he knew exactly who he was: **the sucker.**
   ("Statement 3"), *Id.* at 139.

4. When they saw that Lippman had seated Eisman right next to **the sucker,** both Danny and Vinny had the same thought: *Oh no. This isn't going to end well.* Eisman couldn't contain himself. **He'd figure out the guy was a fool,** and let him know it, and then where would they be? **They needed fools; only fools would take the other side of their trades.**
   ("Statement 4"), *Id.* at 139.

5. Later, **whenever Eisman set out to explain to others the origins of the financial crisis, he'd start with his**

6

**dinner with Wing Chau.** Only now did he fully appreciate the central importance of the so-called mezzanine CDO—the CDO composed mainly of triple-B-rated subprime mortgage bonds—and its synthetic counterpart: the CDO composed entirely of credit default swaps on a triple-B-rated subprime mortgage bonds. "You have to understand this," he'd say. "**This was the engine of doom.**" He'd draw a picture of several towers of debt. The first tower was the original subprime loans that had been piled together. At the top of this tower was the triple-A tranche, just below it the double-A tranche, and so on down to the riskiest, triple-B tranche—the bonds Eisman had bet against. The Wall Street firms had taken these triple-B tranches—the worst of the worst—to build yet another tower of bonds: a CDO. A collateralized debt obligation. The reason they'd done this is that the rating agencies, presented with the pile of bonds backed by dubious loans, would pronounce 80 percent of the bonds in it triple-A. These bonds could then be sold to investors— pension funds, insurance companies—which were allowed to invest only in highly rated securities. It came as news to Eisman that **this ship of doom was piloted by Wing Chau and people like him.** ("Statement 5"), *Id.* at 140.

6. The guy controlled roughly $15 billion, **invested in nothing but CDOs** backed by the triple-B tranche of a mortgage bond or, as Eisman put it, "**the equivalent of three levels of dog shit lower than the original bonds.**" ("Statement 6"), *Id.* at 140.

7. **All by himself, Chau generated vast demand for the riskiest slices of subprime mortgage bonds,** for

which there had previously been essentially no demand. This demand led inexorably to the supply of new home loans, as material for the bonds. The soy sauce in which Eisman double-dipped his edamame was shared by **a man who had made it possible for tens of thousands of actual human beings to be handed money they could never afford to repay.** ("Statement 7"), *Id.* at 140–41.[3]

8. As it happened, FrontPoint Partners had spent a lot of time digging around in those loans, and knew that the default rates were already sufficient to wipe out Wing Chau's entire portfolio. "God," Eisman said to him. "You must be having a hard time." "No," **Wing Chau said. "I've sold everything out."** ("Statement 8"), *Id.* at 141.

9. It made no sense. The CDO manager's job was to select the Wall Street firm to supply him with subprime bonds that served as the collateral for CDO investors, and then to vet the bonds themselves. The CDO manager was further charged with monitoring the hundred or so individual subprime bonds inside each CDO, and replacing the bad ones, before they went bad, with better ones. That, however, was mere theory; in practice, the sorts of investors who handed their money to Wing Chau, and thus bought the triple-A-rated tranche of CDOs—German banks, Taiwanese insurance companies, Japanese farmers' unions, European pension funds, and, in general, entities more or less required to invest in triple-A-rated bonds—did so

---

[3] Plaintiffs quote Statement 7, but make no argument about it in their briefs, and fail to rebut Lewis's position that any claim vis-à-vis this statement has been abandoned. Therefore, we consider any claim related to Statement 7 to be abandoned.

precisely because they were meant to be foolproof, impervious to losses, and unnecessary to monitor or even think about very much. **The CDO manager, in practice, didn't do much of anything, which is why all sorts of unlikely people suddenly hoped to become one.**
("Statement 9"), *Id.* at 141.

10. **"Two guys and a Bloomberg terminal in New Jersey" was Wall Street shorthand for the typical CDO manager.**
("Statement 10"), *Id.* at 141.

11. **The less mentally alert the two guys, and the fewer the questions they asked about the triple-B-rated subprime bonds they were absorbing into their CDOs, the more likely they were to be patronized by the big Wall Street firms.**
("Statement 11"), *Id.* at 141.

12. The whole point of the CDO was to launder a lot of subprime mortgage market risk that the firms had been unable to place straightforwardly. **The last thing you wanted was a CDO manager who asked lots of tough questions.**
("Statement 12"), *Id.* at 141.

13. The bond market had created what amounted to a **double agent—a character who seemed to represent the interests of investors when he better represented the interests of Wall Street bond trading desks.**
("Statement 13"), *Id.* at 141–42.

14. To assure the big investors who had handed their billions to him that he had their deep interests at

9

heart, the CDO manager kept ownership of what
was called the "equity," or "first loss" piece, of the
CDO—the piece that vanished first when the
subprime loans that ultimately supplied the CDO
with cash defaulted.... **Now, almost giddily, Chau
explained to Eisman that he simply passed all the
risk that the underlying home loans would default
on to the big investors who had hired him to vet
the bonds.**
("Statement 14"), *Id.* at 142.

15. But the CDO manager was also paid a fee of 0.01
percent off the top, before any of his investors saw a
dime, and another, similar fee, off the bottom, as his
investor received their money back. That doesn't
sound like much, but, when you're running tens of
billions of dollars with little effort and no overhead,
it adds up. Just a few years earlier, Wing Chau was
making $140,000 a year managing a portfolio for the
New York Life Insurance Company. **In one year as a
CDO manager, he'd taken home $26 million, the
haul from half a dozen lifetimes of working at New
York Life.... His job was to be the CDO "expert,"
but he actually didn't spend a lot of time worrying
about what was in CDOs.**
("Statement 15"), *Id.* at 142.

16. **His goal, he explained, was to maximize the dollars
in his care. He was now doing this so well that,
from January 2007 until the market crashed in
September, Harding Advisory would be the
world's biggest subprime CDO manager.**
("Statement 16"), *Id.* at 142.

17. Among its other achievements, Harding had
established itself as the **go-to buyer for Merrill**

**Lynch's awesome CDO machine, notorious not only for its rate of production** (Merrill created twice as many of the things as the next biggest Wall Street firm) **but also for its industrial waste (its CDOs were later proven to be easily the worst).** ("Statement 17"), *Id.* at 142.

18. "He 'managed' the CDOs," said Eisman, "but managed what? I was just appalled that the structured finance market could be so insane as to allow someone to manage a CDO portfolio without having any exposure to the CDOs. People would pay up to have someone 'manage' their CDOs—**as if this moron was helping you. I thought,** *You prick, you don't give a fuck about the investors in this thing.*" ("Statement 18"), *Id.* at 142-43.

19. **Chau's real job was to serve as a new kind of front man for the Wall Street firms he "hired";** investors felt better buying a Merrill Lynch CDO if it didn't appear to be run by Merrill Lynch. ("Statement 19"), *Id.* at 143.

20. "Then he says something that blew my mind," said Eisman. "He says, '**I love guys like you who short my market. Without you I don't have anything to buy.**'" ("Statement 20"), *Id.* at 143.

21. That's when Steve Eisman finally understood the madness of the machine. He and Vinny and Danny had been making these side bets with Goldman Sachs and Deutsche Bank on the fate of the triple-B tranche of subprime mortgage-backed bonds without fully understanding why those firms were so eager to accept them. **Now he was face-to-face**

**with the actual human being on the other side of his credit default swaps.** Now he got it: The credit default swaps, filtered through the CDOs, were being used to replicate bonds backed by actual home loans. *There weren't enough Americans with shitty credit taking out loans to satisfy investors' appetite for the end product.* Wall Street needed his bets in order to synthesize more of them. **"They weren't satisfied getting lots of unqualified borrowers to borrow money to buy a house they couldn't afford," said Eisman. "They were creating them out of whole cloth. One hundred times over!** That's why the losses in the financial system are so much greater than just the subprime loans. That's when I realized they needed us to keep the machine running. I was like, *This is allowed?*"
("Statement 21"), *Id.* at 143.

22. Wing Chau didn't know he'd been handpicked by Greg Lippmann to persuade Steve Eisman that the **people on the other end of his credit default swaps were either crooks or morons,** but he played the role anyway.
("Statement 22"), *Id.* at 144.

23. Between shots of sake he told Eisman that **he would rather have $50 billion in crappy CDOs than none at all, as he was paid mainly on volume.**
("Statement 23"), *Id.* at 144.

24. **He told Eisman that his main fear was that the U.S. economy would strengthen, and dissuade hedge funds from placing bigger bets against the subprime mortgage market.**
("Statement 24"), *Id.* at 144.

12

25. But when the meal was over, they watched Eisman grab Greg Lippmann, point to Wing Chau, and say, "**Whatever that guy is buying, I want to short it.**" Lippmann took it as a joke, but Eisman was completely serious: **He wanted to place a bet specifically against Wing Chau.** "Greg," Eisman said, "I want to short his paper. Sight unseen." Thus far Eisman had bought only credit default swaps on subprime mortgage bonds; **from now on he'd buy specifically credit default swaps on Wing Chau's CDOs.**
("Statement 25"), *Id.* at 144.

26. **Upon their return they raised it to $550 million, with new bets against the CDOs created by Wing Chau.** With only $500 million under management, the position now overwhelmed their portfolio.
("Statement 26"), *Id.* at 159.

## DISCUSSION[4]

The parties and district court assume without discussion that New York substantive law applies to this defamation action. When a federal court sits in diversity, it applies the choice of law rules of the forum state, here New York. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "The parties' briefs assume that New York law controls, and such implied consent . . . is

---

[4] We review a district court's grant of summary judgment de novo, drawing all reasonable inferences and resolving all ambiguities in favor of the non-movant. *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013).

13

sufficient to establish choice of law." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d

133, 138 (2d Cir. 2000) (internal quotation marks omitted).

When deciding how to construe allegedly defamatory words—which

when written or in print constitute libel—courts must do so in the context of the

publication as a whole, not just the paragraph or chapter containing them, and

do so "in the same way that the reading public, acquainted with the parties and

the subject would take [them]." *Sydney v. Macfadden Newspaper Publ'g Corp.*, 242

N.Y. 208, 214 (1926).  In New York, a plaintiff must establish five elements to

recover in libel: (1) a written defamatory factual statement concerning the

plaintiff; (2) publication to a third party; (3) fault ; (4) falsity of the defamatory

statement; and (5) special damages or *per se* actionability.  *Celle v. Filipino Reporter*

*Enters.*, 209 F.3d 163, 176 (2d Cir. 2000).  On closer inspection, the first element of

these five is actually composed of multiple parts: there must be (A) a writing, it

must be (B) defamatory, it must be (C) factual—that is, not opinion— and it must

be (D) about the plaintiff, not just a general statement.  Issues B, C, and D take up

the bulk of our analysis in the present case, with the remainder dealing with the

falsity of the defamatory statement.  We find, for the reasons below, the twenty-

six statements at issue all fail to fulfill one or more of these elements, making

them unable to serve as the basis for a cause of action.  Accordingly, the district

court's grant of summary judgment to Defendants is affirmed.

## A. Statements that Simply Are Not Defamatory in Meaning

Not all (or even most) maligning remarks can be considered defamatory.  A

statement is defamatory if it exposes an individual "to public hatred, shame,

obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation

or disgrace, or . . . induce[s] an evil opinion of one in the minds of right-thinking

persons, and . . . deprive[s] one of their confidence and friendly intercourse in

society." *Kimmerle v. N.Y. Evening Journal, Inc.*, 262 N.Y. 99, 102 (1933).  A

statement, therefore, can meet all of the other elements of defamation—be

factual, published, false, and about the plaintiff—but still not be actionable if it

fails to rise to the necessary level of derogation.  To be actionable, therefore, the

statement must do more than cause discomfort or affront; the statement is

measured not by the sensitivities of the maligned, but the critique of reasonable

minds that would think the speech attributes odious or despicable

characterizations to its subject.

If a statement is susceptible to only a single meaning, the court must

determine, as a matter of law, whether that one meaning is defamatory.  *See*

*Aronson v. Wiersma*, 65 N.Y.2d 592, 593 (1985).  Of course, a statement or word is

often capable of more than one definition, and in that case, in New York, courts

employ an ordinary person standard to determine if that statement is

"reasonably susceptible [to] a defamatory connotation."  *James v. Gannett Co.*, 40

N.Y.2d 415, 419 (1976).

Statements 2, 8, 14, 23, 25, and 26 are not reasonably susceptible to a

defamatory connotation and are therefore non-actionable.  Statement 8, for

example, purports to quote Chau stating "I've sold everything out."  It is unclear

how such a quote, true or not, could produce hatred, shame, or contempt of

Chau or his business.  Perhaps it would give Harding's investors more

confidence if their money managers also had an equity stake in the investments,

but that they did not does not make the statement defamatory.  Statement 14,

which describes Chau as "almost giddily" telling Eisman that he had "passed all

the risk," is also non-defamatory: passing risk is the business of a money

manager, and we cannot characterize this as defamatory.  Moreover, Lewis's (or

Eisman's) characterization of Chau as "almost gidd[]y" is a subjective assessment

and an opinion.  This same logic applies to Statement 23.  Chau's statement that

he would "rather have $50 billion in crappy CDOs than none at all, as he was

16

paid mainly on volume" merely conveys a fundamental truth: $10 worth of a lousy security *is* worth more than none at all. Similarly, being paid on volume is a statement that is generally applicable to brokers, dealers, and firms. It is unclear how an ordinary reader would interpret this, in context, as defamatory.

Statements 25 and 26 are also not defamatory. Statement 25—which quotes Eisman, referring to Chau in saying, "[w]hatever that guy is buying, I want to short it" and seeking to place a bet specifically against Chau would not be interpreted by an average reader as defamatory. *James*, 40 N.Y.2d at 419. Chau's business—by its very nature—operated by having people to bet against. In this statement, Eisman is merely expressing his intention to bet against Chau—to short Chau's long. The same reasoning applies to Statement 26, which states that Eisman did in fact make new bets against the CDOs created by Chau. Chau correctly points out that Eisman never *actually* bet against Harding CDOs and that this sentence was removed from the tenth and subsequent printings of the book But even though this statement is conceded to be false, it cannot be considered defamatory for the same reasons as Statement 25: it would not be interpreted by an average reader as defamatory.

Statement 2—that Chau "spent most of his career working sleepy jobs at sleepy life insurance companies—but that was all in the past," followed by "He was newly, obviously rich"—was dismissed as non-actionable by the district court on the basis that it was non-factual and merely Lewis's opinion of Chau's career. We disagree in part with this reasoning, but not with the result. Chau spent only two years out of twelve prior to starting Harding, working at a life insurance company—certainly not "most" of his career, and Lewis himself conceded that this description of Chau's career was "incomplete." Because the "most of his career" part of the statement is concededly false, that part was improperly characterized by the district court as opinion. It is properly dismissed, however, because an ordinary person would not take the statement (albeit incorrect) in context to be sufficiently derogatory to make an actionable claim for defamation. The parry at the end of the statement in question—"but that was all in the past," along with the following assertion that "[Chau] was newly, obviously rich"—makes clear that "sleepy jobs at sleepy life insurance companies" is being contrasted with Chau's "new[]" and "obvious[]" wealth. Further, in this context, sleepy means a steady, typical job, or even at its most negative dictionary definition, a job having "little activity, quietly slowly

moving." *Webster's Third New International Dictionary* 2140 (2002). Such a

characterization is a statement of opinion, and it also does not rise to the odium

necessary to constitute defamatory meaning.

## B. Opinion

As mentioned above, only factual statements are actionable as defamation

or libel. This is because, in part, New York law protects derogatory statements

which may be categorized as "opinion" as opposed to "fact." *See Immuno AG. v.*

*Moor-Jankowski*, 77 N.Y.2d 235, 252 (1991); *Steinhilber v. Alphonse,* 68 N.Y.2d 283,

289 (1986). Determining whether a statement is an allegation of fact or mere

opinion is a legal question for the court. *Brian v. Richardson*, 87 N.Y.2d 46, 51

(1995). This is no easy task. Over time, New York courts have identified factors

to be considered in determining whether something is an expression of fact

rather than opinion; statements more likely to be characterized as fact are readily

understood by the reader to have a precise, unambiguous and definite meaning

and can be objectively characterized as true or false. *Steinhilber*, 68 N.Y.2d at 292.

As with defamation in general, courts make these assessments by looking at the

full context of the communication in which the statement appears, while also

considering the broader social context or setting surrounding the

19

communication.  *Id.*  Broader social context can include any particular customs or

conventions that could "signal to readers or listeners that what is being read or

heard is likely to be opinion, not fact."  *Id.* (internal quotation marks omitted).

But this is not necessarily the end of the analysis: if a statement is found to

contain opinion, the court must next determine whether the statement is "pure

opinion" (and thus non-actionable) or "mixed opinion" (and therefore

actionable).  Pure opinion is a "statement of opinion which is accompanied by a

recitation of the facts upon which it is based" or does not imply that it is based

on undisclosed facts.  *Id.* at 289-90.  Mixed opinion, on the other hand, is an

opinion that *does* imply a basis in undisclosed facts, or facts known only to the

author, and is actionable.  *Id.*

In the instant case, the district court correctly held that Statements 1, 3, 4, 5,

17, 18, 19, 21, and 22 are non-actionable opinions.  In the case of Statements 1, 18,

19 and 21, the use of phrasing such as, "I had no idea . . ." and "I didn't

know . . ." are particular customs or signals to readers that something is opinion,

not fact.  *Steinhilber*, 69 N.Y.2d. at 292.  Likewise, the epithets in Statements 3, 4, 5,

17, 19, 22—"sucker," "fool," "frontman," "industrial waste," "pilot[]" of the

"ship of doom," and "crooks or morons"—are hyperbole and therefore not

actionable opinion. *Id.* at 294; *see also Weiner v. Doubleday & Co., Inc.*, 535 N.Y.S.2d

597, 600 (1st Dep't 1988), *aff'd*, 74 N.Y.2d 586 (1989). While someone may not

appreciate being called a fool, it is an expression of one's view of another, and

moreover might not reflect reality: history has shown many "fools" to have

indeed been visionaries. Time may prove the insult misguided, but the insult is

not itself a fact—but rather, is one's perception of facts—at the time it is uttered.

### C. Not of and Concerning Plaintiff

In New York, a plaintiff cannot sustain a libel claim if the allegedly

defamatory statement is not "of and concerning plaintiff" but rather only speaks

about a group of which the plaintiff is a member. *Kirch v. Liberty Media Corp.*, 449

F.3d 388, 398 (2d Cir. 2006). As many of the statements concern "CDO

managers" generally, the district court correctly held that they are not "of and

concerning" Chau. This includes Statements 9, 10, 11, 12, and 13, which

respectively describe the "CDO manager's job;" the "typical CDO manager;"

"[t]he last thing you wanted [from] a CDO manager;" and the "double agent"

created by the bond market. Though Chau is described in the book as a CDO

manager, these statements are *solely* about the group.

### D. Substantial Truth

Falsity of a statement is needed to make out a claim of libel.  But in defamation law, as in life, determinations of fact and fiction are not zero-sum.  In New York, a statement need not be *completely* true, but can be *substantially* true, as when the overall "gist or substance of the challenged statement" is true. *Printers II, Inc. v. Prof'ls Publ'g, Inc.*, 784 F.2d 141, 146-47 (2d Cir. 1986) (citing *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369 (1977); *Fairley v. Peekskill Star Corp.*, 83 A.D.2d 294 (2d Dep't 1981)).

Statements 16, 20, and 24—which describe Plaintiffs' goal to "maximize dollars in [their] care;" their "love [of] guys who short [their] market" and Chau's "main fear . . . that the U.S. economy would strengthen" thus minimizing the number of people betting against the subprime mortgage market—are all completely or substantially true.  Plaintiffs' sole dispute with Statement 16, for example, is that the first part suggests that "maximiz[ing] the dollars in [Chau's] care" was Chau's *only* goal, which they state is false and defamatory.  But as the district court pointed out, this sentence does not imply that Chau was indifferent to his clients' interests.  This statement also lacks a defamatory meaning, as it merely alleges that Chau intended to expand his business.  Likewise, Statement

20, which includes Chau's supposed statement that he "love[s] guys like you who short my market. Without you I don't have anything to buy" is substantially true in content: one literally cannot take a long position without someone taking a corresponding short position. As with Statement 16, Statement 20 is also not defamatory, but rather reflects a reality of the market.

Parallel logic applies to Statement 24; Chau's entire business operated by having people to bet against. Bets are simply gambles that the result of an event—here, mortgage defaults that would devalue CDOs—will favor their side of the wager. While some may cringe at the thought of investing money as a gamble, such bets are the nature of much of the financial market and are especially the case with CDOs. Reducing risk by limiting a CDO to triple-A rated mortgage loans is merely placing the odds in favor of those who were long in the market. Thus, the statement is both substantially true and not reasonably susceptible to defamatory connotation.

### E. Combined Issues of Statements 6 and 15

Statement 6 discusses Plaintiffs' investment "in nothing but CDOs backed by the triple-B tranche of a mortgage bond," which Eisman characterizes as "the equivalent of three levels of dog shit lower than the original bonds." While the

"dog shit" comparison is a non-actionable epithetic opinion, Plaintiffs argue that

the characterization of Harding's CDOs as backed by *nothing but* triple-B

mortgage bonds is false. They contend that of Harding's "21 CDOs, eight were

high-grade, backed almost entirely by securities rated A-/A3 or better."

(Plaintiffs' Br. 43). The district court found the statement to be substantially true

and non-actionable, as all parties conceded that a significant portion of Plaintiffs'

collateral in CDOs was rated triple-B, and a majority was "non-prime." We find

it unnecessary to sort out the "fine and shaded distinctions" of Statement 6

because even if Chapter 6 had published the "truth" (according to Chau) that

38% of Harding's CDOs were backed by A-/A3 securities or better, the effect on

the reader would have been appreciably the same. *Fleckenstein v. Friedman*, 266

N.Y. 19, 23 (1934) (holding that false statements are not actionable if the

statement could have produced no worse an effect on the mind of the reader

than the publication of the truth pertinent to the allegation). Plaintiffs offered

nothing in their submissions to the district court (as reflected in the record) or in

their briefs before us that demonstrates to us the significant superiority of A-/A3

rated securities over triple-B rated securities such that the average reader would

come away with a different impression of Chau's business had Lewis published

the former and not the latter. This lack of proof is all the more telling considering this statement in the broad social context of the financial world at the time *The Big Short* was written. We are reminded that the various ratings assigned to bonds were ever changing and that market participants were continually coming up with new packages and terminologies to make their backings appear more attractive. Indeed, this is a major theme of *The Big Short*. Accordingly, Statement 6 is non-actionable.

We affirm the district court's assessment of Statement 15 as non-actionable for similar reasons. Plaintiffs rightly contend that the statement that Chau "took home $26 million a year" was false: Harding made $25 million in fees in 2007 and Chau personally received only a portion of that amount. But false statements as to Chau's income could have produced no worse an effect on the mind of the reader than the truth. *See Fleckenstein*, 266 N.Y. at 23. If indeed Chau spent only a negligible amount of time considering the quality of his CDOs, we doubt it matters whether he took home $26 million or a fraction of that amount, as conceded by Plaintiffs. Accordingly, Statement 15 is non-actionable.

### F. Chau's Argument of Fabricated Quotes as Defamatory

The "false attribution" of a quotation to a speaker may be defamatory if

putting the words in the plaintiff's mouth "cast[s] doubt on the plaintiff's fitness

for his profession." *Mahoney v. Adirondack Publ'g Co.*, 71 N.Y.2d 31, 38 (1987).

Such a "fabricated quotation may injure reputation" if "it attributes an untrue

factual assertion to the speaker" or if "the manner of expression or even the fact

that the statement was made indicates a negative personal trait or an attitude the

speaker does not hold." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 511

(1991). To survive a motion for summary judgment, a plaintiff who denies

making a statement that has been attributed to him must also demonstrate that

the statement, "when read in context, was . . . defamatory." *James*, 40 N.Y.2d at

419.

Chau denies having said portions of Statements 8, 14, 16, 20, 23, and 24 that

are attributed to him, either as direct quotes or in the form of a paraphrase. This

claim fails, because, as discussed above, Chau did not show that the Statements

were defamatory, or were not substantially true.

## CONCLUSION

Chapter 6 of *The Big Short* portrays Chau as starting out from a series of simple finance-related jobs to becoming the founder and principal of a financial firm managing CDOs, which provided him with what many Americans hope for—great wealth. The market events of 2008 and 2009 may undoubtedly influence one's perception as to whether going long on CDOs meant Chau was a fool, or Chau was a rube, or his motivations were avarice; but hindsight cannot give such opinions a defamatory meaning. Lewis's various implications that Chau was wrong about the mortgage market are not actionable.

The law of defamation in New York is predicated on the free exchange of ideas and viewpoints. That marketplace can wound one's pride—for words can offend or insult—but simple slights are not the stuff of defamation. The tort requires conduct that vilifies or exposes one to shame "in the minds of right-thinking persons." *Kimmerle*, 262 N.Y. at 102. Chau's feelings may be hurt but his claims were rightly dismissed by the district court.

The dissent presses for reversal because, it asserts, the majority opinion evaluates statements from *The Big Short* without regard for the context in which they were made. The dissent examines a "portrait [of] the context [of] the book's

27

portrayal of appellant" to conclude that the majority's view of *The Big Short* is not

"the sole meaning intended by the author or understood by the book's

readership." As the dissent recognizes, whether a statement is defamatory is a

fact issue for a jury only if the statement is "reasonably susceptible of a

defamatory connotation." *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985) (internal

quotation marks omitted). However, if a writing "is not susceptible of a libelous

meaning, then innuendo cannot make it libelous." *Tracy v. Newsday, Inc.*, 5

N.Y.2d 134, 136 (1959). The dissent's error is that it emphasizes the implication,

perceived tone, and innuendo of Defendants' writing, even though the

statements in question are either non-defamatory, privileged opinion, not of or

concerning Plaintiffs, or substantially true. We conclude that the statements are

not libel as a matter of law.

"Consideration of the circumstances and of the broader social context"

confirms our conclusion that *The Big Short* does not contain actionable

defamation. *Steinhilber*, 68 N.Y.2d at 294. The dissent highlights the fact that the

individual plaintiff has been "professionally shunned" since *The Big Short* was

published in 2010. It is understandable that Chau was displeased by a book that

laid a good share of the blame for the financial crisis at the feet of Wall Street

banks—and the advisors they chose to manage the CDOs—that collapsed so
spectacularly. Before the crash, Chau was a top manager of asset-backed CDOs.
By the time the book was published, every CDO managed by Chau was either in
default, liquidated, or downgraded to junk status, and his investors incurred
substantial losses that would damage any money manager's reputation. Our
dissenting brother exploits Chau's fate as context for his view that the
Defendants' writing did not have an "innocent meaning[]"; our view is that a
non-defamatory reflection on this disastrous chapter of our nation's financial
history would not necessarily have an "innocent meaning" for those depicted.

We have considered all of Plaintiffs' contentions on this appeal and have
found them to be without merit. For the reasons above, the judgment of the
district court is AFFIRMED as to all statements.

Chau v. Lewis, et al, 13-1217-cv

WINTER, Circuit Judge, dissenting:

I respectfully dissent.[1]

Michael Lewis's book describes appellant as admitting to acts that a jury could easily find

to have breached his obligations to investors in the fund that employed him and to have

constituted civil or criminal fraud.   Although the authority my colleagues cite demonstrates that

it is axiomatic that allegedly defamatory statements must be viewed by reading the document

as a whole, Sydney v. MacFadden Newspaper Publ'g Corp., 242 N.Y. 208, 214 (1926), their

conclusion that certain statements are not defamatory is reached only by evaluating those

statements in hermetic isolation from the context in which they were made.   They conclude that

certain statements can have only a single and non-defamatory meaning even where the book

clearly conveyed a different and defamatory meaning that was adopted by the book's readership.

And while opinions are protected so long as the facts underlying them are set forth or the opinions

---

[1] This being a dissent, I see no need to prolong matters by examining every statement alleged to be defamatory.   I will limit my remarks to what seem to me to be the most seriously defamatory allegations.

1

do not imply facts that can be disproved, see Steinhilber v. Alphonse, 68 N.Y. 2d 283, 289-92

(1986), my colleagues apply this rule in a fashion that renders opinions protected regardless

of implied facts.

a)  Overall Context

The chapter of the book at issue portrays CDO managers, in pre-crisis times, as selling

interests in funds holding portfolios of risk-laden derivatives, the value of which was dependent

on the value of residential mortgages.  The Big Short at 136-59.  The investors in these funds

relied on the managers to monitor the portfolios to reduce risk.  In the book's words, the

managers were paid "to select the Wall Street firm to supply [the] . . . bonds that served as

the collateral for CDO investors, [and to] . . . . monitor[] the hundred or so individual subprime

bonds inside each CDO, and [to] replac[e] the bad ones, before they went bad, with better

ones."  Id. at 141.

While the CDO managers purported to be trained specialists in such management risk,

they had little specialized knowledge.  Indeed, the chapter asserts that the less knowledgeable

2

Case 13-1133, Document 157-1, 12/24/2014, 1402741, Page33 of 33

the managers, the fewer questions that were asked of "the big Wall Street firms" that put the

various investment packages together, and the more likely those managers were to be patronized

by those firms.  Id.  While the CDO managers purported to manage, they actually did very little.

According to the book, the managers were actually indifferent to the risks because they were

paid by the volume of managed assets.  Id. at 142.  As it turned out, of course, the investors

were left with worthless interests, causing or contributing to the ensuing economic crisis.

This portrait is the context to the book's portrayal of appellant, to which I now turn.

b)  Context of Specific Defamatory Statements

A trier of fact could easily find the following.

Appellant is the only CDO manager mentioned by name in the relevant chapter of the

book and is depicted as the poster child for the CDO managers described above.  Appellant

is portrayed as lining his own pockets and foisting doomed-to-fail portfolios upon investors.

Although he was paid to monitor the amount of risk in the fund's portfolio, he worried only about

volume because he was paid by volume.  And, knowing that the default rate of residential

3

mortgages was sufficient to wipe out the fund's holdings, appellant sold all his interests in the fund, passing all the risk to the fund's investors, who believed he was monitoring that risk.   The portrayal of the appellant is particularly graphic because it purports to show his state of mind and his actions out of his own mouth.

The book states that appellant managed a fund controlling "roughly $15 billion, invested in nothing but CDOs backed by the triple-B tranche of a mortgage bond," described as "dog shit."   Id. at 140.   The book states that appellant had little training or background in CDO management because he had "spent most of his career working sleepy jobs at sleepy life insurance companies."   Id. at 139.   While appellant was paid to manage these investments to reduce risk, "he actually didn't spend a lot of time worrying about what was in CDOs."   Id. at 142.   Indeed, the book portrays appellant as not caring about how much risk was borne by the fund's investors.   Appellant is said to have stated that "he would rather have $50 billion in crappy CDOs than none at all, as he was paid mainly on volume."   Id. at 144.

Case 13-1151, Document 15-9, 12/24/2014, 1402741, Page35 of 35

Moreover, the book depicts appellant as believing that the fund's portfolio was so risky that he had taken all his personal wealth out of the fund.   When confronted by a dinner partner who knew that the rates of mortgage defaults were "already sufficient to wipe out [the fund's] entire portfolio," and who noted to appellant that he "must be having a hard time," appellant is quoted as responding, "No, . . . I've sold everything out."   Id. at 141.   Although the book states that CDO managers generally keep a piece of the investment so as to assure investors that the manager's interests are aligned with the investors, appellant is said to have "almost giddily . . . explained . . . that he simply passed all the risk [of] . . . default on to the big investors who had hired him to vet the bonds."   Id. at 142.   This statement thus portrays appellant as happily and knowingly putting his interests before those of the fund's investors whose interests he was paid to protect.

c)   The Merits

The book's author admits that he does not use a fact checker, and much of what the book says about the appellant is known even now (before a trial) as false.   For example,

5

appellant's fund did not manage "nothing but CDOs backed by the triple-B tranche of a mortgage

bond." Id. at 140. In fact, 38% of the assets were more highly rated. For another example,

appellant spent only two of his 12-year career at life insurance companies, sleepy or not, and

had substantial experience in CDO management. He did not make $26 million annually; his

income was one-tenth of that.

These falsehoods provide the scenic background for the portrayal of the appellant as

engaging in conduct that a trier of fact could find amounted to fraud in order to line appellant's

own pockets. This portrayal can be described as non-defamatory only by declining to view it

as a whole; by taking some of the statements and quotations entirely out of the context in which

they were made; by finding that some statements have only a single and non-defamatory

meaning when the book clearly intended a different and defamatory meaning, one adopted by

readers, or so a trier could find; and by labeling some statements as opinion without regard to

the facts that they imply.

Case 13-1151, Document 150, 12/24/2014, 1402/14, Page 37 of 44

For example, the chapter describes appellant as being paid vast sums "to be the CDO expert," id. at 142, and "to vet" the fund's portfolio, and in the book's words, to "monitor[] the . . . bonds inside each CDO, and [to] replac[e] the bad ones, before they went bad, with better ones," id. at 141.  However, the chapter states that in reality appellant "actually didn't spend a lot of time worrying about what was in [the] CDOs." Id. at 142.  The description of appellant as being paid $26 million by investors to monitor risk while deliberately not doing so is considered, without discussion, not to be defamatory by my colleagues.

The claim that appellant did not monitor the risk in the fund's portfolio is made even worse by the charge that he failed to do so in order to increase his fees.   Appellant is quoted as saying that he would "rather have $50 billion in crappy CDOs than none at all, as he was paid mostly on volume."  Id. at 144.  This remark is said by my colleagues to be non-defamatory because $10 worth of lousy stock (or $50 billion in crappy CDOs) is worth more than none at all.   That is not the single possible meaning of the quote; in fact, it is not even a plausible meaning.   The quoted remark was not that $50 billion is worth more than nothing; the plain meaning was that

a high volume of CDOs led to a higher income for appellant without regard to the increased peril

to investors.   The book does not portray investors as believing they were choosing between

(much less ended up with) $50 billion of crappy CDOs or nothing; they are portrayed as believing

they were investing in a fund with ongoing monitoring of its portfolio.   Instead, the book states

that the monitoring extended only to the maximizing of appellant's fees.   The book itself shows

no doubt about this point; the paragraph that describes appellant's indifference to investors' risk

quotes Eisman as thinking, "*You prick, you don't give a fuck about the investors* . . . ."   Id. at

143.

   As noted, the book erroneously describes the fund as holding "nothing but CDOs backed

by the triple-B tranche . . . ."   Id. at 140.   My colleagues find this falsehood to be irrelevant

because the "average reader" would not believe the difference between A-/A-3 rated securities

and triple-B-rated securities to be significant.   However, the book itself treats the distinction as

of great significance by quoting Eisman to the effect that the triple-B tranche of a mortgage is

"the engine of doom," id. at 140, and "the equivalent of three levels of dog-shit lower than the

8

original bonds." <u>Id.</u>  My colleagues inconsistently find these passages to be either not

defamatory because the average reader would know undisputed facts that render the statements

insignificant or opinions protected because the facts cannot be disproven.[2]

The book goes further and portrays appellant as knowing the risk had become so great

that he took his personal wealth out of the fund.   The assertion that "I've sold everything out,"

<u>id.</u> at 141, is regarded by my colleagues as non-defamatory.   This view simply ignores the

context in which the purported statement was made:   in response to a question of whether

appellant was having a hard time because the mortgage default rate was so great as to wipe

out the fund's entire portfolio.   One could as easily say that a statement that a person took

money handed him by a bank teller is not defamatory because one can ignore a prefatory

statement about a concealed firearm and hold-up note.

---

[2] Perhaps the book's 28-week presence on the <u>New York Times</u>'s best-seller list was due to sales to below-average readers.

The book's statement that the appellant had "almost giddily" made about "pass[ing] all

the risk . . . to the big investors who had hired him to vet the bonds," id. at 142, is held to be

non-defamatory again only by ignoring the context.   The inference clearly intended by the author

was that appellant was well aware of the risks of "crappy CDOs," id. at 144, and concluded that

they were too great for him to take personally.   My colleagues find this non-defamatory because,

they say, passing risk is the business of money managers; but the book alleges far more than

informed risk passing.   It describes the appellant as not doing the monitoring of risk he was paid

to do, privately caring only about volume rather than reducing risk because he was paid by

volume, and, as he learned of the growing number of defaults in amounts that wiped out the

fund's portfolio, selling his interests in the fund to pass all risk on to buyers who were deceived

into believing that the risk was being vetted.   This description could easily serve as the opening

statement in a civil or criminal fraud trial.   See Capital Mgmt. Select Fund Ltd. v. Bennett, 680

F.3d 214 (2d Cir. 2012) ("Private actions may succeed under Section 10(b) if there are

particularized allegations that the contract itself was a misrepresentation, i.e., the plaintiff's loss

10

was caused by reliance upon the defendant's specific promise to perform particular acts while never intending to perform those acts.").   Appellant's purported statements would then provide the evidence of knowing fraud.   Id.   However, my colleagues' view that only innocent meanings could as a matter of law be found by a trier of fact would render the admissions irrelevant.

The book's use of the adverb "giddily" in modifying appellant's purported description of his conduct suggests glee at accomplishing the fraud.   My colleagues find this use as protected opinion because it does not imply facts that can be disproven.   The book's use of the word "giddily" does not purport to be a quotation from Eisman, and my colleagues state that it is protected whether the opinion is Eisman's or Lewis's.   "Giddily" in my view implies an observable, describable, physical manifestation that either occurred or did not, i.e., a provable event.   However, even conceding that the issue may be close with regard to Eisman's opinion, the issue is not at all close if it is Lewis's opinion.   Such an opinion surely implies first-hand observation, and Lewis was admittedly not present at the conversation.

11

As my colleagues point out, a statement is defamatory if it exposes the individual "to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace . . . ." Kimmerle v. N.Y. Evening Journal, 262 N.Y. 99, 102 (1933). Whether a statement is defamatory is an issue of fact to be determined by a jury if it is "reasonably susceptible [to] a defamatory connotation." Davis v. Ross, 754 F.2d 80 (2d Cir. 1985) (quoting James v. Gannett Co., 40 N.Y. 2d 415, 419 (1976)). Appellant has offered, in his opposition to summary judgment, evidence that since The Big Short was published, he has been professionally shunned as a result of its defamatory statements. For example, prior to the publication of the book, appellant was involved in marketing two real estate investment funds. However, because of the book, appellant's business partners, fearing that his involvement would discourage investors, asked appellant to step aside. Moreover, since November 2011, appellant was the Chief Financial Officer of a company that developed communications platforms. After several potential investors voiced concerns about appellant based on the book, the CEO asked appellant to step down from his role. This is sound evidence

12

that the innocent meanings adopted as a matter of law by my colleagues are hardly the sole

meaning intended by the author or understood by the book's readership.

Were the statements attributed to appellant described above introduced in a civil or

criminal fraud trial in which he was the defendant, they would not be excluded on relevance

grounds.   And if the claims made by the book were proven in such a trial, we would unanimously

affirm by summary order admission of the statements and a resultant judgment against appellant.

I, therefore, respectfully dissent.

# UNITED STATES COURT OF APPEALS
# FOR THE
# SECOND CIRCUIT

_____

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 11th day of December, two thousand and fourteen.

_____

Wing F. Chau, Harding Advisory LLC,

Plaintiffs-Appellants,

v.

Michael Lewis, Steven Eisman, W.W. Norton & Company, Inc.,

Defendants-Appellees.

_____

**STATEMENT OF COSTS**

Docket No. 13-1217

IT IS HEREBY ORDERED that costs are taxed in the amount of $962.40 in favor of Defendant-Appellee Steven Eisman.

For the Court:

Catherine O'Hagan Wolfe,
Clerk of Court

